reasonable doubt. See, jury instructions in Joint Appendix Vol. IV, p. 1205

(". . . the state of Ohio must prove to you and each of you beyond a

reasonable doubt the truth of all averments necessary to be proven to

constitutes [sic] the crime charged herein"). The averment that Palmer

have the "specific intent to cause the death of another" was not contained

in the indictment. As a result, the jury was not required to find that element

beyond a reasonable doubt. Absent a finding beyond a reasonable doubt

that the defendant "specifically intended to cause the death of another", the

evidence was insufficient to establish that the defendant is guilty of the

offense of aggravated murder under *Winship*. Therefore, the defendant has

only been convicted of the lesser included offense of murder. Thus, the

remedy is that the defendant be re-sentenced to the term of imprisonment

prescribed for the offense of murder under R.C. § 2903.02.

2.    **THIRD CLAIM FOR RELIEF: PETITIONER OBJECTS TO THE MAGISTRATE JUDGE'S RECOMMENDATION DENYING RELIEF AS TO PETITIONER'S CLAIM THAT THE FAILURE OF THE TRIAL COURT, BELMONT COUNTY COURT OF APPEALS AND THE OHIO SUPREME COURT TO FIND THAT THE STATE PROSECUTOR ENGAGED IN PREJUDICIAL MISCONDUCT IN THE AREAS LISTED BELOW CONSTITUTES AN UNREASONABLE APPLICATION OF THE CONCLUSIONS OF LAW ANNOUNCED IN *BERGER V. UNITED STATES,* AND PREJUDICED PETITIONER IN BOTH THE GUILTY AND PENALTY PHASES OF HIS TRIAL.**

19

The Constitution vests grave powers in a prosecutor seeking the death penalty.  The constitutional corollary is that the prosecutor also assumes the obligation to refrain from improper methods calculated to produce a wrongful conviction or penalty.  In *Berger v. United States*, 295 U.S. 78 (1935), the United States Supreme Court held that,

> It is as much his [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Where the prosecutorial misconduct is "so egregious as to render the entire trial fundamentally unfair" the due process rights of the criminal defendant have been violated.   *Gall v. Parker*, 231 F.3d 265, 311 (6th Cir. 2000).  Petitioner demonstrates below that the number and serious nature of the acts of prosecutorial misconduct in this case render the trial fundamentally unfair and require this Court to grant the habeas corpus relief sought by Petitioner.

## A.    Magistrate Judge's Recommendation Regarding Prosecutor's Use of Highly Prejudicial "Other Acts" Evidence During the Guilt Phase. (Claims 3.2, 3.3, 3.4 3.9, 3.10)

The Magistrate Judge recommends rejecting this claim by finding that the record does not support a incorrectly finding that "the state court's

resolution of the issues presented in claims 3.2, 3.3, 3.9 and 3.10 was

contrary to clearly established federal law. . ."  The Magistrate Judge also

commits error regarding 3.4 by implicitly reaching the same conclusion.

(Doc. 103, pp. 31-34).[1]

## B.    Prosecutorial Misconduct in Guilt and Penalty Phases Entitles Petitioner to Relief

### 1.    Prosecutor Engaged in Several Acts of Misconduct During the Trial Phase (Claims 3.2, 3.3, 3.4, 3.9, 3.10)

The prosecutor repeatedly introduced irrelevant, incompetent and

highly prejudicial testimony and evidence which was designed simply to

inflame and impassion the jury to reach a verdict not based on the conduct

for which Mr. Palmer was charged, but based on innuendo, unsupported

opinion and the perceived character of the Defendant. [2]

For example, the prosecutor repeatedly referred to an alleged dispute

between George Goolie and the Petitioner relating to Petitioner's ex-wife.

During opening statement, the prosecutor made references to the effect

that Mr. Palmer was in the area of the shootings for the burglarizing the

_____

[1] This Court has previously found that this ground has not been procedurally defaulted.  (Decision, Doc. 61, adopting Report and Recommendation, Doc. 50, where the Court found that no procedural default defense had been raised as to this Claim for Relief.  (Doc. 50, p.10).  And see Doc. 103, pp. 24-25, 32.

[2] It is undisputed that Petitioner had no other criminal record.

21

home of George Goolie, an offense for which he was never charged. (Tr. p. 751). During the trial, the prosecutor was allowed to ask Deputy Thompson to testify that Petitioner and Eddie Hill drove past Goolie's trailer and his place of employment, and that Goolie's trailer was located one-quarter mile from where the decedent's body was found. Deputy Thompson was also permitted to testify that Palmer had told him that he was in the area to rob Mr. Goolie. (Trial Tr. p. 847, 867). In the same vein, the prosecutor elicited testimony from a friend of one of the decedents that the two decedents were asked by Goolie to watch his trailer because of past burglaries, implying that Petitioner was the one who had burglarized Goolie's trailer. (Trial Tr. pp. 840, 924). The prosecutor also elicited from Mr. Goolie his unfounded assertion that Petitioner had called Petitioner's ex-wife at Mr. Goolie's house regarding non-support of two of his children. (Trial Tr. pp. 970, 972, 975).

