proof on the purpose element when these instructions are taken as whole.

### C.    AEDPA Standard of Review:

When there has been no adjudication of a claim on the merits in state court AEDPA does not apply and a federal habeas court should review the claim de novo.  Weeks v. Angelone, 176 F.3d 249, 258, 263 (CA4 1999) aff'd on other grounds, 528 U.S. 225 (2000).

### D.    Harmless Error Analysis:

These constitutional errors had a substantial and injurious effect on the jury's verdict. It caused the jury to disregard the Petitioner's defense which was supported by substantial evidence.  Under Brecht v. Abrahmson, 507 U.S. 619, 638 (1993),  the reviewing court on habeas must determine if the constitutional error had a "substantial and injurious" effect on the jury's verdict. This means that the habeas petitioner must demonstrate actual prejudice from the error. See Nevers v. Killinger, 169 F.3d 352, 371-72 (CA6 1999)  If the evidence of guilt on the mens rea element was not overwhelming, then the instructional error contributed to the guilty verdict and the habeas petitioner suffers actual prejudice. Cf. Houston v. Dutton, 50 F.3d 381, 386 (6thCir. 1995) (burden-shifting instruction on malice "substantially and injuriously affected the verdict,

resulting in prejudice to the defendant []" when; instruction caused jury to overlook evidence of accidental killing during struggle, and, instruction caused jury to accept prosecutor's theory of execution-style murder done with malice).

By comparing other cases with burden-shifting instructional errors decided by Sixth Circuit Court of Appeals to the facts in Palmer's case, it is evident that his right to due process was actually prejudiced by these instructional errors on the mens rea element of aggravated murder.  In Houston v. Dutton, supra at 386, the defendant approached a gas station with a loaded ".38 caliber revolver . . ." with the intent to commit a robbery and he shot "an unarmed victim . . ." to death. Id. The victim was shot three times and two fatal wounds were fired "at point-blank range." Id. The defendant claimed that he shot the victim and ran away "after an extended struggle ...." Id.  One witness testified, however, "that he watched Houston walk calmly away from [the crime scene] back to his car." Id. Houston's jury was improperly instructed to presume his "malice" from the use of a deadly weapon. See Id. at 385-86. The Sixth Circuit reasoned that the presumption on malice "substantially and injuriously affected the verdict . . ."because it "destroy[ed] defendant's theory of accident at the outset . . . ."

87

Id. at 386.  Likewise, in Palmer's case, the gist of the offense portion of the purpose instruction completely destroyed the defense theory that Palmer was too drunk to form the purpose or specific intent to cause the deaths of Sponhaltz and Vargo.   (Joint Appendix Vol.IV, p. 1163).  Moreover, gist of the offense charge undermined the lesser included offense charge as to murder. (Joint Appendix Vol.IV, pp.  1228).

Similarly, in Alexander v. Foltz, 838 F.2d 140, 146-47 (CA6 1988), the court found constitutional error in a jury instruction that created a presumption on the mens rea element of murder under Michigan law. The court reasoned that the erroneous instruction was not harmless because, "[u]nlike the district court, we are not overwhelmed by the evidence [on the mens rea element] . . . ." Id. at 147.

In Alexander, the evidence on the mens rea was not overwhelming even though the defendant left the scene of an altercation, got a pistol, returned, and shot the victim. Id. at 141-42. The defendant testified at trial on cross-examination that he acted without an intent to kill the victim. Id. at 142. However, the victim's "two companions..." testified that "immediately before the shooting ... [the defendant] shook his gun in the [victim's] face and shouted `[h]ey, what you gonna do now,' while [the defendant's] wife

88

said `[s]hoot him, Ernest, shoot him,' or `[g]o ahead, kill him, go ahead and kill him, go ahead and shoot him!'" Id.  Here, Palmer testified that he had not intended to kill Sponhaltz and was only trying to scare hit him when the gun went off.   (Joint Appendix Vol.IV, p. 1194). As to the shooting of Mr. Vargo, Palmer testified that when he was backing away from Mr. Sponhaltz, Vargo put his hands up as if to keep Palmer from running into him or to grab Palmer and that is when he puller the trigger.   (Joint Appendix Vol.IV, p.  1197).

Likewise, in Merlo v. Bolden, 801 F.2d 252, 255-57 (CA6 1986), the court granted habeas relief on a burden-shifting instructional error on the mens rea element. The court concluded that the evidence on the mens rea element was "in such a balanced state... " that the instructional error was not harmless. Id. at 257. The Sixth Circuit found that the evidence on the mens rea was balanced notwithstanding the fact that the defendant "shot his wife four times ... " and he fired "two of the shots after [the victim] was on the floor." Id. at 253. Moreover, the evidence suggested that the defendant put a bullet on the victim's car seat "about three weeks before the shootings[]" as a threat. Id.

Simply put, the evidence supporting the mens rea element in

Houston, Alexander, and Merlo was far stronger than is the evidence of

Donald Palmer's purpose to kill Spohaltz and Vargo. Despite much

stronger evidence of malice or intent in those cases, the court faithfully

enforced those defendants' rights to a fair trial under the Due Process

Clause. The same result is required here, where the jury was misled by

fatally flawed instructions on the mens rea and where the evidence of

Palmer's purpose to kill is far from overwhelming. This instructional error

"substantially and injuriously affected the verdict . . "in Palmer's case,

denying him a fair trial.  Petitioner, therefore, is entitled to issuance of the

writ.

