during a crucial portion of the trial, rendering illusory the defendant's right to appeal, requiring a new trial. *Id.* at 1305. Thus, there can be no serious dispute - trial counsel's failure in this regard prejudiced Mr. Palmer. These failures undermine the reliability of the outcome of the appeals. The state courts have unreasonably

### (D) Trial Counsel Failed to Seek a Change of Venue on the Grounds of Pervasive Pretrial Publicity. [Claim 15.5].

**Merits:**

The Report and Recommendation erroneously concluded that this claim was without merit because Petitioner could not show prejudice and because trial counsel heard the trial judge state that "such a motion would not be entertained unless we couldn't seat a jury." (R&R Doc. 103, p. 99). It is important to recognize that the fact that the trial court opined that it wouldn't entertain a motion to change venue unless a jury could not be seated is not a relevant consideration when an attorney, defending a capitally indicted defendant, determines whether or not to assert a legal claim. See, Guideline of the 10.8 of the ABA Guidelines on the Appointment and Performance of Defense Counsel in Death Penalty Cases.

Moreover, Petitioner can show prejudice. Prior to impaneling the jury

155

in this action, the community in which the alleged offenses occurred, and in which the trial was to be held was literally saturated with media coverage concerning Petitioner's guilt.   The media coverage continued during the trial.  See, (Joint Apx. Vol IX, pp. 2196-2246). Additionally, there was substantial and extensive radio and television coverage in the small community in which the trial was taking place.   The amount and extent of coverage exposed the venire to extraordinary amount of pretrial publicity making it highly improbable that they could render a finding and verdict based only upon the evidence introduced in Court.  The jury was necessarily influenced by the facts and opinions contained in the media coverage.  During voir dire, a juror who ultimately sat on Petitioner's case, Frank Melchiorie, admitted that he had pretty much formed his own conclusion prior to trial based on what he read in the newspaper.  Juror Melchiorie expressed on-the-record difficulty in being able to set aside what he had read or heard.  (Tr. p.565, 566). Even though Mr. Melchiorie indicated he had already formed an opinion regarding Petitioner's guilt, he was permitted to sit on the jury.

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955).  "The requirement that a jury's

verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (citation omitted). As such a capital defendant has the right to a fair trial and sentencing by impartial jurors. *See Morgan v. Illinois*, 504 U.S. 719 (1992); *Gray v. Mississippi*, 481 U.S. 648 (1987); *Murphy v. Florida*, 421 U.S. 794 (1975); *Irvin v. Dowd*, 366 U.S. 717 (1961). A jury unaffected by pre-trial publicity being essential to a fair trial, it is necessarily counsel's obligation to protect that right.

In this case the evidence shows that publicity infected the impartiality of at least one juror. Where publicity fosters a prejudice against a defendant, it deprives the defendant of a fundamentally fair trial. *Irvin v. Dowd,* 366 U.S. 717 (1961). In this case, trial counsel concedes that he considered a change of venue, but did not pursue it. No legal strategy was exercised in that decision. Rather counsel again chose not to protect his client's interest because the trial court informally suggested that the motion would be denied. (Nichelson Tr. Vol. I pp. 57-58). As a result of counsel's failure, at least one juror affected by the publicity sat on the jury. Thus, it can be fairly said that counsel's ineffectiveness in not pursuing a

157

change of venue, rendered the result unreliable within the meaning of *Strickland.* The state court's decision to the contrary constitutes an unreasonably application of Supreme Court precedent. applied Supreme Court precedent in holding otherwise.

### E. Trial Counsel Failed to Object to Incomplete and Erroneous Instructions Regarding Inferences [Claim 15.6]

**Procedural Default:**

The Report and Recommendation erroneously concludes that this claim is procedurally defaulted asserting that the claim was not raised on direct appeal. (R&R Doc. 103, p. 97). In the present habeas proceedings, the Court previously found that Respondent failed to oppose Petitioner's motion for Summary Judgment that this claim was not defaulted. (R&R, Doc. 50, pp. 13-14). In adopting the Report and Recommendation regarding Petitioner's motion for summary judgment the District Court never made a finding that this claim was procedurally defaulted. (Doc. 61). Therefore, this claim is not defaulted.

