them.  He did agree that the questions as framed may have confused the jury into thinking that he wasn't offering Dr. Jackson's diagnosis as a mitigating factor in his death penalty case.  (Nichelson Tr., Vol. 1, pp. 50-51).  As mentioned, Jackson is asked to make no diagnosis of substance abuse, in spite of the fact that this precise diagnosis had been made nearly two years prior to the shootings at issue in this case.  (See Joint Appendix Vol. IV, Mitigation Tr., pp. 85-86).  Nor does Jackson address in any way Petitioner's history of serious depression or the interplay of his psychological disorders and substance abuse on his actions which lead to the shootings of Mr. Vargo and Mr. Sponhaltz.  (Id. at pp. 86-89).

Although Dr. Jackson mentions that he has reviewed Petitioner's prior medical records relating to his psychological disorders, defense counsel does not ask him to provide any detailed description of those records nor do they offer those records into evidence.  (See Joint Appendix, Vol. IV, Mitigation Tr., p. 135).  In response to the Judge's request about whether they have any exhibits to introduce, Mr. Nichelson replies, "we do not."

Had the defense counsel offered the medical records from the Ohio Valley Medical Center, the jury would have learned that medical

188

professionals, not hired by the defense to render an opinion in a mitigation hearing, had, two years before the killings, diagnosed Petitioner with borderline personality disorder and substance abuse—multiple drugs. Although these records were in Mr. Nichelson's file at the time of the mitigation hearing, they were never offered into evidence. (See Petitioner's Ex. 2, Trial Notebook, Bates pp. 405-442).

It is apparent that Petitioner's state trial counsel really did nothing to investigate his psychological history and background, especially as it was affected by his family circumstances. The only mitigation expert retained by defense counsel relied entirely on information he obtained from Mr. Palmer. As this Court is aware,

> The sole source of mitigating factors cannot properly be that information which Defendant may volunteer, counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility.

*Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000). That is precisely what happened in this case with respect to the primary focus of mitigation, i.e., Plaintiff's psychological disorders effected by drug and alcohol abuse mitigating the killings at issue. Dr. Jackson relied entirely on its conversations with Plaintiff. The medical records he referred to were not

offered in evidence, nor were any of Mr. Palmer's treating medical

providers interviewed or offered as witnesses.  (See records admitted

during Dr. Smith's testimony).  Counsel's failure to properly investigate and

present mitigating evidence which was readily available to them at the time

of trial and mitigation falls below the objective standard of reasonableness

required under the Sixth and Fourteenth Amendments.  *Carter,* 218 F.3d at

596.

As the Supreme Court has held, "it is undisputed that [Petitioner] had

a right–indeed, a constitutionally protected right–to provide the jury with the

mitigating evidence that his trial counsel either failed to discover or failed to

offer."  *Williams v. Taylor*, 529 U.S. 362, 393 (2000).  In *Williams*, the

Supreme Court found that counsel did not begin to prepare for the

mitigation phase of the proceedings until a week before trial and failed to

conduct an investigation that would have uncovered extensive records that

went directly to the mitigation issues in that case.  *Id*., 529 U.S. at 395.

Similarly, in this case, trial counsel failed to present any of Petitioner's

actual treatment records, nor did they offer testimony of medical care

providers who had treated Petitioner for his previously diagnosed

borderline personality disorder and multiple drug substance abuse.  No

190

evidence was offered to explain the interplay between Petitioner's psychological disorders, his substance abuse, and his drinking of an entire bottle of whiskey immediately preceding the killings. This, no doubt, is a part of counsel's failure to be adequately prepared by retaining the appropriate expert and by properly giving that expert direction. Like counsel's failures in *Williams* and *Carter*, the failure of Mr. Palmer's counsel to develop and present appropriate expert testimony and existing records regarding Mr. Palmer's pre-existing psychological disorders and its interplay with drug and alcohol abuse prejudiced Petitioner within the meaning of *Strickland*. As the Court held in *Williams*, the state court's contrary conclusions are objectively unreasonable. *Williams*, 529 U.S. at 397.