To further inflame the passions of the jury, the prosecutor asked and was permitted to have Mr. Goolie testify that on the day subsequent to the alleged offenses, Mr. Palmer called Goolie and said something to him about "performing sexual acts with me and something to the extent he

wanted to kill me afterwards." (Trial Tr. p. 972).[3] Consistent with this highly prejudicial and irrelevant line of questioning, the prosecutor accused Petitioner during cross-examination of hating Mr. Goolie and wanting to go to his place to rob him and kill him. (Trial Tr. p. 1127). Again, these completely speculative accusations came into evidence although Mr. Palmer had never been charged with any offenses relating to any of the unsupported assertions.

During the trial, the prosecutor insisted on pursuing other equally prejudicial and irrelevant avenues of evidence. For example, Sergeant Hawthorne was asked to testify that on May 7 and the early morning of May 8, he saw a car, implied to be Petitioner's car, in a parking lot of a local motel and noted that there had been a lot of theft in that area. This testimony was designed to and did create the baseless inference the Petitioner engaged in theft in that area. (Trial Tr. pp. 932, 935). Adding to the prejudice to Petitioner, the prosecutor called as a witness for the State

---

[3] The Magistrate Judge relies on the fact that the trial court later sustained an objection to this evidence, (Doc. 103, p. 28, citing Trial Tr. p. 1054). This "correction" was, to say the least, belated as it came the week after the testimony came in (Trial Tr. p. 1054). In ant event, the harm had already occurred. As the "'The naive assumption that prejudicial effects can be overcome by instructions to the jury ... all practicing lawyers know to be unmitigated fiction.' "*Burgett v. Texas,* 389 U.S. 109, 115, f.n.7 (1967), quoting, *Krulewitch v. United States,* 336 U.S. 440, 446 (1949) (Jackson, J., concurring). This admonition is particularly true here where the jury is allowed such a lengthy period of time to consider the prejudicial evidence and where so much similar prejudicial testimony and argument is permitted for jury consideration.

a Mr. Kiss who, in response to the prosecutor's questions, was allowed to testify that on May 8 he was being followed by a brown car to his home and which turned around in the driveway next to him, and that the persons in the car yelled something at him.  His testimony was admitted by the prosecutor to infer that Petitioner intended to rob and harm Mr. Kiss.  (Trial Tr.  pp. 940-942).  Similarly, the prosecutor called two gas station attendants and elicited from them that, on the dates of the shootings, on two separate occasions, the Petitioner and Mr. Hill came into the service station and were acting "suspiciously."  Indeed, the prosecutor had one of the attendants offer what can only be described as pure speculation, that Petitioner and Mr. Hill were acting like they were "casing the place."  (Trial Tr.  pp.945-948, 953-957).  In fact, Petitioner and Hill had done nothing more than purchase pop and gasoline.  (Trial Tr.  pp. 1089-1090).

The prosecutor's improper motive and intent became clear during closing argument where he capitalized on the totally inappropriate "other bad acts" evidence.   In his initial closing remarks the prosecutor tells the jury to consider the following utterly speculative "other bad acts" from which to infer prior calculation and design to kill Mr. Sponhaltz and Mr. Vargo:

- "[D]efendant didn't much care for George Goolie.  He didn't care for the way George had treated his ex-wife . . .

24

- The defendant formed the intent to do something unlawful or criminal to George Goolie. He told Detective McMenemy . . . that he was going to rob George. . . .

- A very reasonable inference you can draw from this fact is that defendant was going to do more than just burglarize George's house. The evidence shows that his intention was to do something harmful to George. . . .

- It doesn't take a great leap of logic to figure from that fact and from the fact that he passed up an opportunity to burglarize the home . . . and went looking for George with a loaded .22. It doesn't take any tremendous leap of logic **to figure out what his real intentions were** . . ."  (Emphasis added).

(Trial Trial Tr. p. 1148-1149).

The prosecutor then directs the jury to assume, without any basis, that the Petitioner was also intending to kill Larry Kiss. "[Defendant and Hill] followed Larry Kiss all the way . . . . to his home . . . I think Mr. Kiss can be thankful that he made it to his driveway before there was any kind of traffic accident." (Trial Trial Tr. p. 1149). The Prosecutor continues to taint the jury with fabricated facts unrelated to the charges against Petitioner by arguing states, "the guys at the gas station, they were very lucky they weren't **robbed and killed."** (Emphasis added). (Trial Trial Tr. p. 1198). The prosecutor then improperly argues to the jury:

"we know pretty much what he did, and from that you good

25

people **are permitted to infer what was going on in his mind** at the time he did it.  All of this we have been over and over what was their original purpose regarding Goolie and the loaded gun circling Goolie's . . .  like birds of prey going in for the kill."

 (Trial Tr.  pp. 1148, 1198, 1200).

It is important to note that the prejudicial effect of the prosecutor's act and conduct during the trial in closing argument was exacerbated by the failure of the Court to properly instruct the jury that they could not base an inference on another inference.[4]  Exploiting his misconduct, the prosecutor told the jury,

> No matter what anyone tells you, you alone have the power to put those facts together and draw the necessary and reasonable inferences.   No one can tell you that you can or cannot draw a certain inference if you feel beyond a reasonable doubt, if you know in your heart that this is the necessary and probably inference to draw from all of the evidence.  It is clear that all the reasonable inferences that any rational person can draw point to no other conclusion and that Petitioner is guilty as charged of all counts and all specifications.