     **5.**    **SEVENTH CLAIM FOR RELIEF: PETITIONER OBJECTS TO**

         **THE MAGISTRATE JUDGE'S RECOMMENDATION**

         **DENYING RELIEF REGARDING TRIAL COURT'S**

         **INSTRUCTION ON INFERENCES WHICH FAILED TO**

         **PROHIBIT THE STACKING OF INFERENCES AND THUS**

         **DEPRIVED PETITIONER OF HIS RIGHT TO DUE PROCESS**

         **OF LAW AND TO BE FREE OF CRUEL AND UNUSUAL**

         **PUNISHMENT AS GUARANTEED BY THE CONSTITUTION**

         **OF THE UNITED STATES AND CONSTITUTED AN**

**UNREASONABLE APPLICATION OF THE UNITED STATE**

**SUPREME COURT'S DECISION IN *ENMUND V. FLORIDA*.**

The trial court failed to instruct the jury that it was prohibited from stacking inferences upon other inferences to reach a verdict in this case. Rather, the court simply instructed the jury as follows:

> . . . Circumstantial evidence is proof of facts or circumstances by direct evidence from which you may reasonably infer other related or connected facts which naturally and logically follow according to common experience of mankind.
>
> To infer or make an inference is to reach a reasonable conclusion of fact which you make but are not required to make from other facts which you find to have been established by direct evidence. ***Whether an inference is made rests entirely with you*** . . .

(Joint App. IV, p. 1231).

91

While the trial court did provide an instruction regarding the definition of inferences to the jury, it failed to properly instruct the jury regarding the limitations placed by law and constitutional principles upon the jury's use of inferences.  The trial court failed to instruct the jury that an inference could not be based upon another inference.  The jury was thus permitted to find an essential element of the offense of aggravated murder to have been proven based upon impermissible inferences that are themselves based upon other inferences.  Such a limiting instruction is critical in this case where the prosecution's proof of the element of intent to kill is based upon circumstantial evidence and inferences drawn upon that evidence.

As stated above, "no person shall be convicted of aggravated murder *unless he has specifically found to have intended to cause the death of another.*"  ORC 2903.01. To reach this verdict the jury was improperly permitted to stack inferences.  The Magistrate Judge incorrectly concludes that any error in the failure to give an instruction prohibiting the stacking of inferences would be harmless and not contrary to or an unreasonable application of federal law as articulated by the Supreme Court.  (Doc. 103,

92

p. 65).[1]

A conviction may not properly withstand constitutional attack where it is obtained by basing one inference upon another inference.  In *Direct Sales Co., v. United States,* 319 U.S. 703, 711 (1943) the United States Supreme Court held that the intent element of a conspiracy charge cannot be proved 'by piling inference upon inference. . ." The Sixth Circuit applied this principle of fairness to grant a writ of habeas corpus in *Tipton v. Jago* 818 F.2d 1264 (6th Cir. 1987):

> The State argues that the mere fact that Tuccinardi took the
> money from the cash register is evidence from which the judge
> could have inferred both a knowledge of the ultimate source of
> the money and the intent to take money, knowing it to be the
> owner's. We disagree, believing that this piles inference upon
> inference to the breaking point.

*Id. at* 1267 -1268. Likewise, the Tenth Circuit has ruled that "[w]e will not uphold a conviction, however, that was obtained by nothing more than

---

[1] This Court has previously found that this ground has not been procedurally defaulted.  (Decision, Doc. 61, adopting Report and Recommendation, Doc. 50, where the Court found that no procedural default defense had been raised as to this Claim for Relief.  (Doc. 50, p.10).

`piling inference upon inference. . . .'" *U.S. v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000), quoting *United States v. Fox*, 902 F.2d 1508, 1513 (10th Cir. 1990). "Where an inference is based solely and entirely upon another inference, its foundation is so insecure that reliance upon the second inference would stretch credulity beyond its permissible bounds and result in an inferred fact which in reality is speculative, . . . ." *State v. Ebright*, (1983), 11 Ohio App.3d 97, 98. *And see, U.S. v. Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998). The First Circuit has likewise cautioned courts against permitting the stacking of inferences:

> We recognize that "the government's proof may lay *entirely* in circumstantial evidence," *United States v. Valerio,* 48 F.3d 58, 63-64 (1st Cir.1995); we are, however, "loath to stack inference upon inference in order to uphold the jury's verdict." *Id.*

U.S. v. Ruiz 105 F.3d 1492, *1500 (C.A.1 (Mass.),1997)

In the case at bar, the trial court failed to instruct the jury that it was prohibited from basing an inference upon another inference. Rather, the trial court provided the jury only with a general instruction regarding circumstantial evidence and regarding the definition of inference. (Tr. p.

94

1231).  Nowhere did the trial court restrict the jury from drawing conclusions where inferences are based on other inferences.