**Merits:**

Petitioner contends as part of his Fifteenth Claim for Relief that trial counsel rendered deficient performance in failing to object to incomplete and erroneous jury instructions regarding inferences. State courts may not permit a jury to base an inference of fact upon another inference. Fundamental fairness dictates that the Court must provide a limiting instruction where an element of an offense, such as intent to kill, is based upon circumstantial evidence and inferences drawn upon that evidence. "We will not uphold a conviction, however, that was obtained by nothing more than `piling inference upon inference . . . '" *U.S. v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000), quoting *United States v. Fox*, 902 F.2d 1508, 1513 (10th Cir. 1990). Permitting a jury to stack inferences in this way renders a resulting verdict unreliable. "Where an inference is based solely and entirely upon another inference, its foundation is so insecure that reliance upon the second inference would stretch credulity beyond its permissible bounds and result in an inferred fact which in reality is speculative . . ." *State v. Ebright*, (1983), 11 Ohio App.3d 97, 98.

In the case at bar, the trial court provided the jury only with a general instruction regarding the definition of inference. (Joint App., Vol. IV, Tr. p. 1231). In this case, the record discloses no objection by counsel to the

159

Court's failure to instruct the jury that it is prohibited from stacking one

inference upon another inference to prove an element of an offense.

Defense counsel was aware of the importance of such a limiting instruction

and conceded that there would be no strategic justification for not either

submitting an instruction to be included or objecting to the omission of

such an instruction.  (Nichelson Trial Tr., Vol 1, pp. 58-59).  Such an

instruction was particularly important where the prosecution introduced

substantial evidence of other acts of criminal misconduct unrelated to the

indictments.  *Id.* at 59.  The instruction in this case permitted the jury to go

beyond an inference from direct circumstantial evidence.  The trial judge

instructed the jury,

> In order to warrant a conviction in a criminal case
> upon circumstantial evidence ***or by any evidence,***
> it is necessary that the evidence be so clear and
> convincing as to exclude every reasonable doubt . .
> .

(Emphasis added).  (Joint App. Vol. IV, Trial Tr., p. 1232).

The Court then proceeds to instruct the jury on determining credibility

by informing them that they should "take into consideration ***any other facts***

***or circumstances*** which may have a bearing upon the credibility of the

witnesses."  (Emphasis added).  (Id.).  By using the phrase "circumstantial

160

evidence or **by any evidence**", and by further informing the jury that they can take into consideration in weighing credibility "any other facts or circumstances" invited the jury to consider a variety of evidence that was clearly unrelated to the elements of intent and purpose, such as the unsubstantiated allegations that he sexually abused his children and ex-wife, that he was intending to harm Mr. Goolie, and that the gas station attendants were lucky they were not robbed or killed.  There is little question that the prosecutor, through irrelevant elicited testimony and through argument, invited the jury to stack these inferences.  (See Petitioner's Traverse Doc. 25, pp. 25-33 for a description of the large body of irrelevant and prejudicial material the prosecutor used to stack inferences of intent and guilt. (Joint App. Vol. IV, Trial Tr., pp. 751, 847, 867, 840, 924, 932, 935, 940-942, 945-948, 953-957, 970, 972, 975, 972, 1127, 1198, 1148, 1198, 1200, 1159-60,  and Mitigation Tr., pp. 122-126, 153).

"An inference is reasonable only if the conclusion flows from the logical and probablistic reasoning." *U.S. v. Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998).  The prosecutor exploited the absence of a limiting instruction regarding the stack of inferences by arguing to the jury,

No matter what anyone tells you, you alone have the power to put those facts together and draw the necessary and reasonable inferences. ***No one can tell you that you can or cannot draw a certain inference*** if you feel beyond a reasonable doubt, ***if you know in your heart*** that that is the necessary and probable inference to draw from ***all of the evidence*** . . .

(Joint App. Vol. IV, Trial Tr. pp. 1159-1160).

Trial counsel's failure to obtain the limiting instruction regarding stacking of inferences, as trial counsel conceded, is particularly critical to this case as the prosecutor had offered substantial evidence regarding unrelated alleged criminal activity of Mr. Palmer prior to the shootings of Mr. Vargo and Mr. Sponhaltz.  (See generally, Traverse, pp. 25-28 for a recitation of the prejudicial evidence offered by the prosecutor.)  It was this highly prejudicial evidence that the prosecutor invited the jury to use in stacking inferences for the purpose of drawing the conclusion that Mr. Palmer purposely killed the two victims.  This had the effect or relieving the prosecution of its burden of proving intent which clearly contravenes well established Supreme Court precedent.  One cannot constitutionally be given the death penalty for an unintended murder.  *Enmund v. Florida*, 458 U.S. 782, 792-93 (1982).

Trial counsel's failure to propose an instruction prohibiting the jury

162

from stacking inferences, as they were invited to do by the prosecutor, relieved the state of proving the element of intent and ultimately permitted the jury to return a verdict of guilty.  Through counsel's deficient performance,  the jury was permitted to stack inferences drawn from unrelated and highly prejudicial assertions of other criminal acts, the verdict is necessarily rendered unreliable. *Glenn v. Tate,* 71 F.3d 1204, 1210 (6th Cir.1996) (finding prejudice to be "quite clear" when counsel failed to present pertinent evidence of mental history and mental capacity). The writ should issue.