## M. Failure to Obtain a Toxicologist/Pharmacologist [Claim 15.20] Procedural Default:

The Report and Recommendation erroneously concludes that this claim is procedurally defaulted. (R&R Doc. 103, p. 91). The basis for the determination in the R&R was that Palmer allegedly violated a state procedural rule that post conviction claims be supported by evidence outside the record. One problem with this analysis is that Ohio's Post

191

Conviction statute (R.C. § 2953.21(A) (1)) clearly indicates that the purported evidentiary requirement is directory not mandatory because it uses the terms "<u>may</u> file a supporting affidavit and other documentary evidence in support of the claim for relief."   Another problem with the analysis is that the last state court to deal with this claim found, not that the claim was defaulted,  but that the claim was not sufficiently documented. The state trial court found that this issue hand already been raised on direct appeal. (Joint Appendix p. 2300). This issue was presented to the Belmont County Court of Appeals as part of Assignments of Error II, IV, and V. (Joint Appendix p. 2324). The Belmont County Court of Appeals decided on the merits that Petitioner had no right to such an expert since he had presented insufficient evidence to establish the need for such an expert. (Joint Appendix pp. 2480, 2483-2484).  Thus, the state court of appeals looked at the merits of the claim and decided Palmer did not meet his burden of production or, ultimately, his burden of  persuasion. Hence there is no default.

**Merits:**

The only witness called by counsel to address in any substantive way Petitioner's history of drug and alcohol abuse and its significance with

192

respect to the shootings was Newton Jackson, Ph.D.  (Nichelson Tr. Vol. 1, p. 59).

At the time Defendant's counsel retained Dr. Jackson as their mitigation expert,  they had formulated a theory of the case for both the guilt and mitigation phases that would focus on the issue of Mr. Palmer's history of drug abuse and the effect of drug and alcohol abuse had on Mr. Palmer's culpability at the time of the shootings.  (Nichelson Tr. Vol. I, pp 27-28, Vol. II, pp. 13-14).  Defense counsel made this decision to hire Dr. Jackson although they were unaware that he had any particular expertise in the psychological effects of drug and alcohol abuse.  They were familiar only with what was contained in his C.V.  (Nichelson Tr. Vol. 1, p. 34).  In fact, Dr. Jackson's C.V. confirms that he lacks any particular expertise with drug or alcohol addiction.  (See Nichelson Trial Notebook, Petitioner's Ex. 2, Bates pp. 385-392). Neither defense counsel nor Dr. Jackson spoke with any health care providers or representatives of hospitals that had previously treated Petitioner for drug or alcohol abuse, suicide attempts and depression.  (Nichelson Tr. Vol. 1, pp. 30-32).  Jackson was asked to make no diagnosis of substance abuse, in spite of the fact that this precise diagnosis had been made nearly two years prior to the shootings at issue

193

in this case.  (See Joint Appendix Vol. IV, Mitigation Tr., pp. 85-86).  Nor

does Jackson address in any way Petitioner's history of serious depression

or the interplay of his psychological disorders and substance abuse on his

actions which lead to the shootings of Mr. Vargo and Mr. Sponhaltz.  (Id. at

pp. 86-89).  Additionally, if defense counsel had met their duty to obtain the

proper expert testimony from one who has expertise with the interplay of

psychological disorders and substance abuse, the jury would have

received much more relevant information in mitigation.

In this regard,  Dr. Smith's testimony established that he  reviewed

medical records that were available at the time of the mitigation hearing.

He also reviewed the mitigation hearing transcript.  He concluded that

counsel failed to give proper direction to Dr. Jackson.  He further offered

the following relevant opinions:

> 1.    Based upon my review of Mr. Palmer's history as set out
>        in his medical records and described above confirming
>        his history of drug addiction, and given Mr. Palmer's
>        testimony regarding drug and alcohol use, especially drug
>        and alcohol use around the time of the killings at issue in
>        this case,[1] it is my opinion, within a reasonable degree of
>        scientific probability, that Mr. Palmer's mental status was
>        affected by the use of drugs and alcohol around and
>        immediately preceding the time of the killings.  His

---

[1]  Petitioner consumed an entire bottle of 100 Proof Southern Comfort shortly before the shootings.  Joint
App. Vol. IV, Trail Tr. pp. 1080-81, 1088.

194

substance abuse interacted with his mental health disorders of depression and borderline personality disorder.

2.    Each of these disorders alone was sufficient to significantly impair Mr. Palmer's perceptions and behavior at the time of the offense. In combination, these disorders had a multiplicative effect. Each disorder exacerbated the effects of the other. Mr. Palmer's depressive symptoms and Borderline Personality traits were magnified by the effects of the alcohol, causing him to be even more impulsive, irritable, emotionally labile and illogical. His ability to interpret interpersonal interactions was impaired, leading to misperceptions regarding the intentions of others. The combined effect of these disorders was impairment in Mr. Palmer's cognition, labile and unstable mood and an inability to appreciate the nature and consequences of his actions.