(Trial Tr.  pp. 1159-60).  In short, the prosecutor invited the jury to infer from this "other bad acts," evidence which included purely speculative opinions about intent to kill and rob other people, and the characterization

---

[4] See Argument as to Seventh Claim for Relief, pp. 85-92  below.

of Mr. Palmer's motives relating to people other than the victims, were designed to do nothing more than poison the mind of the jury by convincing them that Mr. Palmer was a man who was simply bent on robbing and killing anyone in sight. (See especially, ". . . he would have killed any number of people who came along. . ." Trial Tr. 1154)

The Magistrate Judge accepted the state courts' interpretation of this evidence as simply showing "intent, scheme, or plan to commit the offenses." (Doc 103, p. 27). The state courts' interpretation of this highly prejudicial use of such other acts evidence is objectively unreasonable. Mr. Palmer's being driven by Goolie's empty house cannot provide a logical connection to a scheme of killing and robbery. To note the obvious, if Palmer were interested in robbing and killing that day he surely would have exploited the opportunity when he passed by Goolie's empty trailer. He passed up other opportunities when he and Hill pulled up next to Mr. Kiss mistaking him for a friend; when they stopped momentarily at the Knight's Inn; when they stopped to purchase a fifth of Southern Comfort at the state liquor store; and when they stopped at the gas station to buy pop and gas. The fact is, nothing happened at any of those locations, no burglaries, no robberies, no assaults, no threats, no objective misconduct

27

of any kind. And yet that evidence of "other bad acts" was permitted to be used by the prosecution to prove prior calculation and design for the shootings of two individuals who the prosecution concedes were strangers,[5] and whose shootings would not have occurred but for an unforeseeable tragic accident occasioned by Hill's negligence in operating the vehicle. There is no authority for the admission of such tangential and irrelevant evidence to be used in such a prejudicial fashion.

During the penalty phase, the prosecutor continued his character assassination of Petitioner through reference to and evidence of other acts. (Claim 3.19, 3.20) For example, in cross-examining Mr. Palmer's ex-wife, Cammy Palmer, the prosecutor offered into evidence the affidavit filed by Mrs. Palmer in her divorce action with Petitioner. This affidavit was totally irrelevant to the mitigation phase issues and included unsubstantiated and otherwise incompetent statements regarding Mr. Palmer's efforts to attempt to kill his ex-wife, blowing up her car, burning down the marital residence, and threatening to kill his daughter and bury her.

The affidavit used by the prosecutor also made reference to allegations that Mr. Palmer tried to "run his ex-mother-in-law off the road."

---

[5] Trial Trial Tr. p. 1196

28

The affidavit also made unsubstantiated references to alleged sexual advances Mr. Palmer made toward his ex-mother-in-law.  It contained unsupported allegations that Mr. Palmer beat his ex-wife, beat his children and sexually molested his children.  These bizarre, outrageous and conclusory assertions in a divorce proceeding affidavit utterly lacked any evidentiary support or foundation and did not relate in any way to the mitigation evidence offered by Mr. Palmer.   (Mit. Trial Tr.  pp. 122-126).  Again, the prosecutor compounded this intentional error by arguing it to the jury in his efforts to convince the jury to return a recommendation of death.  He repeats the baseless allegations that were contained in that affidavit, including in his recounting some of the content of the affidavit.

> . . . not only was he going to kill her [Cammy
> Palmer], hang himself, blow up her car, burn her
> house down, kill her daughter and bury her . . . .

(Mit. Trial Tr.  p. 153).  The prosecutor also reminds the jury of the speculation regarding Mr. Palmer's motives toward Mr. Goolie and repeats the misconduct that occurred during the trial phase as established above.  He tells the jury that "our [the prosecutor and the jurors] instincts were pretty good.  Our instincts were pretty good about why the defendant was there . . . we had the right instincts there that he was there to hurt George.

That's the background of the case.  The background and circumstances of the case, he was there to even the score." (Mit. Trial Tr.  p. 145).  None of this evidence of other acts was competent or relevant.  Yet the prosecutor insists on beating them like a drum before the jury during closing argument.  If the jury would not sentence him to death for the shootings of Mr. Vargo and Mr. Sponhaltz alone, then the prosecutor clearly wanted to sentence him to death because of Mr. Palmer's purported evil character as evidenced by the prosecutor's persistence in introducing irrelevant and prejudicial material regarding purported other acts committed by Petitioner.

The prejudice occasioned by such misconduct cannot be overstated: considering the critical nature of the sentencing phase.

> The term 'unfair prejudice,' as to a criminal defendant, [as] speak[ing] to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged ... Such improper grounds certainly include ... generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged.

*Coleman v. Ohio Adult Parole Authority* 118 Fed.Appx. 949, 951 (6th Cir., 2004).  Such prejudice is precisely what occurred here.  In *Coleman* the prosecutors reference to the defendant's prior conviction for drug trafficking deprived him of due process and resulted in the Court granting the writ. *Id.*

at 951-952. The same result should occur here.