The prejudice flowing from the failure to give this instruction is established by the prosecutor's argument to the jury in which he misstated the law concerning inferences in their use by a jury in drawing conclusions.

> No matter what anyone tells you, you alone have the power to put those facts together and draw the necessary and reasonable inferences. **No one can tell you that you can or cannot draw a certain inference** if you feel beyond a reasonable doubt, if you know in your heart that is the necessary and probable inference to draw from all of the evidence.
>
> . . .

(Tr. pp. 1159-60).  It is apparent from the transcript that the prosecutor boldly invited the jury to draw any inference it chose, without any limitation whatever.        In this case, an essential element of the state's burden was to show that Mr. Palmer specifically intended to kill both Mr. Sponhaltz

and Mr. Vargo.  The evidence introduced by the prosecutor regarding other

unrelated, alleged criminal acts and regarding the unfounded suspicions or

opinions of prosecution witnesses regarding Mr. Palmer's intent to rob or

kill other individuals not related to the indictments in this case, permitted

the jury to pile inferences upon inferences in order to reach the conclusion

that Mr. Palmer specifically intended to kill each victim.[2]  For example, the

prosecutor sought to have the jury infer that Mr. Palmer was in the area to

commit unrelated crimes at a local gas station.  The prosecutor also invited

the jury to infer that Petitioner intended to rob and/or do harm to George

Goolie, rob and kill the gas station attendants and to kill Mr. Kiss.  From

these utterly speculative "facts" the prosecutor urged the jury to infer the

purposeful killing of both Mr. Sponhaltz and Mr. Vargo.  (See prosecutor's

closing argument Joint App. IV, trial Tr. pp. 1148, 1149, 1150, 1154, 1193,

1194, 1196, 1197, 1198).

This is precisely the type of "piling inferences upon inferences" that

application of due process principles and principles of fundamental fairness

are designed to prevent.  The trial court's failure to limit the jury's ability to

pile inferences upon other inferences,  especially in the face of the

_____

[2]  See discussion at pages 37-40, for a thorough discussion of the prejudice caused by the recurring introduction of irrelevant and speculative "other bad acts" evidence throughout the course of trial.

prosecutor's unrelenting production of evidence of unrelated and purely speculative criminal activity and argument thereon, denied Petitioner a fundamentally fair trial.   *Direct Sales Co., v. United States,* 319 U.S. at 711. *Accord: Ingram v. U.S.,* 360 U.S. 672 (1959) ("Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal. * * * This, because charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning * * * a dragnet to draw in all substantive crimes.[citation omitted]" ) In applying this fundamental principle in the context of conspiracies the Sixth Circuit specifically noted the danger of stacking inferences to obtain a conviction.

> Furthermore, because of the Supreme Court's condemnation of dragnet conspiracies, we choose to adopt the Second Circuit's holding in *Studley. Anderson v. United States,* 417 U.S. 211, 224, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) (holding that "conspiracies are not to be made out by piling inference upon inference, thus fashioning ⋯ a dragnet to draw in all substantive crimes").

*U.S. v. Campbell*, 279 F.3d 392, *400 (6th Cir. 2002) The same "dragnet" effect occurs here where the state is permitted to introduce a significant quantity of speculative and unsupported testimony regarding uncharged crimes upon which the state then builds a series of inferences to convince the jury to find specific intent to kill Mr. Sponhaltz and Mr. Vargo.  *See*

*also, U.S. v. Hanson,* 41 F.3d 580, 582 (10th Cir. 1994) ("Although this standard of review is deferential, we may not uphold a conviction obtained by "piling inference upon inference." [citation and internal quotes omitted]).

The effect of this constitutional violation permitted the jury and sentencer to return a verdict and ultimately impose a death penalty by concluding intent to kill based upon the improper stacking of inferences gleaned from purely speculative and highly prejudicial suggestions that Petitioner had engaged in other bad acts.  *Id.*   One cannot constitutionally give the death penalty for an unintended murder.   *Enmund v. Florida*, 458 U.S 782, 792-93 (1982).  The decision of the State Court of Appeals and State Supreme Court to the contrary was an unreasonable application of and contrary to well established federal constitutional law as enunciated in the above Supreme Court precedence.  Moreover, the exploitation by the prosecutor of inferences based on fabricated and speculative facts undercuts any argument that this error by the trial court was harmless. Accordingly, Defendant is entitled to issuance of a writ.

     6.     **EIGHTH CLAIM FOR RELIEF: PETITIONER OBJECTS TO THE MAGISTRATE JUDGE'S RECOMMENDATION DENYING RELIEF REGARDING THE TRIAL COURT'S IMPROPER PERMITTING OF EVIDENCE OF AND ARGUMENT RELATING TO IRRELEVANT AND HIGHLY PREJUDICIAL "OTHER ACTS" WHICH PETITIONER**

**ALLEGEDLY COMMITTED AGAINST PERSONS NOT NAMED IN THE INDICTMENT, THEREBY DEPRIVING PETITIONER OF HIS RIGHT TO DUE PROCESS OF LAW AND TO BE FREE OF CRUEL AND UNUSUAL PUNISHMENT AS GUARANTEED BY THE UNITED STATES CONSTITUTION. THE STATE COURT'S DETERMINATION OF THIS ISSUE WAS CONTRARY TO AND AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED.**