> **F.    Trial Counsel Failed to Properly Object to Evidence of Other Bad Acts. [Claims 15.8 and 15.9 argued together].**

**Merits:**

The Report and Recommendation erroneously holds that trial counsel were not ineffective in failing to oppose the admission of evidence that Palmer did not pay his child support. [Claim 15.8] (R&R, Doc. 103, p. 100). Evidence as to whether or not Palmer paid his child support obligation was probative of nothing in his capital case. Its admission only served to further the prosecution's obvious plan of character assassination by trying Palmer for who he was and not solely for what he did in the culpability phase.  Mr. Nichelson conceded in his deposition that there was

no strategic reason for permitting this evidence in.  Logic dictates that, in

fact, this evidence could only harm the Petitioner's defense at trial and his

efforts to prove mitigation.  (See Nichelson Tr., Vol. I, pp. 40-56, and see

Nichelson Tr. Vol. II, pp. 2, 20-24).

Petitioner has demonstrated above at the prosecutor's barrage of

irrelevant evidence of alleged other criminal activity "so infected that the

trial with unfairness as to make the resulting conviction a denial of due

process." *Darden v. Wainwright*, 477 U.S. at 181.  Counsel's deficient

performance in this regard so prejudiced the Petitioner that it deprived him

of a trial whose results at both the guilt and mitigation phases were

rendered unreliable.  *Strickland,* 466 U.S. at 687.  Given the serious nature

of the unrelated evidence of other criminal activity, there can be no

question that there is a reasonable probability, that but for counsel's errors

regarding the admission of this evidence, "the result of the proceeding

would have been different."  *Id.* 466 at 694.

The Report and Recommendation erroneously holds that trial

counsel were not ineffective in failing to request a limiting instruction

concerning of evidence that Palmer did not pay his child support because

there was substantial evidence of his guilt.[Claim 15.9] (R&R, Doc. 103, p.

101).  Such reasoning means as long as there is "substantial evidence of guilt" the prosecution can place before the jury as much character assassination as it can muster since it is harmless.  As was the case during the mitigation phase, counsel failed to object to or seek limiting instructions regarding evidence offered by the prosecutor that Petitioner allegedly engaged in other criminal activity unrelated to the charges  which were the subject of his trial.  Specifically, the prosecutor, without objection, was allowed to elicit testimony regarding Petitioner's alleged criminal intent toward, the gas station attendant, a local motel and regarding unsubstantiated criminal acts allegedly perpetrated against his children and his ex-wife, including sexual and physical abuse.  None of this evidence has to do with his whereabouts since it was not contested that he shot the victims. None of this evidence regarding unsubstantiated criminal acts allegedly perpetrated against his children and his ex-wife, including sexual and physical abuse was relevant in any way to his intent or state of mind the day of shootings. There was no objective evidence presented that Palmer had any criminal intent toward the gas station attendant or the local motel.  A limiting instruction was warranted. Thus, the writ should issue.

**Harmless Error:**

165

This error was not harmless since the jurors were instructed during the sentencing phase to consider "all the evidence" without distinguishing between evidence presented in the culpability phase with evidence presented in the sentencing phase. (Joint Apx. Vol. IV. pp. 158, 162, 163)

**G.     Arguments in support of Claim 15.14, "Failure to be Adequately Prepared for the Sentencing/Mitigation Phase" are presented along with the arguments in support of Claim 15.22, "Failure to Properly Investigate and Present Mitigating Evidence" argued below in subsection O.**

**H.     Trial Counsel Failed to Object to Erroneous Jury Instructions Concerning a Unanimous Finding of Mitigation [Claim 15.15]**

**Merits:**

The Report and Recommendation incorrectly concludes that Palmer has failed to demonstrate how the state court decision disposing of this claim was contrary to or an unreasonable application of Supreme Court precedent. (R&R, Doc. 103, p. 104).During the mitigation phase, trial counsel failed to object to the trial court's instruction which effectively informed the jury that their decision to return a verdict less than death must be unanimous and that it would only be a recommendation not binding on the Court.

At the sentencing phase of Mr. Palmer's trial, the Court instructed the

166

jury as follows:

> You shall recommend the death sentence, if you **unanimously** find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.  If you do not so find as to any one or all of the four counts of the indictment, you shall ***unanimously recommend either life sentence with parole eligibility*** after serving 20 years of imprisonment or life sentence with parole eligibility after serving 30 years of imprisonment. (Emphasis added).