Additionally, counsel was ineffective in presenting any helpful explanatory information that would assist the jury at both phases of the case. Such evidence is crucial. See, Wiggins v. Smith, 539 U.S. 510 (2003). Ultimately, this was due to the failure of defense counsel to meet their obligations. See, Guidelines 10.7 and 10.11 of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. Dr. Smith's testimony summarized below establishes the deficient performance of trial counsel:

1.    In spite of the fact that this information regarding this affect of alcohol and drugs on Mr. Palmer's ability to

195

appreciate the nature and consequences of his actions at the time of the killings was available to the defense counsel at the time of guilt and penalty phases of his trial, neither defense counsel nor the one expert retained by defense counsel, Newton L. P. Jackson, Jr., Ph.D., presented any helpful explanatory information that would assist the jury in understanding this affect.

2.    For example, defense counsel and their expert should have informed the jury at the mitigation hearing of Plaintiff's detailed history of drug abuse and its interplay with his substantial consumption of nearly an entire fifth of Southern Comfort whiskey at the time of the killings. The records also disclose that Mr. Palmer consumed LSD at approximately 7:00 p.m. on the evening before the shootings and had been taking cocaine on a near daily basis.  On the date of the shootings, sometime after 2:00 p.m., Mr. Palmer purchased and consumed most of a fifth of Southern Comfort.  Mr. Palmer's co-defendant, Eddie Hill, testified in a suppression hearing that Mr. Palmer drank the entire fifth of Southern Comfort by himself. Given Mr. Palmer's height and weight at the time of the killings, approximately six feet and 165 pounds, the effect the alcohol would have had on Mr. Palmer at the time of the shootings would include impaired motor control, impulsivity, poor judgment, difficulty with decision-making, mood swings, distorted perceptions and impaired memory.  This information would have been significant at the mitigation phase since it demonstrates a significantly diminished capacity to appreciate the consequences of his acts on the day of the shootings.

3.    It appears form the records I have reviewed that Dr. Jackson did nothing to develop mitigation evidence other than to speak with the Defendant, Donald Palmer.  Based upon my experience in consulting and testifying in cases such as this, the attorney for the Defendant typically insures that the mitigation experts have spoken with

196

friends, family members, teachers, treatment professionals, witnesses, etc. who would have relevant knowledge regarding the Defendant's psychological status, including his history of drug and alcohol abuse. Additionally, the attorney would typically provide the expert with all relevant medical, psychological and school records and present these to the jury to support the expert's opinion.  In addition, the expert may discover additional records that he/she may request the attorney to acquire.  In this case, no medical, school, etc.  records were presented to the jury at mitigation.   As mentioned, these records would have been important to properly inform the jury of Mr. Palmer's mental health condition at the times of the shootings, as well as to properly inform the jury of Mr. Palmer's developmental history as it relates to his actions at the time of the shootings.  Neither the defense counsel nor Dr. Jackson presented to the jury any independent medical records which would have confirmed, for example, that Mr. Palmer suffered from drug addiction, exacerbated by alcohol abuse, and was also suffering from depression at the time of the shootings at issue.

In *Caro v. Calderon*, 165 F.3d 1223, 1226-27 (9th Cir. 1999), *cert. denied*, 527 U.S. 1049 (1999) the Court noted that, although counsel consulted four experts, including a medical doctor, a psychologist, and a psychiatrist, counsel failed to consult neurologist or toxicologist who could have explained neurological effects of defendant's extensive exposure to pesticides.  The Court held,

Counsel have an obligation to conduct an investigation which will allow a determination of

197

what sort of experts to consult. Once that determination has been made, counsel must present those experts with information relevant to the conclusion of the expert. Counsel in this case was aware of Caro's extraordinary acute and chronic exposure to neurotoxicants, and yet he failed to consult either a neurologist or a toxicologist, experts on the effects of the chemical poisoning. In addition, he failed to provide those experts who did examine Caro with the information necessary to make an accurate evaluation of Caro's neurological system.

*Id.* at 1226. The Court concluded that such a failure could constitute ineffective assistance of counsel and renders the results of the mitigation phase unreliable. *Id.* at 1228. The same failure occurred in this case.

In this case, counsel failed to even seek an expert knowledgeable in the field of alcohol and drug abuse. They failed otherwise to fully investigate these issues and properly present them to the jury for consideration at mitigation although all of the information above was available to them at the time of mitigation. Given the fact that the affect of the drug abuse and alcohol abuse on Petitioner's culpability was the focus of the defense and mitigation at a relatively early stage of the proceedings, such a failure rises to the level of constitutionally ineffective assistance of counsel, undercutting the reliability of both the guilt phase and mitigation phase verdicts. Id.; and see *Skaggs v. Parker,* 235 F.3d 261, 271-272 (6th

198

Cir. 2000).

### N.   Trial Counsel Failed to Proffer the Substance of the Testimony of Reverend Bush which was Improperly Excluded by the Trial Court. [Claim 15.21].