### 2.   Prosecutor Engaged in Misconduct by Misstating the Law in Closing Argument (Claims 3.5, 3.6, 3.8)

To compound this constitutional misconduct, the prosecutor consistently misstated the law to the jury during closing argument.  The prosecutor effectively misstated the law regarding prior calculation and design by suggesting that the instantaneous act or deliberation of simply pulling back the hammer on the trigger would be sufficient to establish the prior calculation and design specification for aggravated murder.  (Trial Tr. pp. 1152-53, Claim 3.5).[6]  As Petitioner demonstrates in his Second Claim for Relief,[7] based on the undisputed record in this, each of the prior calculation and design factors set out in *State v. Taylor*, (1997),78 Ohio St.3d 15, 19, must be answered in the negative: (1) there was no evidence that Petitioner knew either of the victims; (2) there is no evidence that Petitioner knew he would encounter two strangers through the fortuity of an

---

[6] The Magistrate Judge is in error in finding claim 3.5 was procedurally defaulted.   The Court previously made a specific finding that no procedural default defense was raised as to this claim.  (See Decision, Doc. 61, adopting Report and Recommendation, Doc. 50, where the Court found that no procedural default defense had been raised as to this Claim for Relief.  (Doc. 50, p.10).   Thus, the Court must address the merits of this claim.

[7] See pages 2 through 15, above, addressing the Second Claim for Relief demonstrating the absence of evidence of prior calculation and design, thus confirming the impropriety of the prosecutor's argument.

auto accident with a vehicle he was not driving and thus could not have given prior thought to either a murder weapon or a site; and (3) as Justice Pfeiffer noted the event was spur of the moment decision. *Id.,* quoting in part *State v. Jenkins,* (1976), 48 Ohio App.2d 99, 102. The "studied and plan" required by Ohio law was intentionally ignored in the prosecutor's closing argument.  Indeed, as the Magistrate Judge properly notes, the Court of Appeals found that the prosecutor did, in fact, misstate the law regarding this fundamental element of the offense.  (Doc. 103, p. 36)  It follows that under the *Taylor* and *Jenkins* decisions, the element of prior calculation and design is not supported by record, and the jury was intentionally misled by the prosecutor to conclude otherwise.   Thus, "every fact necessary to constitute the crime with which [Petitioner] has been charged" has not been established beyond a reasonable doubt in violation of Petitioner's right to Due Process. *Jackson v. Virginia,* 443 U.S. 307, 315 (1979). The prosecutor's argument which misstate's Ohio' well established law regarding  prior calculation and design necessarily contravenes the Due Process constraints announced in *Jackson* and cannot be fairly considered harmless.

Additionally, the prosecutor improperly directed the jury that they

could return a verdict of guilty for aggravated murder regardless of the

sequence in which the alleged robbery and killing occurred, thus giving the

jury the incorrect impression that the formation of intent to rob and

aggravated robbery could happen after the killing rather than

contemporaneous with the deaths of the victims.  (Trial Tr.  p. 1156) (Claim

3.6).[8]

The elements of aggravated robbery are set forth in ORC 2911.01 as

follows:

> (A) No person, in attempting to commit a theft
> offense, as defined in Section 2913.01 of the
> Revised Code, in fleeing immediately after such
> attempt or offense, shall do either of the following:
>
> (1) Have a deadly weapon or dangerous ordinance,
> as defined in Section 2923.11 of the Revised Code,
> on or about his person or under his control;
>
> (2) Inflict, or attempt to inflict serious physical harm
> on another.

The unambiguous language of the statute requires that the underlying

elements (having a deadly weapon or dangerous ordinance or inflicting or

attempting inflict serious physical harm) occur simultaneously with the theft

or the attempt to commit theft.  The absence of any ambiguity in this regard

---

[8] The Magistrate Judge correctly found that there was no procedural default and no adjudication
by the State Courts on the merits and is thus subject to *de novo* review here. (Doc. 103, p.37)

is reinforced by the decisions of the Ohio courts interpreting the statute.

> Under ORC 2911.02, the elements of robbery ***must
> occur simultaneously*** in order for the offense to
> occur.  Therefore, the state must prove that the
> accused's intent to deprive the owner of the
> property, as well as the actual taking (elements of
> the theft offense), ***coincided in point of time with
> the force or threat of force*** used in committing the
> theft offense, or in fleeing thereafter.  (Emphasis
> added).

*State v. Ballard*, (1984), 14 Ohio App.3d 59, syllabus, para. 1.  In *State v.
Campbell*, (1998), W.L. 827601, the defendant had been charged with
physically assaulting the victim who immediately left the scene of the
assault to wash her eyes of mace that was sprayed by defendant's
companion during the assault.  It was charged that defendant had taken
her coat immediately after the assault and left the scene.  In rejecting the
robbery charge, the Court of Appeals held,

> Furthermore, the state failed to prove that
> defendant stole the victim's coat in the course of
> slapping the victim.  The ***elements of robbery did
> not occur simultaneously*** as required by ORC
> 2911.02.

*Id.* at *3.  There is not substantive distinction between the facts of this case
and the facts set out in *Ballard* and *Campbell*.

In the case at bar, it is undisputed that the events surrounding the

34

taking of the victim's possessions occurred after and were totally unrelated to the use of force. Indeed, the only fair conclusion was that the taking of the personal possessions of the victim occurred in an effort to delay apprehension. The state offered no evidence to contradict the defendant's testimony that the shootings occurred during the altercation over the car accident and had nothing to do with any intent on the part of Petitioner and Mr. Hill to rob either of the victims. The State offered no evidence to contradict Mr. Palmer's testimony that he did not know that Mr. Hill was disposing of some of the items belonging to the victim. (Tr. p. 1103-05). Mr. Hill told Mr. Palmer that if he disposed of the items, that the victims would not be identified as quickly and they would have time to get back to Columbus. (Tr. p. 1105). There was never any discussion about robbing either of the victims during or before shootings. (Tr. p. 1104). It is clear, therefore, that the taking of the personal possessions of the victims occurred as an afterthought to delay apprehension.