Petitioner has previously demonstrated that the prosecutor engaged in a persistent effort to pepper the guilt phase and penalty phase proceedings with evidence that Mr. Palmer engaged in many instances of other criminal activity for which he was not charged and which were unrelated to the criminal charges for which he was indicted.[3] The Prosecutor's closing argument makes it abundantly clear that these unrelated "other acts" testimony of prosecution witnesses constituted little more than the witnesses and prosecutor's own speculation that: Mr. Palmer wanted to harm and rob George Goolie and burglarize his home (Trial Tr. p. 1148-49), kill or otherwise harm Larry Kiss, burglarize a local motel, rob and steal from whoever he could get his hands on (Trial Tr. p. 1149), kill and rob attendants at a gas station (Trial Tr. p. 1197), and that

---

[3]See pp. 18 through 52 above regarding Third Claim for Relief.

"he would have killed any number of people who came along." (Trial Tr. p. 1154). There is not a shred of evidence in the trial record from which a jury could fairly conclude that Petitioner intended to commit any of these acts for whcih he was never charged.  Nevertheless, it is upon these fabricated "other criminal acts" that the prosecutor asks the jury to conclude that Mr. Palmer intended to kill Mr Sponhaltz and Mr. Vargo, two individuals he had never before seen, and with whom he would not have had contact save for the tragic fortuity of the auto accident, an accident that occurred with Eddie Hill driving his own vehicle.[4]

The prosecutor was also allowed to offer incompetent and irrelevant evidence regarding telephone calls made after the deaths of Mr. Sponhaltz and Mr. Vargo to George Goolie in which Petitioner is supposed to have threatened the well being of Mr. Goolie, threatened sexual misconduct against him and threatened harm to his ex-wife.[5]  Additionally, the prosecutor offered improper opinion testimony of the gas station attendant regarding his belief that Mr. Palmer was acting as though he was intending to rob the gas station.  The State offered no evidence in the trial court that

---

[4]  Joint App. IV, Trial Tr. p. 1091-1092.

[5]  Allow the trial court excluded the testimony *after* it had been fully presented to the jury, the impact was clear in light of the other prejudicial unrelated evidence the court allowed the jury to receive.

would connect these speculative allegations to either of the shooting victims in the case at bar. This evidence clearly violates the Petitioner's rights to due process of law and to be free from cruel and unusual punishment because the evidence of "other acts" allowed the jury to convict and sentence Petitioner to death because the jury believed that he was a person of bad and violent character prone to unlawful criminal conduct, rather than basing its decision on evidence relevant to the elements of the offenses for which he was actually indicted.[6]

## A.    Magistrate's Recommendation

The Magistrate Judge recommends denial of this claim by concluding that the "jury . . . was unlikely to have been swayed to convict him because of the alleged "other acts" evidence." The Magistrate Judge further recommends a finding that Petitioner was unable to show that the Court of Appeals finding on this issue was "objectively unreasonable" or that its decision was contrary to or an unreasonable application of federal law. (Doc. 103, pp. 65-66). Petitioner objects as these conclusions are not supported by the record. Moreover, the neither the Ohio Supreme Court nor the Ohio Court of Appeals did not address the merits of Petitioner's

---

[6] It is undisputed that Petitioner had no prior criminal record.

federal constitutional claim.  Thus, under the AEDPA, no deference is due the state court conclusions and findings.[7]

## B.    AEDPA Deference is not Appropriate

The Magistrate Judge correctly notes that the Supreme Court of Ohio failed to address the merits of this claim.  However, the Magistrate Judge is in error in concluding that the State Court of Appeals did address the issue on its merits.  (Doc. 103, p. 65).  No merits review of Petitioner's federal constitutional claim occurred in the decision referenced by the Magistrate Judge.  Rather, the Court of Appeals decision and analysis is limited solely to the application of Rule 404(B) of the Ohio Rules of Evidence to the introduction of "other acts" evidence. There is no reference in that discussion and analysis to any federal law or federal constitutional jurisprudence.  *State v. Palmer,* (Ohio App. 7th Dist. 1996) 1996 WL 495576 at *6.  Thus, "the deferential standard of review set forth in §2254(d) is inapplicable." *Clinkscale v. Carter,* 375 F.3d 430, 436 (6th Cir. 2004). Accordingly, this Court should review this claim *de novo* considering the "totality of the evidence." *Id.*   Yet even should this Court grant

---

[7] There is no issue regarding procedural default as this Court has previously held that no defense was raised as to this claim.   (Decision, Doc. 61, adopting Report and Recommendation, Doc. 50, where the Court found that no procedural default defense had been raised as to this Claim for Relief. (Doc. 50, p.10).  Additionally, the Magistrate Judge correctly concludes that this claim was properly exhausted. (Doc.103, p. 65).

deference to the state court findings and legal conclusions, the discussion below compels the conclusion that those findings are objectively unreasonable and the legal conclusions reached are both contrary to and an unreasonable application of established federal law.

## C.    Petitioner is Entitled to Relief on This Claim

The United States Supreme Court long ago explained that principles of fairness underlie the widely accepted rule that character evidence suggested by other bad acts" cannot be permitted to provide a basis for conviction.