(Mit. Tr. p. 162).  This instruction requiring a unanimous verdict regarding sentences less than death violates Mr. Palmer's rights as secured by the Eighth and Fourteenth Amendments to the United States Constitution.

In *Mills v. Maryland*, 486 U.S. 367 (1988), the Supreme Court reversed the imposition of a death sentence and remanded for resentencing in light of the probability that jurors, by virtue of the Court's instructions, thought that they were precluded from considering any mitigating evidence unless they first unanimously agreed on the existence of a particular mitigating circumstance.  The Court explained its concern,

> . . . if petitioner is correct, a jury that does not unanimously agree on the existence of any mitigating circumstance may not give mitigating evidence any effect whatsoever, and must impose the sentence of death.

*Id*. at 375.  In light of the *Mills* Court's emphasis that "in reviewing death

167

sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper ground," a reversal of the death sentence is equally appropriate in this case.  The *Mills* Court went on to caution,

> But common sense . . . [s]uggest[s] that juries to not leave blanks and so do not report themselves as deadlocked over mitigating circumstances after reasonable deliberations . . ., unless they are expressly instructed to do so.  The decision to exercise the power of the state to execute a defendant is unlike any other decision, citizens and public officials are called upon to make.  Evolving standards of societal decency have imposed a correspondingly high requirement of reliability on the determination that death is the appropriate penalty in a particular case.  The possibility that petitioner's jury conducted its tasks improperly certainly is great enough to require re-sentencing.

*Id.* at 383-84.

The instruction in this case unambiguously leads the jury to believe that it must first consider the factors necessary to impose the death penalty.  The jury is then instructed that any recommendation of a sentence less than death must be unanimous.  Thus, the jury is prevented from knowing that a single juror could prevent the imposition of death. It unconstitutionally permitted the jury only to consider mitigating factors that it found unanimously.  *Gall v. Parker*, 231 F.3d 265, 328-329 (6th Cir. 2000).

168

The Sixth Circuit has set aside a death sentence that was based on a unanimity instruction substantively the same as the one given to the jury in this case. *Davis v. Mitchell*, 318 F.3d 682 (6th Cir. 2003). In *Davis*, the Court, relying on *Mills*, found the mitigation phase instruction to be constitutionally deficient where it simply confused the jury so that they may have incorrectly believed that a sentence less than death could only be recommended upon an unanimous finding. *Id*. at 684-685. The Court concluded,

> In fact, there is a reasonable likelihood that the jury believed that it could not render a verdict in favor of life imprisonment rather than death unless the jury was unanimous with respect to its reasoning on the presence of mitigating factors and unless the jury was unanimous in rejecting the death penalty. **Instructions that leave the jury with the impression that the juror unanimity was required to mitigate the punishment from death to life imprisonment clearly violate the Eighth Amendment, and therefore a writ of habeas corpus must issue setting aside the death sentence.** (Emphasis added).

*Id*. at 685.

The instruction in this case was more direct and less ambiguous than the one found constitutionally deficient in *Davis*. By directing the jury that "you shall unanimously recommend either life sentence with parole

eligibility after serving 20 years of imprisonment or life sentence with parole eligibility after serving 30 years of imprisonment", the Court made it clear that the jury had to unanimously agree on any mitigating factor as outweighing the aggravating sentence that  less than death.

*Mills* had unequivocally established this legal principle prior to the mitigation hearing in Mr. Palmer's case.  There could be no strategic decision exercised by defense counsel to explain their failure to object to this instruction.[1]  Consistent with the decisions in *Mills* and *Davis*, the resulting jury recommendation is clearly rendered unreliable within the meaning of *Strickland*.

**Harmless Error**:

This error was not harmless since the jurors were instructed during the sentencing phase to consider "all the evidence" without distinguishing between evidence presented in the culpability phase with evidence presented in the sentencing phase.  (Trial Tr. II. 158, 162, 163)

I.    **Trial Counsel Failed to Object to Erroneous Jury Instructions Concerning the sentencing verdict as being only a  a Recommendation. [Claim 15.16]**

**Merits:**

---

[1]Defense counsel's objections to the instructions appear at Joint Appendix, Vol. IV, Mitigation Tr., p. 164.

The Report and recommendation erroneously concludes that trial

counsel were not ineffective in failing to object to unanimity requirement for

any verdict of less than death. (R&R, Doc. 103, p. 104)

Additionally, the trial Court makes multiple references to the jury's

decision at the mitigation phase being nothing more than a

recommendation.