**Procedural Default:**

The Report and Recommendation erroneously concludes that this claim is procedurally defaulted. (R&R, Doc. 103, p. 108).

**Merits:**

During the sentencing phase of the proceedings, Petitioner attempted to present the testimony of Reverend Bush, a minister who had provided some counseling to Plaintiff while he was in jail awaiting trial and sentencing.  The trial court prevented his testifying out of a concern that he might testify regarding moral considerations involved in imposing the death penalty in spite of the fact that he had provided ministerial counseling to Petitioner.  His testimony was excluded.  (Joint App. Vol. IV, Mitigation Tr. pp. 5-9).  Although the Court expressly invited counsel to present Reverend Bush's testimony to the Court outside of the hearing of the jury, Petitioner's counsel failed to take advantage of the invitation and did not otherwise proffer the testimony that was improperly excluded.  (Id. at 6-11). Trial counsel conceded that it was their obligation as counsel to proffer this

testimony since it was relevant to the issue of mitigation and that there was no strategic reason not to make such a proffer.  (Nichelson Tr., Vol. II, pp. 21-23). Reverend Bush is dead. (Nichelson Tr. Vol. II, p. 23).  Thus, at this stage, his testimony cannot be proffered.

The principles underlying the Eighth Amendment dictate that "the jury in a capital case may not be precluded from considering, ***as a mitigating factor,*** any aspect of a defendant's character or record in any of the circumstances of the offense that the defendant proffers is a basis for a sentence less than death.'" *Mason v. Mitchell*, 320 F.3d 604, 618 (2003), quoting *Lockett v. Ohio* , 438 U.S. 586, 604 (1978).  It is counsel's corresponding obligation, therefore, to present all relevant mitigating evidence.  *Williams v. Taylor*, 529 U.S. at 393. Certainly, evidence regarding counseling provided by a minister is precisely the kind of evidence that the Supreme Court in *Lockett* held must be considered as part of the weighing process in deciding whether to impose a sentence less than death.

Counsel's failure to proffer the testimony of a key mitigation witness, especially in light of the deficiency set out above, demonstrates a reasonable probability that, but for counsel's errors, the result of the

200

proceeding, i.e., the imposition of the death penalty, would have been

different.  Certainly counsel's failure "undermines confidence in the

outcome." *Williams v. Taylor*, 529 U.S. at 390-391.

> **O.    Arguments in support of Claim 15.14, "Failure to be Adequately Prepared for the Sentencing/Mitigation Phase" and Claim 15.22, "Failure to Properly Investigate and Present Mitigating Evidence"  argued together.**

**Procedural Default:**

The Report and Recommendation erroneously concludes that these

claims are procedurally defaulted.   (R&R Doc. 103, p. 91).  The basis for

the determination in the R&R was that Palmer allegedly violated a state

procedural rule that post conviction claims be supported by evidence

outside the record. One problem with this analysis is that Ohio's Post

Conviction statute (R.C. § 2953.21(A) (1)) clearly indicates that the

purported evidentiary requirement is directory not mandatory because it

uses the terms "may file a supporting affidavit and other documentary

evidence in support of the claim for relief."   Another problem with the

analysis is that the last state court to deal with this claim found, not that the

claim was defaulted,  but that the claim was not sufficiently documented.

The Belmont County Court of Appeals decided on the merits that Petitioner

201

had no right to such an expert since he had presented insufficient evidence to establish the need for such an expert. (Joint Appendix pp. 2480, 2483-2484). Thus, the state court of appeals looked at the merits of the claim and decided Palmer did not meet his burden of production or, ultimately, his burden of persuasion. Hence there is no default.

**Merits:**

The theory of mitigation in Palmer's case was that his long history of drug abuse and his drug and alcohol use prior to the time of shootings its effect on his pre-existing psychological problems explained his behavior called for a sentence of less than death.

Trial counsel conceded that his representation was inadequate:

> A.    My answer is that ***I did not feel fully competent at that time and I don't feel that I was fully competent sitting here today because we didn't have the experience in such cases.*** We had cases that were capital but not death and we were also holding our regular full time positions and trying other cases. So ***I still don't feel that we had a really good adequate defense in the case***. (Emphasis added).

(Nichelson Tr. Vol. I, pp. 86-87).

Petitioner's state trial counsel, James Nichelson and Mark Costine, produced to Petitioner's counsel all documents they could find with respect

202

to their representation of Donald Palmer during his initial trial and
mitigation hearings.  Mr. Nichelson identified Petitioner's Exhibit 1 as his
"working file" case and Petitioner's Exhibit 2 as the trial notebook which he
maintained in defending Mr. Palmer.[2]  (Nichelson Tr. Vol. 1, pp. 11, 13).