In any event, it is undisputed that the taking of the possessions did not occur simultaneously with the use of force. Consistent with the clear language of ORC 2911.01 and the Ohio Court's interpretation of that statute in *Ballard* and *Campbell*, there is simply no evidence that can

35

support Mr. Palmer's conviction on either count of aggravated robbery.

The prosecutor's misstatement of Ohio on this issue, necessarily invites

the jury to convict for a crime regarding which an element has not been

established beyond a reasonable doubt.  This contravenes a fundamental

principle of Due Process. *In Re: Winship,* 397 U.S. 358, 364, (1970).  The

cumulative effect of all incidents of prosecutorial misconduct compels the

conclusion that the errors may not be constitutionally considered harmless.

The misconduct here has "so infected the trial with unfairness as to make

the resulting conviction a denial of due process.'" *Darden v. Wainright*,

477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo,* 416 U.S. 637

(1974). See *Berger v. U.S.,* 295 U.S.  at 89.

 The prosecutor argued to the jury that they have some form of duty to

convict the Plaintiff.  "Mr. Palmer must be held legally accountable by you

for the confusion he himself created that day. ***It is your duty to see that***

***he is.***" (Emphasis added). (Trial Tr.  p. 1200). In *U.S. v. Sanchez,* 176

F.3d 1214, 1225 (9th Cir. 1999) the Court of Appeals reversed a conviction

for various acts of prosecutorial misconduct including improper use of prior

bad acts in impeaching witnesses and for improper argument.  Among the

issues addressed by the Court was the prosecutor improper invocation of

the jury's civic duty to convict.  The Court noted, "the prosecutor did not tell the jury that it had a duty to find the defendant guilty only if every element of the crime had been proven beyond a reasonable doubt. Nor did he remind the jury that it had the duty to acquit Sanchez if it had a reasonable doubt regarding his guilt." The constitutional defects exist here.  *See also,* *Spears v. Mullin,* 343 F.3d 1215, 1247 (10th Cir.2003) *cert denied sub nom., Powell v. Mullin,* 541 U.S. 909 (2004), (quoting *Viereck v. United States,* 318 U.S. 236, 247-48 (1943)( "It is error for a prosecutor to exhort a jury to reach a guilty verdict based 'on the grounds of civic duty.'"). Again, the cumulative effect of this misconduct when added to multiple incidents reviewed above compels a finding that the misconduct violated Petitioner right to a fundamentally fair trial. *Berger v. U.S.,* 295 U.S.  at 89*; Darden v. Wainwright*, 477 U.S. at 181.

**C.    The Prosecutor Continued Improper Prejudicial Use of "Other Bad Acts" Evidence and Argument in the Penalty Phase (Claims 3.19, 3.20)**

During the penalty phase, the prosecutor continued his character assassination of Petitioner through reference to and incompetent evidence of other criminal acts for which Petitioner.  The Magistrate Judge incorrectly finds that these claims are procedurally defaulted as they were

not presented to the state courts as penalty phase errors.  (Doc. p. 55).
This is error.

## 1.    These Claims are not Procedurally Defaulted

Petitioner presented to the state courts very specific examples of
prosecutorial misconduct to support his federal constitutional claim that he
was denied a fair trial and thus denied Due Process of law.  It is not argued
in this case that Petitioner presented his prosecutorial misconduct claims
including the ones set out in the Magistrate's Supplemental Report only
under state law.  The specific factual examples of prosecutorial misconduct
set out in the Grounds for Relief identified in the Magistrate Judge's
Supplemental Report (Doc. 56) at p. 3 simply presents additional factual
support for the claim of prosecutorial misconduct as permitted by the
Supreme Court in *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).  In
reviewing these federal constitutional challenges to prosecutorial
misconduct, the state reviewing courts were charged with determining
whether the statements supporting prosecutorial misconduct were isolated
or among a series of improper statements.  *Boyle v. Million*, 201 F.3d 711,
717 (6th Cir. 2000).  The additional facts pleaded in support of Petitioner's
prosecutorial misconduct claims, such as arguments regarding improper

38

use of "other bad acts" evidence during the penalty phase  do not

"fundamentally alter" or place in a "significantly different posture" the legal

claim already considered by the state courts and accepted by the

Magistrate Judge for federal review above.  Thus, the state courts were

presented with a fair opportunity to decide and remedy the asserted

constitutional violation as required by this Court in *Riggins v. McMackin*,

935 F.2d 790 (6th Cir. 1991).

> **2.    The Petitioner has Established a Violation of Clearly
> Established Federal  Law Regarding The Prosecutor's
> use of "Other Bad Acts Evidence in the Penalty Phase**

In cross-examining Mr. Palmer's ex-wife, Cammy Palmer, the

prosecutor offered into evidence the affidavit filed by Mrs. Palmer in her

divorce action with Petitioner.  This affidavit was totally irrelevant to the

mitigation phase issues and included unsubstantiated and otherwise

incompetent statements regarding Mr. Palmer's efforts to attempt to kill his

ex-wife, blowing up her car, burning down the marital residence, and

threatening to kill his daughter and bury her.  The affidavit used by the

prosecutor also made reference to allegations that Mr. Palmer tried to "run

his ex-mother-in-law off the road."  The affidavit also made unsubstantiated

references to alleged sexual advances Mr. Palmer made toward his ex-

mother-in-law.  It contained unsupported allegations that Mr. Palmer beat

his ex-wife, beat his children and sexually molested his children.  These

bizarre, outrageous and conclusory assertions in a divorce proceeding

affidavit utterly lacked any evidentiary support or foundation and did not

relate in any way to the mitigation evidence offered by Mr. Palmer.   (Mit.