> "Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. . . . The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime.[FN8] The inquiry is not rejected because character is irrelevant;[FN9] on the contrary, it is said to weigh too much with the jury and to so over persuade them as to prejudge one with a bad general record and *deny him a fair opportunity to defend against a particular charge.* The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance *tends to prevent confusion of issues, unfair surprise and undue prejudice.*" (Emphasis added)

*Michelson v. U.S.* 335 U.S. 469, 475-476 (1948). More recently, the Court reaffirmed this constitutional concern for such prejudicial evidence. "In the

103

event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee* 501 U.S. 808, 825 (1991). These principles were ignored by the state courts who reviewed Mr. Palmer's conviction and sentence.

The Ohio Supreme Court has long recognized a strict limitation on the admission of such "other act" testimony and evidence. Where the evidence of "other acts" does not

> form part of the immediate background of the alleged act which **forms the foundation of the crime charged in the indictment.** In such cases, **it would be impossible to prove that the accused committed the crime charged without also introducing evidence of the other acts.** To be admissible pursuant to this sub-category of `scheme, plan or system' evidence, the `other acts' testimony **must concern events which are inextricably related to the alleged criminal act.** (Emphasis added).

*State v. Curry*, (1975), 43 Ohio St.2d 66, 69. The only other permissible use of "other acts" evidence is when it is necessary to prove the identity of the perpetrator. Neither of these exceptions apply to the instant case. Identify was not an issue since Petitioner admitted the shootings. Nor can any of the "other acts" evidence prove "events which are inextricably

related to the alleged criminal act."   The other criminal acts evidence offered by the state and relied upon by the prosecutor in closing to prove intent cannot logically be connected with the serendipitous auto accident with the 2 victims who were unknown to Petitioner and who were completely uninvolved in these "other acts."  Petitioner's stopping at a gas station and **purchasing** gas and pop, his stopping for a few minutes at a local motel and his driving past George Goolie's house can have no logical connection to the auto accident and the victims of the shooting.  Yet, as established above, the prosecutor used this evidence to divine an unsupportable conclusion that petitioner specifically intended to kill Mr. Sponhaltz and Mr. Vargo, two individuals previously unknown to Petitioner who had no involvement in these "other acts."   As the prosecutor argued the jury, "[n]o one can get inside another person's mind.  We infer a person's intentions *from all the facts and circumstances surrounded by his acts."* (Trial Tr. p. 1192).  After so directing the jury, the prosecutor returns to his fabrication regarding criminal acts that never occurred, including his unsupported characterization that Petitioner was probably intending to rob and kill the "guys at the gas station" and Goolie. (Trial Tr. p. 1197-1198).  Of course, this occurs after the prosecutor spent much of

105

his initial closing argument describing several other fictional accounts of

Petitioner's intent to kill other people and after he offers the completely

basis assertion that "he would have killed any number of people who came

along." (Trial Tr. p. 1154; see also Trial Tr. p. 1148, 1149, 1157).

Use of such highly prejudicial "other acts" evidence deprived Mr.

Palmer of a fundamentally fair trial.  In *Manning v. Jarnigan*, 501 F.2d 408

(6th Cir. 1974), the Sixth Circuit reversed the denial of a petition for writ of

habeas corpus and remanded the case for an evidentiary hearing

concerning the prosecutor's conduct in making references to the criminal

defendant's alleged prior involvement in criminal acts concerning

bootlegging and other incidents relating to the possession of barbiturates.

The Court found that such misconduct could in fact render the criminal

defendant's trial unfair in a constitutional sense and ordered an evidentiary

hearing regarding what the Court of Appeals referred to as "facts . . .

disturbing enough to remand these issues also for an evidentiary hearing

and findings of fact on appellant's claims of federal due process violation."

*Id*. at 412.

It is axiomatic that the admission of "other acts" evidence which was

probative of only of defendant's character deprives him of a fair trial and

106

warrants the granting of habeas corpus relief.  These is particularly true where the "other criminal acts" are based entirely on the speculation of the state's witnesses and the prosecutor.

Similarly in *McKinney v. Rees*, 993 F.2d 1378 (9th Cir. 1993), the court affirmed the granting of a habeas corpus petition where the prosecution exploited "other acts" evidence which was probative only to establish the murder defendant's character, thus depriving him of a fundamentally fair trial requiring granting of a writ of habeas corpus.  In so holding, the Ninth Circuit stated,

> The use of `other acts' evidence as character
> evidence is not only impermissible under the theory
> of evidence codified in the California rules of
> evidence . . ., but is contrary to firmly establish
> principles of Anglo-American jurisprudence.

*Id*. at 1380.  In so holding, the court relied on the long established constitutional principle enunciated in *Brinegar v. United States*, 338 U.S. 160 (1949):

> 'Guilt in a criminal case must be proved beyond a
> reasonable doubt and by evidence confined to that
> which long experience in the common-law tradition,
> to some extent embodied in the constitution, has
> crystalized into rules of evidence consistent with
> that standard.  These rules are historically
> grounded rights of our system, developed to
> safeguard men from dubious and unjust

107

> convictions, with resulting forfeitures of life, liberty
> and property.'