> . . . you will now decide whether you will
> recommend to the court that the sentence of death
> shall be imposed . . . (Joint App. Vol. IV, Mitigation
> Tr., p. 158).
>
> . . . if not, you will recommend that the Defendant
> be sentenced to life imprisonment.  (Id.)
>
> . . . You shall make a recommendation to the Court
> on each of the four counts of the indictment.  (Id. at
> 162).
>
> . . . You shall recommend the death sentence . . .
> (Id.).
>
> . . . You shall either unanimously recommend either
> life . . . (Id.).

Under *Caldwell v. Mississippi,* 472 U.S. 320 (1985), it is

constitutionally impermissible to rest a death sentence on a determination

made by a sentencer who has been led to believe that the responsibility for

determining the appropriateness of the defendant's death rests elsewhere."

171

*Id.* at 328-329.  The trial court's repeated emphasis that the jury's

sentencing decision was on a recommendation diluted the jury's sense of

responsibility, thus violating this constitutional principle and denying

Petitioner a fair decision on sentencing.  Again, there can be no strategic

reason for permitting such instructions to go to the jury without objection.

The failure to object thus rendered the jury's sentencing decision unreliable

within the meaning of *Strickland.*  Issuance of the writ is appropriate.

###      J.      Trial Counsel Failed to Object to Cross-examination
         Concerning Other Acts Evidence. [Claim 15.17]

**Merits:**

The Report and Recommendation contends that this claim is without

merit. (R&R, Doc. 103, p. 105). Here, the improper questions were

extensive and served no purpose other than assassinate Palmer's

character to induce the jury to rely on non-statutory aggravating

circumstances to sentence him to death.

For example, the prosecutor repeatedly referred to an alleged dispute

between George Goolie and Petitioner relating to Petitioner's ex-wife.

During opening statement, the prosecutor made references to the effect

that Mr. Palmer was in the area of the shootings for the purpose of

172

burglarizing the home of George Goolie, an offense for which he was never charged. (Tr. p. 751). During the trial, the prosecutor was allowed to ask Deputy Thompson to testify that Petitioner and Eddie Hill drove past Goolie's trailer and his place of employment, and that Goolie's trailer was located one-quarter mile from where the decedent's body was found. Deputy Thompson was also permitted to testify that Palmer had told him that he was in the area to rob Mr. Goolie. (Tr. p. 847, 867). Likewise, the prosecutor elicited testimony from a friend of one of the decedents that decedent was asked by Goolie to watch his trailer because of past burglaries, implying that Petitioner was the one who had burglarized Goolie's trailer. (Tr. pp. 840, 924). Mr. Goolie himself was allowed to testify, in response to the prosecutor's questions, that his home had been burglarized earlier in the year that one of the decedents was asked to watch his trailer. The prosecutor also elicited from Mr. Goolie his unfounded assertion that Petitioner had called Petitioner's ex-wife at Mr. Goolie's house regarding non-support of two of his children. (Tr. pp. 970, 972, 975). To further inflame the passions of the jury, the prosecutor asked and was permitted to have Mr. Goolie testify that on the day subsequent to the alleged offenses, Mr. Palmer called Goolie and said

173

something to him about "performing sexual acts with me and something to the extent he wanted to kill me afterwards." (Tr. p. 972).

Consistent with this highly prejudicial and irrelevant line of questioning, the prosecutor accused Petitioner during cross-examination of hating Mr. Goolie and wanting to go to his place to rob him and kill him. (Tr. p. 1127). Again, these unfounded accusations came into evidence although Mr. Palmer had never been charged with any offenses relating thereto.

During the trial, the prosecutor insisted on pursuing other equally prejudicial and irrelevant avenues of evidence. For example, Sergeant Hawthorne was asked to testify that on May 7 and the early morning of May 8, he saw a car, implied to be Petitioner's car, in a parking lot of a local motel and noted that there had been a lot of theft in that area. This testimony was designed to and did create the impression that Petitioner engaged in theft in that area. (Tr. pp. 932, 935). The prosecutor called Mr. Kiss to testify. In response to the prosecutor's questions, Mr. Kiss was allowed to testify that on May 8, 1989 he was being followed by a brown car to his home. This car turned around in the driveway next to him, and the persons in the car yelled something at him. His testimony was

174

admitted by the prosecutor to infer that Petitioner intended to rob Mr. Kiss. (Tr. pp. 940-942).  Similarly, the prosecutor called gas station attendants and elicited from them that, on the dates of the shootings, on two separate occasions, the Petitioner and Mr. Hill came into the service station and were acting "suspiciously."  Indeed, the prosecutor had one of the attendants offer the opinion that Petitioner and Mr. Hill were acting like they were "casing the place."  (Tr. pp.945-948, 953-957).

With the exception of an alleged telephone conversation between Mr. Goolie and Mr. Palmer, defense counsel offered no objections, made no effort to exclude the other bad acts testimony and failed to request any limiting instruction.  (See generally Nichelson Tr., Vol. I, pp. 40-43, 58).