Mr. Nichelson testified that it was his practice in 1989, at the time of
the trial, to keep all of his notes regarding witness interviews in his working
file similar to Petitioner's Exhibit 1, Mr. Nichelson confirmed his normal
practice that witness notes would normally be kept in a single file and that
he could not recall any other files that he kept on Mr. Palmer's case which
would have contained notes of witness interviews.  (Id., pp. 16-17).  Mr.
Nichelson's review of the working file in Mr. Palmer's case revealed notes
of interviews with only two witnesses, their client, Donald Palmer, and his
ex-wife, Cammy Palmer.  (Id., pp. 15-16).  Mr. Nichelson also testified that
he remembered speaking with witnesses Ruby Grimes, Petitioner's great-
aunt, and Petitioner's mother, Norma Needham.  (Nichelson Tr. Vol. 2, pp.
10-12).  Mr. Nichelson does not recall if he spoke with any of the other
witnesses on the witness list he had in his trial notebook.  (Nichelson Tr.
Vol. 2, pp. 11-14).  Mr. Nichelson was unable to recall which of the

---

[2]The originals of these exhibits were filed with the Court along with the transcript and
video testimony of Mr. Nichelson and Mr. Costine.

witnesses on the witness list the defense team had spoken with either before the trial or before the mitigation hearing.  (Id. at 9-10).

Although Mr. Nichelson and Mr. Costine thought there might have been other interviews, there is nothing in their files, produced in response to Petitioner's subpoena, which would confirm that they spoke with any other lay witnesses in preparation for mitigation.  The absence of any adequate preparation for the mitigation hearing is apparent from a review of the mitigation transcript.  Admittedly, Mr. Nichelson called seven witnesses other than the Petitioner, six of those were family members (Grimes, Younkins, Needham, Cammy Palmer and Harris) or very close friends (Agnes Jones and James Jones).  Most of their testimony was redundant and focused on Donald Palmer being a good child growing up and did virtually nothing to advance the defense team's theory of mitigation, i.e., Palmer's long history of drug abuse and his drug and alcohol abuse, its psychological causes and the affect on Mr. Palmer at the time of the killings. (See Joint Appendix, Vol. IV, pp. 17-136).  Additionally, the defense team called Keith Groves who was minister at Petitioner's church and testified regarding Mr. Palmer's apparent remorse and his opinion that he was "basically a person who had run into some difficulties

204

with drugs and alcohol." (Id. at 135). Unfortunately, none of the witnesses called by Petitioner could directly corroborate Petitioner's history of drug abuse or its affect on Petitioner at the time of the shootings at issue. Nor do any of these witnesses address Palmer's psychological illnesses (which the records showed he suffered prior to the shootings) that would have contributed to his history of alcohol and chemical abuse. The failure to obtain such records has been found to be prejudicial. See, Rompilla v. Beard, 125 S.Ct. 2456 (2005).

Counsel's failure to meet minimum standards of conducting an investigation into available evidence, operates to deny Petitioner his constitutional right to effective assistance of counsel and undermines the fundamental fairness of the jury's imposition of the death penalty.

Presentation

Counsel's lack of preparation is evident in the Mitigation testimony of Petitioner's mother, Norma Needham. Her testimony fails to cover critical matters which she had previously described in a May 25, 1989, letter to Mr. Nichelson and Mr. Costine. In that letter she describes the following matters which were not addressed in testimony:

- The 1985 incident where Donald Palmer "lost control at my house . . . His nerves were bad due to separation of wife and 3

children - said he was losing his mind."

- Doctors at Riverside suggested that he get help for his **deep depression** and attempted suicide.

- In 1988 and 1989 "Don was very, very depressed at home and would set around not talking much. **Out of depression and chemical use** slept a lot. He was out of a job and had no car."

- "May 3rd **Don lost a child**! He was crying and went into the bathroom. He was sitting on the tub with his head hung down. And then he had to reach down and take the baby to the hospital. Its head, eyes, small arms and legs were formed. I had to get a container of water for him."

- Don's Grandmother died the 6th of May and was buried the 9th of May - was **depressed over that as his grandmother practically raised him**.. . . . he felt that his Grandmother was only one who loved him besides his mother. He has never been the same since.

- "Don is under so much pressure mentally in my estimation that I was having a hard time getting him to understand things at different times when we would talk. He just sat in a daze very often."