Trial Tr.  pp. 122-126).  Again, the prosecutor compounded this intentional

error by arguing it to the jury in his efforts to convince the jury to return a

recommendation of death.  He repeats the baseless allegations that were

contained in that affidavit, including in his recounting some of the content

of the affidavit.

> . . . not only was he going to kill her [Cammy
> Palmer], hang himself, blow up her car, burn her
> house down, kill her daughter and bury her . . . .

(Mit. Trial Tr.  p. 153).  The prosecutor also reminds the jury of the

speculation regarding Mr. Palmer's motives toward Mr. Goolie and repeats

the misconduct that occurred during the trial phase as established above.

He tells the jury that "our [the prosecutor and the jurors] instincts were

pretty good.  Our instincts were pretty good about why the defendant was

there . . . we had the right instincts there that he was there to hurt George.

That's the background of the case.  The background and circumstances of

the case, he was there to even the score." (Mit. Trial Tr.  p. 145).

None of this evidence of other acts was competent or relevant.  Yet the prosecutor insists on beating them like a drum before the jury during closing argument.  If the jury would not sentence him to death for the shootings of Mr. Vargo and Mr. Sponhaltz alone, then the prosecutor clearly wanted to sentence him to death because of Mr. Palmer's purported evil character as evidenced by the prosecutor's persistence in introducing irrelevant and prejudicial material regarding purported other acts committed by Petitioner.

Concern regarding the prejudice occasioned by this misconduct must be particularly sensitive in light of the critical nature of sentencing proceedings in death penalty cases.

> In the context of a death penalty sentencing hearing, however, the question of error or effect is more complex than in traditional trials. Rather than determining whether a constitutional error would have pushed a jury from a "not guilty" verdict to a "guilty" verdict, we must attempt to discover whether the constitutional error influenced the jury's decision between life and death.

*Bates v. Bell,* 402 F.3d 635, 641 (6th Cir., 2005).  The Court concluded that, as the remarks of the prosecutor tended to incite and mislead the jury, the writ should issue reversing the imposition of the death sentence. *Id* at 641-643.  The same result must occur here where the prosecutors misconduct

41

during sentencing was designed to inflame and mislead the jury.  While the nature of the misconduct in *Bates* was factually different than the present case, as demonstrated above, the effect was no less prejudicial.

Again, the cumulative effect of this misconduct when added to multiple incidents reviewed above compels a finding that the misconduct violated Petitioner's right to a fundamentally fair trial. *Berger v. U.S.,* 295 U.S. at 89;  *Darden v. Wainwright*, 477 U.S. at 181.

### D. The Prosecutor Engaged in Misconduct by Invoking God and Bible (Claim 13.13 and 13.18)

During arguments at the trial and penalty phases the prosecutor made improper references to God and Bible.  Examples include the following:

- "But only God himself is truly able to look inside a person's mind. . ."(Joint App. IV, Trial Tr. p. 1200)

- "You know in his sermon on the mount Jesus in warning his followers how to detect false prophets and liars said - - and you have got to have the King James for this - - "We shall know them by their truths, not by their sweet sounding words, but by what they actually do." (Joint App. IV, Trial Tr. p. 1200)

- "God did not give us the power to look directly inside defendant's head, but he did give you something almost as good and that is your common sense."  (Joint App. IV Trial Tr. p. 1201)

42

- I guess he missed Sunday School the day they talked about "Thou shalt not kill." (Joint App. IV, Mit. Tr. p. 156)

- Referring to the"job" of the jury the Prosecutor states, "It's different from the minister who is supposed to get him right with God . . We are no talking about God's forgiveness. . ." (Joint App. IV, Mit. Tr. p. 157).

Such religious references in closing argument violate the Petitioner's right to fundamental fairness and taint both the guilt phase and penalty phase verdicts by improperly impassioning the jury. *Sandavol v. Calderon,* 241 F.3d 765, 776 (9th Cir. 2000).

"The prosecutor's argument frustrated the purpose of closing argument, which is to explain to the jury what it has to decide and what evidence is relevant to its decision." *Id.*

The Magistrate Judge did not address the merits of these claims. Rather, he incorrectly held they had been procedurally defaulted. (Doc. 103, pp. 44, 53). This is error.

## 1.    Claims 3.13 and 3.18 Were Not Procedurally Defaulted.

The Magistrate Judge concedes in the Supplemental Report that claims 3.13 and 3.18 (injection of religious matter into argument) was

43

presented to the Ohio Supreme Court.  (Doc. No. 56, pp. 4-5).[9] However,

the Magistrate Judge does not revise his Recommendation to deny

Petitioner's Motion for Summary Judgment with regard to procedural

default of these claims because no "contemporaneous objection" to the

religious matter in the trial court or any assignment of error in the Court of

Appeals was made.  The Magistrate Judge cites the Ohio Supreme Court's

statement that "[a]dditionally, many of appellant's arguments have been

waived."  (Supplemental Report, p. 5, citing *State v. Palmer*, 80 Ohio St.3d

543, 552, 687 N.E.2d 685, 697 (1997); and see Doc. 103, p. 44).  Such a

generalized finding that some unidentified propositions of law may have

been waived is not sufficient to constitute a finding of default.