*McKinney v. Rees,* at 1381, quoting *Brinegar*, 338 U.S. at 174.  The Ninth

Circuit then proceeded to emphasize the historical importance of the rule

against the admission of "other acts" evidence.

> The rule against using character evidence to show
> behavior in conformance therewith, or propensity, is
> one such historically grounded rule of evidence.  It
> has persisted since at least 1684 to the present,
> and is now established not only in the California
> and Federal Rules of Evidence, but in evidence
> rules of 37 other states and in the common-law
> precedents of the remaining 12 states and the
> District of Columbia.

*McKinney,* at 1381.  Applying those principles, the Ninth Circuit held that

evidence that the defendant possessed certain types of knives and that the

defendant was proud of his knife collection was in fact character evidence

offered only to show propensity and thus violated the defendants right to

due process. *Id.* at 1385.  The Court of Appeals explain the fundamental

constitutional importance of this principle as recognized by the Supreme

Court. "The character rule is based on such a 'fundamental conception of

justice' and the 'community's sense of fair play and decency' as concerned

the Supreme Court in *Dowling* [*v. U.S.*493 U.S. 342 (1990]*." McKinney,*

993 F.2d at 1384.

The facts in *McKinney* are instructive and analogous to the facts here.  In that case the defendant was charged with the murder of his mother whose throat was slit.  Additionally, there was testimony that the defendant would occasionally wear a knife strapped to his side.  The prosecutor was permitted to inquire about the defendant's "fascination with knives."  The prosecutor reiterated this kind of evidence in its closing argument, as did the prosecutor in the case at bar.  The state argued that the evidence was probative of opportunity and that it disputed the defendant's assertion that he had no knives at the time of his mother's murder.  The Court of Appeals found that the evidence was primarily evidence of another act offered to prove character and giving rise to a propensity inference, and did not tend to prove a fact of consequence. *Id*. at 1382-1384.  The Court concluded that the prosecutor's introduction of most of the evidence of other acts relating to the knives in the knife collection was an emotionally charged effort to "help paint a picture of a young man with a fascination with knives and with a commando lifestyle . . . it served only to prey on the emotions of the jury, to leave them to mistrust McKinney and to believe more easily that he was the type of son who would kill his mother in her sleep without much apparent motive."  *Id*.

109

at 1385.  Consequently, the court found that the other acts evidence

rendered in McKinney's trial "fundamentally unfair in violation of the due

process clause."  *Id*.  And, see *Michelson v. United States*, *supra*, 335 U.S.

at 475-76 (1948).        The same result must obtain here where the

prosecutor literally peppered the state's entire case with repeated

references to irrelevant and highly prejudicial other acts.  The state's

transgressions include the following:

> (1)    Remarks by the prosecutor in opening
> statement informing the jury that Mr. Palmer went to
> the area of the shootings because it was his intent
> to `burglarize the home of George Goolie and to rob
> him.'  The prosecutor also explained that Goolie
> was having a relationship with appellant's ex-wife
> which angered the appellant.

> (2)    The prosecutor introduce evidence of
> investigator Fred Thompson regarding his assertion
> that Palmer told him that he drove past Goolie's
> trailer and his place of employment, pointing out
> that Goolie's trailer was one-quarter mile from the
> location where Mr. Vargo's body was found.

(Tr. pp. 801-802).

> (3)    Thompson was permitted to testify that
> Palmer told him that they were in the area to rob
> Goolie.  Thompson gave this information and was
> allowed to tell the jury that he was in that area to
> `stake out the house for that purpose.'

(Tr. p. 867).

(4)    Frank Donbeck, a friend of Mr. Sponhaltz was allowed to testify that Goolie had asked Sponhaltz to watch his trailer because of a past burglary, implying that it was appellant who burglarized Goolie's trailer in the past.  This was based on Goolie's suspicions and not on any evidence.

(Tr. pp. 840, 924).

(5)    George Goolie was allowed to testify despite the fact that he had no personal knowledge of the shootings and knew nothing of relevance relating to the alleged offenses.  Goolie testified that his home had been burglarized in February.

(Tr. p. 968).

(6)    Goolie was also permitted to verify that Sponhaltz and other neighbors watched his trailer for him.

(Tr. p. 969).

(7)    Goolie was allowed to testify about his relationship with Palmer's ex-wife, Cammy Palmer.

(Tr. p. 970).

(8)    Although he had never met Palmer, Goolie was allowed to testify on one occasion when he was at Cammy's home, he answered the telephone and spoke to someone who identified himself as Palmer and spoke on the telephone with his ex-wife.  Goolie was allowed to testify that the conversation was unfriendly and concerned non-support of Palmer's children.

(Tr. pp. 971, 972, 975).

111

(9)    Goolie was permitted to testify that after the alleged offenses Donald Palmer called him and said something about `performing sexual acts with me and something to the extent he wanted to kill me afterwards.'

(Tr. p. 972).[8]

(10)   The prosecutor asked Mr. Palmer during cross-examination if he disliked Goolie which appellant denied.  The prosecutor then accused Palmer of hating Mr. Goolie and going to his place to `rob and kill him.'