The prosecutor's improper motive and intent became clear during closing argument where he capitalized on these totally inappropriate "other acts" evidence.   For example, the prosecutor argued to the jury that "the guys at the gas station, they were very lucky they weren't robbed and killed."  (Tr. p. 1198).  The prosecutor proceeded to improperly argue to the jury "we know pretty much what he did, and from that you good people are permitted to infer what was going on in his mind at the time he did it.  All of

175

this we have been over and over what was their original purpose regarding

Goolie and the loaded gun circling Goolie's . . . like birds of prey going in

for the kill." (Tr. pp. 1148, 1198, 1200).

It is important to note that the prejudicial effect of the prosecutor's act

and conduct during the trial in closing argument was exacerbated by the

failure of the Court to properly instruct the jury that they could not base an

inference on another inference. Exploiting his misconduct, the prosecutor

told the jury,

> No matter what anyone tells you, you alone have
> the power to put those facts together and draw the
> necessary and reasonable inferences. No one can
> tell you that you can or cannot draw a certain
> inference if you feel beyond a reasonable doubt, if
> you know in your heart that this is the necessary
> and probable inference to draw from all of the
> evidence. It is clear that all the reasonable
> inferences that any rational person can draw point
> to no other conclusion and that Petitioner is guilty
> as charged of all counts and all specifications.

(Tr. pp. 1159-60). In short, the prosecutor invited the jury to infer from

these other acts, speculative opinions about intent to kill and rob other

people, and the characterization of Mr. Palmer's motives relating to people

other than the victims, that Petitioner formed a requisite intent to kill and

that death was the appropriate sentence. These comments were designed

176

to do nothing more than poison the mind of the jury by convincing them that Mr. Palmer was a man who was simply bent on robbing and killing.

In *Kincaid v. Sparkman*, 175 F.3d 444 (6th Cir. 1999), the Court of Appeals held that in a burglary prosecution, a prosecutor's comments about the defendant's prior numerous acts of burglary and implied involvement in a series of offenses warranted granting habeas corpus relief. The Court found that the prosecutor's comments constituted more than simply error under state law. Rather, these prejudicial acts on the part of the prosecutor constituted misconduct that was fundamentally unfair and thus denied petitioner due process. In so holding, the Court looked at the degree to which the prosecutor's comments and remarks had a tenancy to mislead the jury into prejudice against the defendant; the extent to which the prosecutor's misconduct was isolated or extensive; and whether they were deliberate or accidental efforts to place improper information before the jury. *Id*. at 446. In that case, the Sixth Circuit found due process violations where the prosecutor, although making his comments within a relatively short period of time, conveyed to the jury the prosecutor's contention that the defendant was a "professional burglar" and reminded the jury that there had been several other burglaries around the

177

county.

Here, the prosecutor in this case painted a similarly improper picture of Palmer with his efforts to persuade the jury that Mr. Palmer was out to rob and kill virtually everyone in his path including the gas station attendants, Mr. Kiss, and Mr. Goolie. Unlike the prosecutor in the *Kincaid* case where the Sixth Circuit held that the prosecutor's remarks required granting of the writ, the prosecutor in Mr. Palmer's case egregiously peppered the entire trial phase with evidence of other bad acts allegedly contemplated or committed by the Defendant. Like the prosecutor's conduct in *Kincaid*, the misconduct and comments of the prosecutor in this case were clearly deliberate and warrant granting of the writ.

### K.    Trial Counsel Failed to Object to Introduction of Cammy Palmer Affidavit. [Claim 15.18]

**Merits:**

The Report and Recommendation asserts that Palmer invited the prosecution to bring out his ex-wife's affidavit from divorce proceedings. (R&R, Doc. 103, p. 106). The problem is that there are limits to the character and conduct evidence that can be put on by the prosecution concerning an accused. Here, none of Cammy Palmer's affidavit was

178

relevant to show any proof of defendant's motive, opportunity, intent,

preparation, plan, knowledge, identity or absence of mistake or accident

concerning the aggravating circumstances or mitigating factors. In addition,

it is improper to cross examine character witnesses with questions that

require an assumption of the defendant's guilt. See, State v. Brumback,

109 Ohio App.3d 65 (1995).

During the penalty phase, the prosecutor continued this misconduct

by eliciting from Mr. Palmer's ex-wife, Cammy Palmer, that she had filed an

Affidavit in their previous divorce proceedings.  That affidavit made

reference to other alleged criminal activity by Mr. Palmer which was

unrelated to the murder indictments.  For example, the affidavit used by the

prosecutor made reference to Mr. Palmer's efforts to attempt to kill his wife,

blowing up her car, burning down the marital residence, and threatening to

kill his daughter and bury her.  The affidavit also made reference to Palmer

allegedly trying to run his ex-mother-in-law off the road.  Finally, and most

prejudicial, the affidavit alleges that Palmer beat his ex-wife, and beat and

sexually molested his children.  (Joint App. Vol. IV, Mitigation Tr., pp. 122-

126).