(Emphasis added). (See Nichelson Trial Notebook, Petitioner's Ex. 2,

Bates pp. 237-238, and compare Mitigation testimony of Norma Needham,

Joint App. Vol. IV, Mitigation Tr. 49-61). At the Mitigation hearing, trial

counsel had Ms. Needham state in a conclusory fashion that Donald

Palmer was depressed and unhappy after his divorce and that he had been

hospitalized. Although he had the mother's letter regarding Petitioner's

206

history,  none of this specific information was presented by counsel in Ms. Needham's testimony.  In short, Defense counsel offered no specific corroborating evidence to support the primary theory of mitigation.

At the outset of his opening statement at the Mitigation phase, Mr. Nichelson confessed to the jury: "last night when I should have been making my notes for this opening statement, I was watching the television as to the earthquake in California, so my notes are not extensive and my comments are not extensive." (Joint App. Vol IV, Mitigation Tr. p. 12).  Mr. Nichelson's candid admissions are supported by the record before this Court which reflects a failure of constitutionally adequate preparation and resulting prejudice to Petitioner.

In fact, counsel's decision to present Petitioner's ex-wife, Cammy Palmer, actually caused irreparable harm to his client's mitigation efforts. When the decision was made to call Cammy Palmer, trial counsel was or should have been aware that, during those divorce proceedings, Cammy Palmer had filed an affidavit with the Belmont County Court of Common Pleas, stating under oath that Petitioner had: repeatedly physically abused her; threatened to kill her; physically abused and beaten her children; repeatedly sexually molested and sexually abused her children; threatened

207

to kill and bury her daughter; threatened to blow up Cammy's car and burn down her house. All of this information came in without counsel's objection. (Nichelson Tr. Vol. I, pp. 46-48; Joint App. Vol. IV, Mitigation Tr. pp. 122-123). Indeed, it was initially raised by defense counsel during his direct examination of Cammy Palmer. It is difficult to conceive of any information that could have more effectively doomed Petitioner's efforts to receive a sentence less than death. Where counsel creates a more damaging image of his client than the prosecution, constitutional ineffectiveness is present and prejudice should be presumed. See *Rickman v. Bell,* 131 F.3d 1150, 1156-1157 (6th Cir. 1997). The writ should issue.

**12.    SEVENTEENTH CLAIM: Petitioner Was the Recipient of Ineffective Assistance of Counsel During His Direct Appeal.**

> **(A)    Procedural Default of Claims 17.1, 17.3, 17.7, 17.11, 17.12, and 17.13**

The Report and Recommendation's resolution of Claims 17.1, 17.3, 17.7, 17.11, 17.12, and 17.13 is erroneously based on procedural default. To determine whether a claims is procedurally defaulted a court must employ a four-part analysis. <u>Maupin v. Smith</u>, 785 F.2d 135, 138 (CA6

1986). "First, the court must determine that there is a procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with that rule." Id.  Second, the court must determine whether the state courts actually enforced the state procedural sanction. Id.  Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. Id.  Finally, if the court has determined that a state procedural rule was not met, and that the rule was an adequate and independent state ground for decision, then the petitioner must demonstrate cause for failing to comply with the procedural rule and that he was actually prejudiced by the alleged constitutional error. Id.

Here, the Report and Recommendation asserts Claims 17.1, 17.3, 17.7, 17.11, 17.12, and 17.13 are meritless because petitioner failed to raise them in post conviction instead of direct appeal.  There is no Ohio procedural rule that requires a defendant to raise claims that rely in part on evidence outside the record only in post conviction proceeding. In fact, post conviction proceedings are not the proper procedural vehicle for raising claims of ineffective assistance of appellate counsel. See, State v. Murnahan, 63 Ohio St.3d 60 (1992). Moreover, issues developed after

sentencing that are reviewable on appeal cannot be raised in post conviction proceedings. See, <u>State v. Lester</u>, 41 Ohio St.2d 51 (1975). To hold otherwise would be to ignore the fact that many times Ohio courts of appeal reverse and remand cases to the trial court for further factual development. This is especially true in cases involving allegations of ineffective assistance of counsel.

Assuming, arguendo, that there is an Ohio procedural rule requiring defendants to only raise claims that rely in part on evidence outside the record in post conviction there is absolutely no indication that the Ohio Supreme Court enforced such a rule against Petitioner. Specifically, the Ohio Supreme Court did not find that his claims were raised in the wrong forum or that Palmer used the wrong procedural vehicle. Instead the Ohio Supreme Court found "Palmer has failed to raise 'a genuine issue as to whether [he] was deprived of the effective assistance of counsel on appeal' before the court of appeals, as required under App.R.26(B)(5)."  Thus, the Ohio Supreme Court never enforced the procedural sanction raised in the Report and Recommendation. As a result, Claims 17.1, 17.3, 17.7, 17.11, 17.12, and 17.13 should have been dealt with on their merits.