Where a state court has not clearly expressed whether it has rested

its decision on a procedural bar, a procedural default should not preclude

consideration of a federal claim in federal habeas corpus proceedings.

> Procedural default will not preclude consideration of
> a federal claim in federal habeas corpus unless the
> last state court rendering judgment in the case
> **clearly and expressly stated that its judgment
> rested on that procedural bar**.

---

[9]The Magistrate Judge also concedes that the Petitioner did properly present his claims relating to 3.19 (prosecutorial misconduct in eliciting evidence of petitioner's failure to pay child support) to the state courts.  (Doc. No. 56, pp. 5-6).

(Emphasis added). *Lemaster v. Ohio*, 119 F.Supp.2d 754,762 (S.D. Ohio 2000), citing *Harris v. Reed,* 489 U.S. 255, 265-266 (1989). The District Court concluded that no procedural bar existed because the state appellate court in that case "did not clearly and expressly indicate in the decision . . . the reasons for its refusal to address claims raised . . ." *Id.* citing *Harris v. Reed*, 489 U.S. 255, 265-66 (1989).  As the Supreme Court explained in *Reed,* "[r]equiring a state court to be explicit in its reliance on a procedural default does not interfere unduly with state judicial decision-making." *Id.* at 264.

Applying that principal to this case, it is clear that the Ohio Supreme Court did not expressly and clearly make a finding that these prosecutorial misconduct claims identified in the Supplemental Report were procedurally barred, nor did it explicitly rest its decision on such a regularly applied rule of a procedural bar.  Without identifying which claims it was referring to, the Ohio Supreme Court simply states as an introductory matter,

> Many of the issues raised by appellant had been addressed and rejected by this court under analogous circumstances in a number of prior cases.  Our positions on these issues have not changed.  Additionally, many of appellant's arguments have been waived.  ***Upon careful and extensive review of the record, the governing law, and the arguments advanced by the parties,***

we failed to detect any errors requiring reversal of
appellant's convictions and death sentence.

*Id*. at 552.  (Emphasis added).  The Court decided to "address and

discuss, in detail, only those issues that merit some further discussion."  *Id*.

at 552-553.  The Court does not specifically identify which arguments have

been waived and which were among those it considered on the merits and

"addressed and rejected by the Court under analogous circumstances in a

number of our prior cases."  Thus, it cannot be held that the Ohio Supreme

Court clearly and expressly based its decision with respect to the specific

prosecutorial misconduct claims outlined at pages 3-6 of the Supplemental

Report on a finding of a procedural bar.  Indeed, the Ohio' s Supreme

Court's reference to its "careful and extensive review of the record, the

governing law, and the arguments," suggests that it considered the ***merits***

of each of Petitioner's claims.  Consequently, consistent with the law in this

circuit, the District Court should proceed to consider the merits of each of

the claims listed in the Supplemental Report.

## 2. Prosecutor's Invocation of God and Bible Denied Petitioner a Fundamentally Fair Trial

The Prosecutors recurring reference to God and the Bible as

described above were  clearly designed to inflame the passions of the jury

46

and instill in them a sense that they had a religious duty to convict

Petitioner and sentence him to death. "The prosecutor's argument

frustrated the purpose of closing argument, which is to explain to the jury

what it has to decide and what evidence is relevant to its decision."

*Sandavol v. Calderon, supra,* 241 at 776.  Petitioner has demonstrated

above that the recurring religious references to God and Bible in closing at

both the guilt and penalty phases, especially in light of all the other

examples of prosecutorial misconduct denied Petitioner a fundamentally

fair trial.

**E.    The Prosecutor Engaged in Misconduct at Penalty Phase by Improperly Arguing: All Aggravating Factors at Trial Weigh Against Mitigators; that it was Petitioner's Burden to Show Mitigators Outweighed Aggravators;  that Rejecting Voluntary Intoxication at Trial Constituted the Jury's Rejection of Intoxication as a Mitigator. (Claims 3.14, 3.15, 3.16 and 3.17).**[10]

Petitioner establishes further incidents of prosecutorial misconduct in

the penalty phase by showing that the Prosecutor improperly argued: that

all aggravating factors at trial weigh against mitigators in the penalty phase

(3.14); that it was petitioner's burden to show mitigators outweighed

aggravators (3.15, 13.16); and that rejecting voluntary intoxication at trial

---

[10]  The Magistrate Judge correctly concluded that these claims were not procedurally defaulted. Doc. 103, pp. 45, 47, and 51

constituted the jury's rejection of intoxication as a mitigator. (3.17).

The Magistrate Judge concludes either that there was no error by the prosecutor or that any misstatement was overcome by instructions given by the court and was not contrary to clearly established federal law. (Doc. 103, pp. 44-53). Petitioner demonstrates below that these incidents of improper argument at the penalty phase denied Petitioner a fundamentally fair sentencing process.