(Tr. p. 1127).

(11)   The prosecutor made a continued issued about Mr. Palmer having a gun as he drove past Goolie's home.  The prosecutor thus was allowed to infer Mr. Palmer's intent to kill and rob Mr. Goolie.

(Tr. p. 1127).

(12)   The prosecutor emphasized these various issues regarding Mr. Goolie throughout his closing argument.  He made references such as `he didn't much care for George Goolie.  He didn't care for the way George Goolie treated his ex-wife. . . .'   The prosecutor went on to argue that `on May 7, 1989, the defendant formed an attempt to do something unlawful or criminal to George Goolie.'  The prosecutor then referred to Mr. Palmer's effort to locate Mr. Goolie at his place of employment and

_____

[8]Defense counsel requested that all this testimony be stricken.  The request was overruled.  (Tr. p. 974).  Much later in the trial after the state rested, the trial court finally ordered the testimony concerning the telephone threat only to be stricken.  All of Goolie's other testimony remained before the jury.  (Tr. p. 1054).

concluded that `defendant was going to do more than just burglarize George's house. . . .' The evidence shows that his intention was to do something harmful to George.

(Tr. p. 1148).

(13)   Further along in closing argument, the prosecutor referred to Mr. Palmer as `circling around the Goolie trailer like birds of prey going in for the kill.'

(Tr. p. 1198).

(14)   The prosecutor then told the jury that `you good people are permitted to infer what was going on in his mind . . . what was their original purpose regarding Goolie and a loaded gun circling Goolie's.'

(Tr. p. 1200)

(15)   The prosecutor was allowed to inquire of the gas station attendants that the petitioner and Mr. Hill came into their service station on two separate occasions acting suspiciously.  One of the attendants was permitted to give the opinion that Mr. Palmer was acting like he was "casing the place."

(Tr. pp. 945-48, 953-57).

(16)   This was used to create the improper inference that petitioner was going to rob the gas station and possibly do harm to the attendants.

(17)   The prosecutor exploited this in closing argument by arguing to the jury that the gas station

113

attendants were lucky that they were not robbed
and killed.

(Tr. p. 1198).

(18)   The prosecutor was also allowed to call
Sergeant Hawthorne during the guilt phase to testify
that around the time of the shootings, he saw a car
in the parking lot of a local motel where there had
been thefts in the area.  The Sergeant was allowed
to create the innuendo that Palmer had engaged in
theft in that area.

(Tr. pp. 932-935).

(19)   The prosecutor was permitted to call Larry
Kiss who was allowed to testify that he was being
followed on May 8th by a brown car which turned
around in the driveway next to his and yelled
something at him.  The testimony was admitted to
infer that petitioner intended to rob or do harm to
Mr. Kiss.

(Tr. pp. 940-942).

## D.    The Error Cannot be Considered Harmless

The state's repeated fabricated references to the Petitioners

supposed intent to commit a series of other crimes, including murder and

robbery, completely unrelated to the crimes for which he was charged

cannot be fairly characterized as harmless.  A review of the prosecutor's

closing argument and his repeated references to these fictional crimes

reveals the state's reliance on that propensity evidence to prove Plaintiff's

114

purposeful intent to kill both victims. The propensity evidence was central to the states argument. (Trial Tr. pp. 1148, 1149, 1154, 1193, 1194, 1196, 1197, 1198, 1200).

The "other acts" evidence offered by the prosecutor here goes far beyond that which was held to deprive a criminal defendant of his constitutional rights in *McKinney.* This evidence was intended to do nothing more than paint a portrait of Petitioner as an evil character who would rob and kill anyone in its path. This in spite of the fact that Petitioner had absolutely no criminal record. This is the kind of character evidence that courts in the Anglo-American system of jurisprudence have excluded because of its tendency to deprive the criminal defendant of a fundamentally fair trial. This evidence unquestionably deprived Mr. Palmer of his right to a fundamentally fair trial. Moreover, since the trial court instructed the jury to consider this evidence with all other evidence during the sentencing phase, they harm infects both the guilt and sentencing phases and renders them both fundamentally unfair in violation due process[9]  *McKinney, and see, Michelson v. United States*, 335 U.S. 469, 475-476 (1948).

_____

[9] See Joint Appendix, Vol. IV, Mitigation Tr. pp. 158-160.

115

Although this Court should conduct a *de novo* review of these issues as the State Court failed to address the merits of the federal constitutional claim, petitioner has demonstrated that decision of the state appellate court are to the contrary is an unreasonable application of the Supreme Court precedent and other federal precedent reviewed above. Accordingly, the Court should grant to the requested writ as to this claim for relief.

**7    NINTH CLAIM FOR RELIEF: PETITIONER OBJECTS TO THE MAGISTRATE JUDGE'S RECOMMENDATION DENYING RELIEF REGARDING THE TRIAL COURT'S FAILURE TO GIVE A LIMITING INSTRUCTION ON THE "OTHER ACTS" EVIDENCE DEPRIVED PETITIONER DUE PROCESS OF LAW AND VIOLATED PETITIONER'S RIGHT TO BE FREE OF CRUEL AND UNUSUAL PUNISHMENT.**

Petitioner has detailed in his Third and Eighth Claims for Relief the substantial volume of "other acts" evidence which was used by the prosecution to obtain aggravated murder convictions against Mr. Palmer by attempting to show his purported character or propensity to act in violation of his due process rights. The prejudicial nature of the improper admission of this evidence and its prejudicial affect on the verdicts rendered in this case was substantially enhanced by the trial court's failure to provide any limiting instruction with regard to the use of that evidence.