It is important to emphasize that the prosecutor took advantage of

counsel's failure to exclude this damaging testimony when he recounted

some of the contents of the affidavit in his argument to the jury during

mitigation.

> . . . not only was he going to kill her [Cammy
> Palmer], hang himself, blow up her car, burn her
> house down, kill her daughter and bury her . . .

(Id., Mitigation Tr., p. 153).

In *McKinney v. Rees*, 993 F.2d 1378 (9th Cir. 1993), the Court of

Appeals concluded that the prosecutor admitted a substantial amount of

evidence of "other acts" that was "probative only of character . . . ." *Id.* at

1384.   The Court concluded that "this evidence . . . was not relevant to the

question before the jury.  It served only to prey on the emotions of the jury,

to lead them to mistrust McKinney, and to believe more easily that he was

the type of son who would kill his mother in her sleep without much

apparent motive." *Id.* at 1385.  The Court concluded that the admission of

other acts evidence deprived the criminal defendant of a fair trial and

violated his right to due process.  Accordingly, the Court granted the writ.

Even where the evidence of guilt is strong, the Sixth Circuit Court of

Appeals has held that the cumulative effect of prosecutorial misconduct

throughout trial proceedings can warrant a new trial.  "The prosecutor here

simply failed in his duty to `refrain from improper methods' and did so

pervasively and repeatedly, presenting to the jury without substantiated

arguments, implicit opinions and conclusory assertions.  Although the

individual review of each remark or other separate sets of remarks . . . are

not as severe, our review of all the statements through the whole trial

compels us to remand these cases for new trials."  *United States v.*

*Francis*, 170 F.3d 546, 553 (6th Cir. 1999).  The fundamental unfairness

present in the trial in *Francis* is clearly present in the instant case and

requires granting of the writ.  See also *Floyd v. Meachum*, 907 F.2d 347

(2nd Cir. 1990), where the Court held that the accumulative effects of the

state prosecutor's improper remarks and summation warranted the

granting of the habeas corpus relief.  This misconduct included both

inflammatory comments, erroneous statements of law and diverting the

jury's attention from charges on which the defendant was actually being

tried.

There can be little question that the improper conduct by the

prosecutor unopposed by defense counsel "so infected the trial with

unfairness as to make the resulting conviction a denial of due process."

*Darden v. Wainwright,* 477 U.S. 168, 181 (1986) quoting *Dennely v.*

181

*D'Christoforo*, 416 U.S. 637 (1974).  As Mr. Nichelson conceded in his

testimony, the failure to object and try to exclude such evidence was not

the product of a strategic choice.  (Nichelson Tr., Vol. I, pp. 40-43, 58).

Rather, it was simply neglect, and thus constitutes ineffective assistance of

counsel within the definition of *Strickland*.  Given the enormous prejudice

caused by so many other acts of criminal activity being presented to the

jury without opposition by defense counsel, it is readily apparent that the

jury's verdict at both the guilt phase, and the recommendation of death at

the sentencing phase were infected by the unfettered misconduct of the

prosecutor.  Counsel's deficient performance in this regard prejudiced

Petitioner by depriving him of a trial whose results at both the guilt and

mitigation phases are not reliable.  One's confidence in the death sentence

is undermined the prosecution's unopposed introduction of evidence

unrelated to the nature and circumstances of the crimes, the aggravating

circumstances and the proffered mitigating factors during the sentencing

phase of Palmer's capital trial. Thus, the writ should issue.

## L.    Failure to Obtain a Mitigation Specialist [Claim 15.19]

**Procedural Default:**

The Report and Recommendation erroneously concludes that this

claim is procedurally defaulted.   (R&R Doc. 103, p. 91).  The basis for the

determination in the R&R was that Palmer allegedly violated a state

procedural rule that post conviction claims be supported by evidence

outside the record. One problem with this analysis is that Ohio's Post

Conviction statute (R.C. § 2953.21(A) (1)) clearly indicates that the

purported evidentiary requirement is directory not mandatory because it

uses the terms "<u>may</u> file a supporting affidavit and other documentary

evidence in support of the claim for relief."   Another problem with the

analysis is that the last state court to deal with this claim found, not that the

claim was defaulted,  but that the claim was not sufficiently documented.