The Due Process Clause of the Fourteenth Amendment to the United

210

States Constitution grants criminal defendants a right to the effective assistance of counsel during a first appeal of right.  Appellate counsel are charged with acting as advocates and must support the cause of the client to the best of their ability. Penson v. Ohio, (1989), 488 U.S. 75.  While appellate attorneys should always attempt to winnow out their best issues for presentation to the courts, in a capital case, which by definition involves the ultimate societal sanction, appellate attorneys must err on the side of inclusion, particularly when, . . . , there appear to exist a significant number of facts to support the claim. Greer v. Mitchell, 264 F.3d 663 (CA6 2001). Prejudice is established when the neglected claim would have a reasonable probability of success on appeal.  Boliek v. Bowersox, (CA8 1996), 96 F.3d 1070.  Failure to present a meritorious issue for review constitutes ineffective assistance of appellate counsel. Matire v. Wainwright, (CA11 1987), 811 F.2d 1430.  To establish a federal constitutional claim of ineffective assistance of appellate counsel, Palmer does not have to show by a preponderance of evidence that the result of his appeal would have been different but for appellate counsels' errors, but only a reasonable probability that the errors undermine confidence in the outcome.  See, Strickland v. Washington, (1984), 466 U.S. 668, 694;

211

Brown v. Myers, (CA9 1998), 137 F.3d 1154, 1157.

As forth below, the Ohio Supreme Court unreasonably applied the

Strickland test when it determined that Palmer "failed to raise 'a genuine

issue as to whether [he] was deprived of the effective assistance of

counsel on appeal' . . . " State v. Palmer, 92 Ohio St.3d 241 (2001).

**(B)    Claim 17.1 Appellate Counsel rendered deficient
performance when they failed to present an assignment of
error premised on the grounds that: Trial counsel was
constitutionally ineffective, under the Fifth, Sixth, Eighth
and Fourteenth Amendments to the United States
Constitution and Sections 5, 9, 10 and 16 of the Ohio
Constitution, for failing to proffer the testimony of a
mitigation witness after the trial court erred by excluding
relevant mitigation evidence at the penalty phase of Mr.
Palmer's capital trial, in violation of his rights to an
informed, individualized determination of the appropriate
penalty and to his constitutional rights to due process and
against cruel and unusual punishment.  Eddings v.
Oklahoma, 455 U.S. 104 (1982); McKoy v. North Carolina,
494 U.S. 433 (1990); Strickland v. Washington, 466 U.S. 668
(1984).**

**Procedural Default:**

The Court is respectfully referred to the arguments presented in

section A of this presentation of the Claim 17.

**Merits:**

Few rights are more fundamental than that of an accused to present

212

witnesses in his own defense. <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302

(1972). In this case, Palmer sought to present the testimony of Reverend

Bush in mitigation of penalty. A jury in a capital case may not be precluded

from considering as a mitigating factor, any aspect of a defendant's

character or record and any circumstances of the offense that the

defendant proffers as a basis for a sentence of less than death. <u>Lockett v.</u>

<u>Ohio</u>, 438 U.S. 586, 604 (1978). The trial court excluded Reverend Bush

from testifying. (Joint Apx. Vol.IV.Tr.pp.8 & 9).  Counsel did not proffer the

substance of Reverend Bush's testimony but only stated that the Reverend

counseled Palmer while the jury was deliberating the guilt phase of the trial

(Joint Apx. Vol.IV.Tr.p.8) and that his testimony would concern Palmer's

attitude.  (Joint Apx. Vol.IV.Tr.p.9).

Petitioner takes the position that there was sufficient justification

under <u>Lockett</u> for defense counsel to call a mitigation witness to testify

about a defendant's attitude.  Since defense counsel did not proffer more

substance to the trial court and did not actually call Reverend Bush to

testify it appears that the failure by defense counsel to present mitigating

evidence when it was available constituted an abdication of advocacy

rather than a strategic decision.  See <u>Austin v. Bell</u>, 126 F.3d 843, 849

(CA6 1997). The evidence at the hearing established that Nathan Ray was

responsible for raising issues of ineffective assistance of trial counsel.

(Hearing Tr. p. 15). Under such circumstances, both prongs of the

Strickland test were met. As a result, the Ohio Supreme Court application

of Strickland was unreasonable. Hence, the writ should issue

> **(C)    17.2 Appellate Counsel rendered deficient performance when they failed to present an assignment of error premised on the grounds that:__Prosecutorial misconduct during the penalty phase of appellant's trial by the prosecutor's reference to the bible in urging the jury to sentence appellant to death deprived appellant of his right to due process of law and against cruel and unusual punishment. [Tr. 191, 285-86, 1201-02, Mitigation Tr.156-57] State v. Thompson, (1987), 33 Ohio St. 3d 1; Commonwealth v. Chambers, (Pa. 1991), 599 A. 2d 630. State v. Mills, (1992), 62 Ohio St. 3d 357.**

**Merits:**

The Report and Recommendation concludes that this discrete claim

would not be successful on appeal. (R&R, Doc. 103, p. 117). Petitioner

disagrees and refers the Court to arguments presented in reference to

claims 3.13 and 3.18. In addition, the prosecutor denigrated Palmer's

mitigation witnesses during final argument:

> Your job is different from everyone else' here. It's
> different from his mom and aunts and uncles who
> are supposed to love him no matter what he does.