As mentioned, the prosecutor incorrectly advised the jury as to the number of aggravating circumstances that had already been established. In essence, he directed the jury to balance the aggravating circumstances of the capital offenses against all the mitigating circumstances during the weighing process. In other words, the jury was advised by the prosecutor to accumulate all aggravating circumstances and weigh those against the mitigating factors offered by the Petitioner during the penalty phase. This clearly violated Ohio law which requires the jury to weigh all mitigating factors against the aggravating circumstances of the each particular offense. Specifically, the prosecutor directed the jury that,

> The judge will tell you if you find beyond a
> reasonable doubt that the aggravating
> circumstances outweigh the mitigating factors and
> you shall recommend the sentence of death; not

48

may or can, but shall.

(Mit. Tr. pp. 157-158).

The prosecutor continues to exacerbate the situation by repeating his improper argument that the **defense had failed to show** that the mitigating factors outweighed the aggravating factors, knowing that it was not the defense's burden to do so.  Rather, the prosecutor made this misstatement of law knowing that he was mischaracterizing the burden at the mitigation phase and, thus, mislead the jury into believing that it was the Defendant's burden to show that mitigating circumstances outweighed the aggravating factors.  (Mit. Tr. pp. 16, 146, 154).

The prosecutor also told the jury "you have already found and we have already established beyond a reasonable doubt that the defendant is guilty of three aggravating circumstances in the case . . . .  What you will be considering at this second stage is the question, do these three established aggravating circumstances outweigh the mitigating factors that will be brought out by the defense in the course of their presentation?"  (Mit. Tr. pp. 14-15).  In fact, the counts involving Mr. Sponhaltz's alleged only two specifications.  Additionally, this statement reinforced the jury's mis-impression that it was to weigh all of the aggravating factors in all of

49

the counts against the mitigating circumstances.

The prosecutor was or should have been aware that "the only aggravating circumstances relating to a given count may be considered in assessing the penalty for that count." *State v. Cooey*, (1989), 46 Ohio St.3d 20, syllabus, para. 3.  Where, as the prosecutor and court did in the instant case, the aggravating circumstances from all the counts are combined and weighed against the mitigating circumstances, the defendant is denied, "that `consideration of *** the circumstances of the particular offense *** that is a constitutionally indispensable part of the process of inflicting the penalty of death.`" *Id.* quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).  It follows that the prosecutor's misleading arguments to the jury, coupled with the trial court's failure to properly instruct the jury deprived appellant of his due process rights, and rendered his capital convictions constitutionally infirm.  The prosecutor's misleading statements to the jury regarding the burden of proof were not isolated.  The misstating of the burden occurred repeatedly.

> . . . because even if some mitigation factor or other
> is considered established, it must still outweigh, that
> is be more important than, the aggravating
> circumstances you have already found.

(Mit. Tr. p. 16).  Later, in characterizing the Petitioner's argument, the

50

prosecutor states,

> Somehow or another that's a mitigating factor that should outweigh and wipe out all of this.
>
> So I think after somberly reflecting on the instructions, the judge is going to give you and after you have done your job you will see clearly there is nothing at all in this so called **mitigation evidence that outweighs the aggravating circumstance** of what the defendant has done. . . .
>
> The mere finding of the existence of a mitigating factor does not mean that it necessarily overreaches these aggravating circumstances . . . .
>
> . . . even if you accept all those factors as proved, they **don't outweigh** what he did on May 8th.

(Mit. Tr. p. 146). The prosecutor continues his closing argument,

> So I am not sure what we are suppose to do with Dr. Jackson's testimony. **It doesn't outweigh anything.** (Emphasis added).

(Mit. Tr. p. 154).

It can be safely assumed that the prosecutor had to be aware that he was misstating the Petitioner's burden. In *State v. Greer*, (1988) 39 Ohio St.3d 236, 250-251, the Ohio Supreme Court found prosecutorial arguments very similar to those made in this case to be error. Although the *Greer* court found the error to be harmless, it did so because the jury was properly instructed by the Court. *Greer* did not involve the

51

circumstances, like this case, where the prosecutor persisted in misstating the burden of proof, clearly misleading the jury into assuming that the defendant had the obligation to prove that the mitigating circumstances outweighed all aggravating factors.

Where, as here, the prosecutorial misstatements are not merely incidental or isolated comments, and which essentially constitute an effort by the prosecution to urge the jury to disregard the law in arriving at a verdict, the defendant is deprived of a fair trial. See *State v. Henry*, (1983), 4 Ohio St.3d 44, syllabus, para. 3.

The prosecutor in Mr. Palmer's sentencing phase further misstated the law by suggesting to the jury that since voluntary intoxication was rejected as a defense during the guilt phase, that the jury should also reject it as a mitigating factor. Specifically he argued to the jury that,

> You have rejected this defense [alcohol intoxication] once already in your first proceedings when the alcohol or intoxication defense charge was given to you. And, of course, he knew enough about what he was doing so that he could plan way before he took that first drink of Southern Comfort, he had planned to do what he was going to do.[11]

(Mit. Tr. p. 144). The prosecutor, thus, directs the jury to reject the alcohol

---

[11]The plan the prosecutor was referring to here, by inference, was to kill George Goolie, not the victims in this case.

52

intoxication as a mitigating factor since it has already rejected it as a defense during the guilt phase.

In *State v. Lawrence*, (1989), 44 Ohio St.3d 24, the Ohio Supreme Court reversed the death sentence imposed on the defendant were the prosecution had repeatedly misstated the import of a jury's rejection of a