116

## A.    Magistrates Decision

The Magistrate Judge rejects this claim on the merits concluding incorrectly that there evidence of Petitioner's guilt was "substantial." (Doc. 103. p. 68)[10] This recommendation is in error.

## B.    The Trial Court's Failure to give a limiting Instruction Violated Clearly Established Federal Law and Denied Fundamentally Fair Proceedings

Generally, if the trial judge concludes the balancing of the probative versus the prejudicial affect of other acts testimony weighs in favor of its admission, the Court "should ordinarily instruct the jury carefully as to the limited purpose for which the evidence is admitted." *United States v. Sangrey*, 586 F.2d 1312, 1314 (9th Cir. 1978).[11]  See also *United States v. Yopp*, 577 F.2d 362, 365 (1978) (failure to give an admonition is clear error which requires vacation of the judgment).

Both the state and federal rules of evidence regarding the admission

---

[10]There is no issue regarding procedural default as this Court has previously held that no defense was raised as to this claim.   (Decision, Doc. 61, adopting Report and Recommendation, Doc. 50, where the Court found that no procedural default defense had been raised as to this Claim for Relief.  (Doc. 50, p.10).  Additionally, the Magistrate Judge correctly concludes that this claim was properly exhausted. (Doc.103, p. 67).

[11]The court in this case found no error, noting that it appeared from the "record as a whole" that the trial judge adequately weighed the probative value in prejudicial effective proffered evidence before its admission. . . .  *Id.* at 1315.  Of course, in the case at bar there is scant evidence that the trial court properly weighed the unusually large volume of "other acts" testimony and evidence against its prejudicial effect.

of other acts are substantively identical.  (Compare Rule 404, Federal

Rules of Evidence with Rule 404, Ohio Rules of Evidence).  Ohio prohibits

the use of "other acts" evidence to show character or propensity.  When

such evidence has a legitimate purpose, the jury must be instructed to limit

its consideration of such proof.  *State v. Flonnory*, (1972), 31 Ohio St.2d

124, syllabus, para. 2).  As the Sixth Circuit has held,

> When the trial court's final decision is made, the
> balancing have been done, and the jurors are
> permitted to hear of the Defendant's prior
> misconduct, it is important that the jurors then be
> ***clearly, simply, and correctly instructed***
> ***concerning the narrow and limited purpose for***
> ***which the evidence may be considered.*** . . .
> (Emphasis added).

*U.S. v. Johnson*, 27 F.3d 1186, 1193 (6th Cir. 1994), cert. denied 513 U.S.

1115.  As the Court of Appeals explained, "because prior acts evidence

carries with it such a high risk of confusion and misuse . . . there is a

heightened need for the careful application of principles set out in Rule

403.  *Id.* at 1193.  The Court affirmed the conviction in that case, only

because the trial court, unlike the trial court in Mr. Palmer's case, gave

specific limiting instructions.

    Petitioner has previously demonstrated, in his Objections as to Third

and Eighth Claims, that the state's pervasive use of "other acts" evidence

118

throughout the guilt and penalty phase of the proceedings in state court were not admissible for any purpose. Even assuming the voluminous "other acts" evidence had some limited purpose for which it could be admitted, the trial court would then have a *sua sponte* obligation to provide a limiting instruction, even in the absence of any objection by Petitioner's counsel. The Court's failure to offer such a limiting instruction as the evidence was admitted and in final instructions to the jury was plain error and denied Petitioner his substantive right to due process. *U.S. v. Suaza-Martinez*, 217 F.3d 754, 759-60 (9th Cir. 2000) (where the Court held that the trial court had a *sua sponte* obligation to provide a limiting instruction regarding the proper use of a co-defendant's out of court statement).

Petitioner has demonstrated in his Eighth Claim for Relief, above, the historical and fundamental importance of protecting a criminal defendant against the use of "other acts" evidence to prove a criminal defendant's character or propensity. As Petitioner has demonstrated, these principles and fundamental fairness are deeply rooted in the Anglo-American jurisprudence. In reversing a denial of a petition for writ of habeas corpus, and remanding the matter for an evidentiary hearing, the Ninth Circuit held,

> In *Dickson [v. Sullivan*, 849 F.2d 403 (9th Cir. 1998)]
> we found it `impossible' to conclude that exposure

119

of one or more jurors to highly prejudicial
information regarding the defendant's prior criminal
acts was harmless beyond a reasonable doubt.
(Citation omitted). The serious concerns that
motivated us to grant habeas relief in that case are
likewise present here and lead us to the same
result even under the . . . harmless error standard.

*Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993).

It is readily apparent from the record in this case that Petitioner was

denied a fundamentally fair trial as a result of the prosecutor's pervasive