The state trial court found that this issue hand already been raised on

direct appeal. (Joint Appendix p. 2300). This issue was presented to the

Belmont County Court of Appeals as part of Assignments of Error II, IV,

and V. (Joint Appendix p. 2324). The Belmont County Court of Appeals

decided on the merits that Petitioner had no right to such an expert since

he had presented insufficient evidence to establish the need for such an

expert. (Joint Appendix pp. 2480, 2483-2484).  Thus, the state court of

appeals looked at the merits of the claim and decided Palmer did not meet

his burden of production or, ultimately, his burden of  persuasion. Hence

183

there is no default.

**Merits:**

At the time of their assignment to represent Mr. Palmer, Petitioner's state trial counsel, Mr. James Nichelson and Mark Costine, had no experience in defending cases where the state sought the death penalty. (Nichelson Tr. Vol. I, p. 10).  In spite of this lack of death penalty experience, Mr. Palmer's counsel failed to seek the assistance of a mitigation specialist or the appointment of counsel with experience in such cases.  Mr. Nichelson testified he may have had a few brief discussions with the trial judge, off the record, but decided against pursuing appointment of someone who had death penalty expertise.   The decision not to seek such assistance was not the product of the considered judgment or strategic choice of counsel.  Rather, Mr. Nichelson concedes in his testimony that this important decision was made simply to avoid annoying or angering the trial judge.  (Nichelson Tr. Vol. I, p. 33). Thus, this decision failed to reflect "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options." *Groseclose v. Bell,* 130 F.3d 1161, 1167 (CA6 1997).

Given Dr. Jackson's lack of expertise as a mitigation specialist other

than being a forensic psychologist it is important to emphasize that the
defense team did not give Dr. Jackson any specific directions to speak with
anyone to develop and confirm Petitioner's substantial history of
psychological disorders and related drug and alcohol abuse.  (Nichelson
Tr. Vol. 1, pp. 31-32).  As it happens, neither defense counsel nor Dr.
Jackson spoke with any health care providers or representatives of
hospitals that had previously treated Petitioner for drug or alcohol abuse,
suicide attempts and depression.  (Id. at 30-32).  This is so in spite of
defense counsel's concession that it was their duty as counsel to assure
that Dr. Jackson had properly developed evidence to support their
mitigation theory.  (Id. at p. 59).

The record before this Court demonstrates that counsel failed in this
duty.  Having failed to instruct Dr. Jackson or otherwise direct him to speak
with people with relevant knowledge regarding Petitioner's psychological
history, Dr. Jackson spoke with no one other than defense counsel and
Donald Palmer.  (See Dr. Jackson's time records, Petitioner's Ex. 1, Bates
pp. 58-59; Nichelson Tr. Vol. 1, pp. 35-36).[2]  It is important to note that Dr.
Jackson spent more time speaking with the prosecutor prior to the

---

[2]Mr. Nichelson confirmed that this represented the entire billing they received from Dr.
Jackson for work he performed on the case.  (Nichelson Tr., Vol. 1, p. 35).

mitigation hearing (1.5 hours) than he did with the defense team (1 hour). (See Dr. Jackson's time records, Petitioner's Ex. 1, Bates pp. 58-59). Having spoken with no relevant medical care providers, Dr. Jackson's testimony consisted almost entirely of simply repeating what he was told by Mr. Palmer.  While Dr. Jackson did testing to arrive at a diagnosis of borderline personality disorder and mentions Petitioner's  turning to abuse of alcohol and drugs, he fails to make any substance abuse diagnosis. (Joint Appendix Vol. IV, pp. 85-86).  In fact, the opinion elicited by defense counsel ultimately harms Petitioner's chance of mitigation.  After asking Dr. Jackson to recount his findings, Mr. Nichelson then asked Dr. Jackson to agree that Petitioner does not meet the legal criteria for criminal insanity. Additionally, he asked the following two questions which, on their face, totally undercut the mitigation interest of his client:

> Q:     And we are not saying that Donald Palmer is
>        criminally insane.
>
> A:     No.  I do not believe he meets the legal
>        criteria for that definition.
>
> Q:     By the same token, *we are not saying that*
>        *this is something that absolutely mitigates*
>        *against penalties in this type of case*
>        *either, are we?*
>
> A:     I'm not sure I understood that question.

186

Q:    Okay.  Let me rephrase that.  **This is not**
**something that falls squarely within the**
**mitigating categories of the law in capital**
**cases as well, is it?**

A:    **No.  This diagnosis is not of itself a**
**mitigating factor. . .**

(Id., pp. 86-87).

When asked about those questions and the responses elicited, Mr.

Nichelson could not recall asking the questions or why he would have

asked