214

It's different from the minister who is supposed to try to get him right with God no matter what happens to him in civil punishment. We are talking about civil punishment. We are rendering under Caesar. We are not talking about God's forgiveness. We are talking about man's justice, accountability and responsibility to the State of Ohio.

The psychologist, he diagnoses and treats people. You know he's out to save people. He is not interested in legal justice. (Joint Apx. Vol. IV. p. 157).

There are four factors that a relevant in analyzing a claim of forensic prosecutorial misconduct: (1) what is the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks are isolated or extensive; (3) whether they were accidentally or deliberately placed before the jury; and (4) the strength of the competent proof to establish the guilt of the accused. Hill v. Brigano, 199 F.3d 833, 847 (CA6 1999).

Here, the prosecutor's remarks told the jury that testimony from Palmer's family members, a minister and the psychologist had nothing to do with justice, accountability and responsibility. In a death penalty case, mitigation testimony has everything to do with whether or not a person should be held accountable to the point that he has forfeited his life to the state.

215

Palmer was prejudiced by these remarks since they told the jury to ignore mitigation testimony. Most of the prosecutor's argument was geared toward denigrating mitigation witnesses. As such the remarks were not isolated. There can be no doubt that the prosecutor said what he said to the jury on purpose. He was not goaded by improper argument emanating from the defense team.  The strength of the aggravating circumstances was not so overwhelming that no reasonable jury would have declined to consider and give effect to the mitigating evidence actually presented. Consequently, the prosecutor committed forensic misconduct when he denigrated the mitigation testimony. Such a claim had merit for purposes of appeal.  Petitioner therefore requests that the writ issue.

**(D)    17.3 Appellate Counsel rendered deficient performance when they failed to present an assignment of error premised on the grounds that: The judgment and sentences against appellant are void or voidable because his trial was held in a community that had been saturated with media coverage concerning his guilt, including extensive newspaper coverage and extensive radio and television coverage. (Tr. 555, 565-66); Irvin v. Dowd, 366 U.S. 717 (1961).**

**Procedural Default:**

The Court is respectfully referred to the arguments presented in section A of this presentation of Claim 17.

**Merits:**

Petitioner respectfully refers the Court to the arguments made above concerning claim 15.5.

**(E)    17.4 Appellate Counsel rendered deficient performance when they failed to present an assignment of error premised on the grounds that: The judgment and sentences against appellant are void or voidable because a juror sat on his jury who stated during voir dire that he had already formed an opinion as to the guilt of appellant thus denying appellant his rights to due process of law, to a fair hearing and to be free from cruel and unusual punishment as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 5, 10 and 16 of Article I of the Ohio Constitution. [Tr. 565-66]; Morgan v. Illinois, 504 U.S. 719 (1992); Gray v. Mississippi, 481 U.S. 648 (1987); Murphy v. Florida, 421 U.S. 794 (1975); Irvin v. Dowd, 366 U.S. 717 (1961).**

**Merits:**

The Report and Recommendation found that this claim does not undermine the reliability of Palmer's convictions. (R&R, Doc. 103, p. 118). Petitioner disagrees.   Juror Melchiorre testified during voir dire that he initially from his own conclusion about the case. (Joint Apx. Vol.III, p.  565). Juror Melchiorre further testified that he would set aside his opinion and render a decision on what he heard in the courtroom.  (Joint Apx. Vol.III, p. 566). Nathan Ray testified that he did not raise this issue on direct appeal because he or Mr. Murray did not feel there was a meritorious claim to it that it would succeed. (Hearing Tr. p 18). But that he did raise this issue in

subsequent state post conviction proceedings so that it would be exhausted even though it was procedurally defaulted. (Hearing Tr. p 17-18).

A defendant who alleges implied juror bias is entitled to a hearing in which he has the opportunity to prove actual bias. Smith v. Phillips, 455 U.S. 209, 215 (1982). At no time did defense counsel ask for a hearing to prove actual bias by juror Melchiorre. At no time did defense counsel use a challenge for cause or a peremptory challenge to remove juror Melchiorre