## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **DONALD L. PALMER** | : | |
| | : | |
| **Petitioner,** | : | |
| | : | **CASE NO. C-1-00-882** |
| **v.** | : | **JUDGE ROSE** |
| | : | **Magistrate Judge Merz** |
| **MARGARET BAGLEY, Warden** | : | |
| | : | |
| **Respondent.** | : | |

## MOTION FOR THE ISSUANCE OF A CERTIFICATE
## OF APPEALABILITY

Donald L. Palmer, Petitioner in the above named case, respectfully requests, pursuant to

28 U.S.C. § 2253, that the Court issue a certificate of appealability as to the issues identified

below, for the reasons set forth in the accompanying memorandum.

      

s/ Michael O'Hara
_____
MICHAEL O'HARA, ESQ.(0014966)
O'HARA, RUBERG, TAYLOR,
SLOAN & SERGENT
209 Suite C Thomas More Park
Crestview, Kentucky 41017
(859) 331-2000
(859) 578-3365 (facsimile)
mohara@ortlaw.com


s/ Keith A. Yeazel
KEITH A. YEAZEL (0041274)
65 SOUTH FIFTH STREET
COLUMBUS, OH 43215
(614) 228-7005
Yeazel@netwalk.com
Trial Counsel for Petitioner

## TABLE OF CONTENTS

|  |  | **PAGE** |
| --- | --- | --- |
| **SUMMARY** | | **3** |
| **MEMORANDUM IN SUPPORT** | | **3** |
| **A.** | **Procedural Posture** | **3** |
| **B.** | **Standard for the Issuance of a Certificate of Appealability** | **4** |
| **C.** | **Reasons for Issuing Certificate of Appealability** | **5** |
| **1.** | **Claim 2** | **5** |
| **2.** | **Claim 3** | **7** |
| **3.** | **Claim 4** | **22** |
| **4.** | **Claim 6** | **28** |
| **5.** | **Claim 8** | **31** |
| **6.** | **Claim 9** | **39** |
| **7.** | **Claim 10** | **42** |
| **8.** | **Claim 12** | **46** |
| **9.** | **Claim 15** | **48** |
| **10.** | **Claim 17** | **73** |
| **D.** | **Conclusion** | **79** |
| **CERTIFICATE OF SERVICE** | | **80** |

## SUMMARY

Under the standards set forth in 28 U.S.C. § 2253 and <u>Slack v. McDaniel</u>, 529 U.S. 473, (2000), Petitioner is entitled to the issuance of a certificate of appealability as to his constitutional claims identified in the second, claims for relief advanced in his Petition for a Writ of Habeas Corpus filed on September 8, 2000.

## MEMORANDUM IN SUPPORT

### A.    Procedural Posture

On March 4, 2002, Magistrate Judge Merz issued a Report and Recommendation concerning Petitioner's Motion for Partial Summary Judgment that none of his claims were procedurally defaulted. (Doc. 50, Report and Recommendation).  The R & R indicated that claims 1, 15.4, 15.6, 15.11, 15.12, 15.13, 15.21, 15.22 and 17 were not procedurally defaulted. Both parties filed objections. (Docs. 52 & 53).  On May 1, 2002, Magistrate Judge Merz issued a supplemental report and recommendation that Petitioner's Motion for Partial Summary Judgment be granted as to claims 15.4, 15.6, 15.11, 15.12, 15.13, 15.21, and 15.22. (Doc. 56, p. 6).  On May 7, 2002, District Judge Weber issued an Order adopting the Report and Recommendation (Doc. 50) to the extent that it was not objected to. (Doc. 57).  On October 10, 2002, District Judge Rose issued an Order adopting the supplemental Report and Recommendation (Doc. 56) and overruled the party's objections. (Doc. 61).  This is significant because Judge Rose's Order (Doc. 56) meant that Petitioner was granted partial summary judgment that his ineffective assistance of counsel claims numbered 15.4, 15.6, 15.11, 15.12, 15.13, 15.21, and 15.22 were not procedurally defaulted.

On December 16, 2005, Magistrate Judge Merz issued a Report and Recommendation addressing all Eighteen of Petitioner's grounds for relief and recommending that the petition be denied. (Doc. 103, Report and Recommendation). Petitioner filed objections to the report and recommendation. (Doc. 110). On April 17, 2006, District Judge Rose issued a Decision and Order overruling the objections and adopting the report and recommendation in its entirety. (Doc. 117, Decision and Order). The next day the Clerk entered judgment against Petitioner. (Doc. 118, Judgment in a Civil Case). Petitioner filed his notice of appeal and amended notice of appeal on May 15 and May 16, 2006, respectively. (Docs. 120, 121). On June 23, 2006, Magistrate Judge Merz entered an Order requiring petitioner to file his motion for a certificate of appealability on or before July 15, 2006. (Doc. 123). Below Petitioner sets for the claims and bases for issuing a certificate of appealability.

**B.    Standard for Issuance of Certificate of Appealability**

If a federal habeas claim is denied on the merits, the question of whether to issue a certificate of appealability is governed by 28 U.S.C. § 2253 (c) (2). Under 28 U.S.C. § 2253 (c) (2), a certificate of appealability may issue if applicant has made "a substantial showing of the denial of a constitutional right."

If a federal habeas claim is denied on procedural ground, without reaching the underlying merits of the claim, then the question is different. In Slack v. McDaniel, 529 U.S. 473, 478 (2000), the Supreme Court held that when a district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claims, a certificate of appealability may issue if the prisoner shows: (1) that jurists of reason would find it debatable whether the petition states a valid claim of the denial of constitutional right and (2) that jurists of

4

reason would find it debatable whether the district court was correct in its procedural ruling.

**C.     Reasons for Issuing a Certificate of Appealability**

**1.     Second Claim for Relief: Insufficient Evidence of Prior Calculation and Design**

The District Court disposed of this claim on the merits. (Doc. 103, Report and Recommendation, pp. 17-18).

Petitioner was convicted for two counts of aggravated murder under ORC 2903.01(A) (prior calculation and design) and two counts of aggravated murder under ORC 2903.01(B) (felony-murder). The Due Process Clause requires the prosecution to prove beyond a reasonable doubt "every fact necessary to constitute the crime with which [the defendant] is charged." In re Winship, 397 U.S. 358, 364, (1970).

Palmer takes the position that the prosecution failed to offer constitutionally sufficient evidence to support Appellant's conviction or two counts of aggravated murder under ORC 2903.01(A), one count for each victim. 2903.01(A) provides in relevant part that "no person shall purposely, and with ***prior calculation and design***, cause the death of another." (Emphasis added). The paucity of the State's evidence in this regard is exposed by Justice Pfeiffer's concurring opinion in Mr. Palmer's direct appeal. Justice Pfeiffer initially notes,

> "Neither the degree of care nor the length of time
> the offender takes to ponder the crime before hand
> are critical factors in themselves, but they must
> amount to *'more than momentary deliberation.'"*
> (Emphasis added).

State v. Palmer, (1997), 80 Ohio St.3d 543, 577-578, quoting Legislative Committee Note (1993) (Pfeiffer, J., concurring).

In weighing the evidence regarding prior calculation, giving the benefit of the

5

doubt to the prosecution, Justice Pfeiffer found the evidence clearly lacking.

> In this case, the prosecution failed to prove beyond a reasonable doubt that the killings of Sponhaltz and Vargo were the product of prior calculation and design. The murders were not the result of `studied care in planning or analyzing the means of the crime.' Rather, they were the result of a ***spur of the moment decision*** by Palmer to kill two total strangers. Accordingly, I would dismiss Counts I and IV. (Emphasis added).

Id. at 578.

The Ohio Supreme Court has adopted the following factors which are critical to a determination of whether sufficient evidence of prior calculation and design exists.

> (1)    Did the accused and the victim know each other, and if so, was that relationship strained?
> (2)    Did the accused give thought or preparation to choosing the murder weapon or murder site? and
> (3)    Was the act drawn out or `an almost instantaneous eruption of events'?

State v. Taylor, (1997), 78 Ohio St.3d 15, 19, quoting in part State v. Jenkins, (1976), 48 Ohio App.2d 99, 102). In Palmer's case there was absolutely no evidence that the accused and the victims knew each other. There was no evidence that Palmer or his co-defendant gave any thought or preparation regarding the choice of weapon or the murder site. There was evidence that the crimes arose from an almost instantaneous eruption of events. As a result, the offense at bar does not meet Ohio's test for prior calculation and design.

Having clearly failed to establish the elements of prior calculation and design with respect to the two aggravated murder counts brought against Mr. Palmer under ORC 2903.01(A), those convictions cannot stand. Petitioner's conviction on those counts in the absence of adequate evidence clearly violates his rights as protected by the Due Process Clause of the Fourteenth

6

Amendment. Under these circumstances, Petitioner has made a substantial showing of the denial of a constitutional right. Therefore, the issuance of a certificate of appealability on the question of whether there was sufficient evidence of prior calculation and design to support the convictions for two counts of aggravated murder is warranted

2.    **Third Claim for Relief: Prosecutorial Misconduct**

   **THIRD CLAIM FOR RELIEF: THE FAILURE OF THE TRIAL COURT, BELMONT COUNTY COURT OF APPEALS AND THE OHIO SUPREME COURT TO FIND THAT THE STATE PROSECUTOR ENGAGED IN PREJUDICIAL MISCONDUCT IN THE AREAS LISTED BELOW CONSTITUTES AN UNREASONABLE APPLICATION OF THE CONCLUSIONS OF LAW ANNOUNCED IN *BERGER V. UNITED STATES,* AND PREJUDICED PETITIONER IN BOTH THE TRIAL AND PENALTY PHASES OF HIS TRIAL.**

   (i)    **Claims 3.2, 3.3, 3.4 3.9, 3.10 – Other Acts Evidence introduced during the trial phase. (Argued together)**

3.2    **The Prosecutor argued that the jury could conclude that because Petitioner had a dispute with George Goolie about Goolie's treatment of Palmer's ex-wife , and because various persons deemed Petitioner's activities prior to the shootings to be suspicious, that it was Petitioner's intent to rob and kill anyone in his path.**

3.3    **The prosecutor opined that the persons at the gas station where Petitioner stopped prior to the shootings were lucky that they had not been killed by Petitioner.**

3.4

   **The prosecutor told the jury that it was permissible to infer from Petitioner's dislike of Coolie, and his suspicious activities prior to the shootings, that he intended to cause the death of persons with whom he came in contact prior to the shootings.**

3.9    **The prosecutor introduced irrelevant and inflammatory evidence of other acts committed by petitioner**

3.10    **The prosecutor argued that the jury could consider other acts evidence for improper purposes.**

7

The District Court Resolved these claims for relief on their merits finding that state court resolution of these issues was not contrary to clearly established federal law. (Doc. 103, Report and Recommendation, p. 31).

The Constitution vests grave powers in a prosecutor seeking the death penalty. The constitutional corollary is that the prosecutor also assumes the obligation to refrain from improper methods calculated to produce a wrongful conviction or penalty. In <u>Berger v. United States</u>, 295 U.S. 78 (1935), the United States Supreme Court held that,

> It is as much his [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Petitioner submits that the prosecution's use of "other acts" evidence was so egregious that it rendered the entire trial unfair.

The prosecutor repeatedly referred to an alleged dispute between George Goolie and the Petitioner relating to Petitioner's ex-wife. During opening statement, the prosecutor made references to the effect that Mr. Palmer was in the area of the shootings for the burglarizing the home of George Goolie, an offense for which he was never charged. (Tr. p. 751). During the trial, the prosecutor was allowed to ask Deputy Thompson to testify that Petitioner and Eddie Hill drove past Goolie's trailer and his place of employment, and that Goolie's trailer was located one-quarter mile from where the decedent's body was found. Deputy Thompson was also permitted to testify that Palmer had told him that he was in the area to rob Mr. Goolie. (Trial Tr. p. 847, 867). In the same vein, the prosecutor elicited testimony from a friend of one of the decedents that the two decedents were asked by Goolie to watch his trailer because of past burglaries, implying that Petitioner was the one who had burglarized Goolie's trailer. (Trial Tr.

pp. 840, 924). The prosecutor also elicited from Mr. Goolie his unfounded assertion that Petitioner had called Petitioner's ex-wife at Mr. Goolie's house regarding non-support of two of his children. (Trial Tr. pp. 970, 972, 975).

To further inflame the passions of the jury, the prosecutor asked and was permitted to have Mr. Goolie testify that on the day subsequent to the alleged offenses, Mr. Palmer called Goolie and said something to him about "performing sexual acts with me and something to the extent he wanted to kill me afterwards." (Trial Tr. p. 972).[1] Consistent with this highly prejudicial and irrelevant line of questioning, the prosecutor accused Petitioner during cross-examination of hating Mr. Goolie and wanting to go to his place to rob him and kill him. (Trial Tr. p. 1127). Again, these completely speculative accusations came into evidence although Mr. Palmer had never been charged with any offenses relating to any of the unsupported assertions.

During the trial, the prosecutor insisted on pursuing other equally prejudicial and irrelevant avenues of evidence. For example, Sergeant Hawthorne was asked to testify that on May 7 and the early morning of May 8, he saw a car, implied to be Petitioner's car, in a parking lot of a local motel and noted that there had been a lot of theft in that area. This testimony was designed to and did create the baseless inference the Petitioner engaged in theft in that area. (Trial Tr. pp. 932, 935). Adding to the prejudice to Petitioner, the prosecutor called as a witness for the State a Mr. Kiss who, in response to the prosecutor's questions, was allowed to testify that

---

[1] The fact that the trial court later sustained an objection to this evidence was not sufficient to dispel the prejudice enuring to Petitioner., (Trial Tr. p. 1054). This "correction" was, to say the least, belated as it came the week after the testimony came in (Trial Tr. p. 1054). In ant event, the harm had already occurred. As the "'The naive assumption that prejudicial effects can be overcome by instructions to the jury ... all practicing lawyers know to be unmitigated fiction.' "*Burgett v. Texas,* 389 U.S. 109, 115, f.n.7 (1967), quoting, *Krulewitch v. United States,* 336 U.S. 440, 446 (1949) (Jackson, J., concurring). This admonition is particularly true here where the jury is allowed such a lengthy period of time to consider the prejudicial evidence and where so much similar prejudicial testimony and argument is permitted for jury consideration.

on May 8 he was being followed by a brown car to his home and which turned around in the driveway next to him, and that the persons in the car yelled something at him.  His testimony was admitted by the prosecutor to infer that Petitioner intended to rob and harm Mr. Kiss.  (Trial Tr. pp. 940-942).

Similarly, the prosecutor called two gas station attendants and elicited from them that, on the dates of the shootings, on two separate occasions, the Petitioner and Mr. Hill came into the service station and were acting "suspiciously."  Indeed, the prosecutor had one of the attendants offer what can only be described as pure speculation, that Petitioner and Mr. Hill were acting like they were "casing the place."  (Trial Tr.  pp.945-948, 953-957).  In fact, Petitioner and Hill had done nothing more than purchase pop and gasoline.  (Trial Tr.  pp. 1089-1090).

The prosecutor's improper motive and intent became clear during closing argument where he capitalized on the totally inappropriate "other bad acts" evidence.  In his initial closing remarks the prosecutor tells the jury to consider the following utterly speculative "other bad acts" from which to infer prior calculation and design to kill Mr. Sponhaltz and Mr. Vargo:

-    "[D]efendant didn't much care for George Goolie.  He didn't care for the way George had treated his ex-wife . . .

-    The defendant formed the intent to do something unlawful or criminal to George Goolie.  He told Detective McMenemy . . . that he was going to rob George. . . .

-    A very reasonable inference you can draw from this fact is that defendant was going to do more than just burglarize George's house.  The evidence shows that his intention was to do something harmful to George. . . .

-    It doesn't take a great leap of logic to figure from that fact and from the fact that he passed up an opportunity to burglarize the home . . . and went looking for George with a loaded .22.  It doesn't take any tremendous leap of logic *to figure out what his real intentions were* . . ."  (Emphasis added).

10

(Trial Trial Tr. p. 1148-1149).

The prosecutor then directs the jury to assume, without any basis, that the Petitioner was also intending to kill Larry Kiss. "[Defendant and Hill] followed Larry Kiss all the way . . . . to his home . . . I think Mr. Kiss can be thankful that he made it to his driveway before there was any kind of traffic accident." (Trial Trial Tr. p. 1149). The Prosecutor continues to taint the jury with fabricated facts unrelated to the charges against Petitioner by arguing states, "the guys at the gas station, they were very lucky they weren't *robbed and killed.*" (Emphasis added). (Trial Trial Tr. p. 1198). The prosecutor then improperly argues to the jury:

> "we know pretty much what he did, and from that you good people *are permitted to infer what was going on in his mind* at the time he did it. All of this we have been over and over what was their original purpose regarding Goolie and the loaded gun circling Goolie's . . . like birds of prey going in for the kill."

(Trial Tr. pp. 1148, 1198, 1200).

It is important to note that the prejudicial effect of the prosecutor's act and conduct during the trial in closing argument was exacerbated by the failure of the Court to properly instruct the jury that they could not base an inference on another inference.[2] Exploiting his misconduct, the prosecutor told the jury,

> No matter what anyone tells you, you alone have the power to put those facts together and draw the necessary and reasonable inferences. No one can tell you that you can or cannot draw a certain inference if you feel beyond a reasonable doubt, if you know in your heart that this is the necessary and probably inference to draw from all of the evidence. It is clear that all the reasonable inferences that any rational person can draw point to no other conclusion and that Petitioner is guilty as charged of all counts and all specifications.

---

[2] See Argument as to Seventh Claim for Relief infra.

(Trial Tr. pp. 1159-60). In short, the prosecutor invited the jury to infer from this "other bad acts," evidence which included purely speculative opinions about intent to kill and rob other people, and the characterization of Mr. Palmer's motives relating to people other than the victims, were designed to do nothing more than poison the mind of the jury by convincing them that Mr. Palmer was a man who was simply bent on robbing and killing anyone in sight. (See especially, ". . . he would have killed any number of people who came along. . ." Trial Tr. 1154)

The state courts' interpretation of this evidence as simply showing intent, scheme, or plan to commit the offenses is objectively unreasonable. Mr. Palmer's being driven by Goolie's empty house cannot provide a logical connection to a scheme of killing and robbery. To note the obvious, if Palmer were interested in robbing and killing that day he surely would have exploited the opportunity when he passed by Goolie's empty trailer. He passed up other opportunities when he and Hill pulled up next to Mr. Kiss mistaking him for a friend; when they stopped momentarily at the Knight's Inn; when they stopped to purchase a fifth of Southern Comfort at the state liquor store; and when they stopped at the gas station to buy pop and gas. The fact is, nothing happened at any of those locations, no burglaries, no robberies, no assaults, no threats, no objective misconduct of any kind. And yet that evidence of "other bad acts" was permitted to be used by the prosecution to prove prior calculation and design for the shootings of two individuals who the prosecution concedes were strangers,[3] and whose shootings would not have occurred but for an unforeseeable tragic accident occasioned by Hill's negligence in operating the vehicle. There is no authority for the admission of such tangential and irrelevant evidence to be used in such a prejudicial fashion.

---

[3] Trial Trial Tr. p. 1196

During the penalty phase, the prosecutor continued his character assassination of Petitioner through reference to and evidence of other acts. (Claim 3.19, 3.20).  For example, in cross-examining Mr. Palmer's ex-wife, Cammy Palmer, the prosecutor offered into evidence the affidavit filed by Mrs. Palmer in her divorce action with Petitioner.  This affidavit was totally irrelevant to the mitigation phase issues and included unsubstantiated and otherwise incompetent statements regarding Mr. Palmer's efforts to attempt to kill his ex-wife, blowing up her car, burning down the marital residence, and threatening to kill his daughter and bury her.

The affidavit used by the prosecutor also made reference to allegations that Mr. Palmer tried to "run his ex-mother-in-law off the road."  The affidavit also made unsubstantiated references to alleged sexual advances Mr. Palmer made toward his ex-mother-in-law.  It contained unsupported allegations that Mr. Palmer beat his ex-wife, beat his children and sexually molested his children.  These bizarre, outrageous and conclusory assertions in a divorce proceeding affidavit utterly lacked any evidentiary support or foundation and did not relate in any way to the mitigation evidence offered by Mr. Palmer.   (Mit. Trial Tr.  pp. 122-126).  Again, the prosecutor compounded this intentional error by arguing it to the jury in his efforts to convince the jury to return a recommendation of death.  He repeats the baseless allegations that were contained in that affidavit, including in his recounting some of the content of the affidavit.

> . . . not only was he going to kill her [Cammy Palmer], hang himself, blow up her car, burn her house down, kill her daughter and bury her . . . .

(Mit. Trial Tr.  p. 153).  The prosecutor also reminds the jury of the speculation regarding Mr. Palmer's motives toward Mr. Goolie and repeats the misconduct that occurred during the trial phase as established above.  He tells the jury that "our [the prosecutor and the jurors] instincts

13

were pretty good.  Our instincts were pretty good about why the defendant was there . . . we had

the right instincts there that he was there to hurt George.  That's the background of the case.  The

background and circumstances of the case, he was there to even the score."  (Mit. Trial Tr.  p.

145).  None of this evidence of other acts was competent or relevant.  Yet the prosecutor insists

on beating them like a drum before the jury during closing argument.  If the jury would not

sentence him to death for the shootings of Mr. Vargo and Mr. Sponhaltz alone, then the

prosecutor clearly wanted to sentence him to death because of Mr. Palmer's purported evil

character as evidenced by the prosecutor's persistence in introducing irrelevant and prejudicial

material regarding purported other acts committed by Petitioner.

　　　　The prejudice occasioned by such misconduct cannot be overstated considering the

critical nature of the sentencing phase.

> The term 'unfair prejudice,' as to a criminal defendant, [as] speak[ing] to the capacity of
> some concededly relevant evidence to lure the fact finder into declaring guilt on a ground
> different from proof specific to the offense charged ... Such improper grounds certainly
> include ... generalizing a defendant's earlier bad act into bad character and taking that as
> raising the odds that he did the later bad act now charged.

*Coleman v. Ohio Adult Parole Authority* 118 Fed.Appx. 949, 951 (6th Cir., 2004).  Such

prejudice is precisely what occurred here.

　　　　Having shown that his trial devolved into a character assassination due to prosecutorial

misconduct, Palmer has made a substantial showing of the denial of constitutional right.

Petitioner requests that a certificate of appealability issue as to claims for relief 3.2, 3.3, 3.4 3.9,

and 3.10

　　　　　　　　　　**(ii)**　　　　**Claim 3.5**

　　　　　　　　　　　　　　**The prosecutor misstated the law when he told the jury that,
　　　　　　　　　　　　　　for purposes of establishing prior calculation and design, it was**

**legally possible for the Petitioner to have sufficient prior calculation and design in a period of 10 to 15 seconds. Procedural**

The prosecutor effectively misstated the law regarding prior calculation and design by suggesting that the instantaneous act or deliberation of simply pulling back the hammer on the trigger would be sufficient to establish the prior calculation and design specification for aggravated murder. (Trial Tr. pp. 1152-5). As Petitioner demonstrates in his Second Claim for Relief supra based on the undisputed record in this, each of the prior calculation and design factors set out in *State v. Taylor*, (1997),78 Ohio St.3d 15, 19, must be answered in the negative: (1) there was no evidence that Petitioner knew either of the victims; (2) there is no evidence that Petitioner knew he would encounter two strangers through the fortuity of an auto accident with a vehicle he was not driving and thus could not have given prior thought to either a murder weapon or a site; and (3) as Justice Pfeiffer noted the event was spur of the moment decision. *Id.,* quoting in part *State v. Jenkins,* (1976), 48 Ohio App.2d 99, 102.

The "studied and plan" required by Ohio law was intentionally ignored in the prosecutor's closing argument. Indeed, as the Magistrate Judge properly notes, the Court of Appeals found that the prosecutor did, in fact, misstate the law regarding this fundamental element of the offense. (Doc. 103, p. 36) It follows that under the *Taylor* and *Jenkins* decisions, the element of prior calculation and design is not supported by record, and the jury was intentionally misled by the prosecutor to conclude otherwise. Thus, "every fact necessary to constitute the crime with which [Petitioner] has been charged" has not been established beyond a reasonable doubt in violation of Petitioner's right to Due Process. *Jackson v. Virginia,* 443 U.S. 307, 315 (1979). The prosecutor's argument which misstate's Ohio' well established law

regarding prior calculation and design necessarily contravenes the Due Process constraints announced in *Jackson* and jurists of reason would find it debatable whether the claim states the denial of a constitutional right.

The Court previously made a specific finding that no procedural default defense was raised as to this claim. (See Decision, Doc. 61, adopting Report and Recommendation, Doc. 50, where the Court found that no procedural default defense had been raised as to this Claim for Relief. (Doc. 50, p.10). In a subsequent Report and Recommendation, the Court found that this claim was defaulted. (Doc. 103, pp. 34-35). Jurists of reason would find it debatable whether the district court may impose a procedural default the Warden never asserted.

**(iii)    Claim 3.14**

**The prosecutor argued that Petitioner was guilty of three aggravating circumstances.**

The District Court resolved this claim on its merits. (Doc. 103, pp.45-47**).**

The Prosecutor improperly argued that all aggravating factors at trial weigh against mitigators in the penalty phase. Specifically, the prosecutor directed the jury that,

> The judge will tell you if you find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors and you shall recommend the sentence of death; not may or can, but shall.

(Mit. Tr. pp. 157-158). This clearly violated Ohio law which requires the jury to weigh all mitigating factors against the aggravating circumstances of the each particular offense. The prosecutor was or should have been aware that "the only aggravating circumstances relating to a given count may be considered in assessing the penalty for that count." *State v. Cooey*, (1989), 46 Ohio St.3d 20, syllabus, para. 3. Where, as the prosecutor and court did in the instant case,

16

the aggravating circumstances from all the counts are combined and weighed against the

mitigating circumstances, the defendant is denied, "that `consideration of *** the circumstances

of the particular offense *** that is a constitutionally indispensable part of the process of

inflicting the penalty of death.`" *Id.* quoting *Woodson v. North Carolina*, 428 U.S. 280, 304

(1976).

It follows that the prosecutor's misleading arguments to the jury, coupled with the trial

court's failure to properly instruct the jury deprived appellant of his due process rights, and

rendered his capital convictions constitutionally infirm. In such a situation it is submitted that

Petitioner has made a substantial showing of the denial of his constitutional rights under

*Woodson*.  The Court should issue a certificate of appealability as to Claim 3.14.

**(iv)    Claim 3.17**

**The prosecution argued that since the jury had rejected voluntary intoxication in the trial phase, voluntary intoxication was not a mitigator in the penalty phase.**

The District Court resolved this claim on the merits. (Doc. 103, p. 55).

The prosecution argued:

> You have rejected this defense [alcohol intoxication] once already in your first proceedings when the alcohol or intoxication defense charge was given to you.  And, of course, he knew enough about what he was doing so that he could plan way before he took that first drink of Southern Comfort, he had planned to do what he was going to do.[4]

(Mit. Tr. p. 144).  The prosecutor, thus, directs the jury to reject the alcohol intoxication as a

mitigating factor since it has already rejected it as a defense during the guilt phase.

_____

[4]The plan the prosecutor was referring to here, by inference, was to kill George Goolie, not the victims in this case.

In *State v. Lawrence*, (1989), 44 Ohio St.3d 24, the Ohio Supreme Court reversed the death sentence imposed on the defendant were the prosecution had repeatedly misstated the import of a jury's rejection of a defense at the guilt phase by implying that the same result necessarily would obtain at the penalty phase. That court found that, in spite of appropriate instructions from the trial court, prosecutor's misstatement of the law in this regard was in error. The court found that the statement could reasonably have mislead the jury into believing that the juror's determination of the existence of a mental disorder as a defense of the guilt phase had to be considered the same during the sentencing phase. The court therefore reversed the convictions.

Consequently, even the jury instructions regarding the burden of proof during the mitigation phase of Palmer's trial were accurate statements of the law, a court should nevertheless vacate the death sentence in light of the prosecutor's repeated misstatements to the jury suggesting that it was defendant's burden to prove that the mitigating circumstances outweigh the aggravating factors. *Id.* Due process demands no less.

This mistatement and others were not remedied by jury instructions. The jury would have every reason to rely on the prosecutor's statement of what the law was. In *Mills v. Maryland,* 486 U.S. 384 (1988) the Supreme Court makes it very clear that conducting a penalty phase trial in such a way as to mislead or even confuse a jury as to the law it must follow in deciding whether a sentence of death is to be imposed constitutionally taints the that phase and requires reversal of a death sentence. *Id.* 384. Although the Court was addressing a instruction regarding unanimity, the same concerns which caused reversal there apply with equal force here. The prosecutor's repeated misstatements regarding the law that must be followed in the sentencing

18

phase of Petitioner's case occasioned the same constitutional harm that required reversal in *Mills*.

Accordingly, Palmer has made a substantial showing that his constitutional rights, as discussed in

<u>Mills</u>, were denied . Thus, a certificate of appealability should issue as to Claim 3.17

> **(v)    Claims 3.19 and 3.20**
>
> > **The prosecutor introduced evidence that Petitioner failed to pay child support.**
> >
> > **The prosecutor introduced evidence suggesting that Petitioner sexually abused his children.**

The Court disposed of these claims on procedural grounds. (Doc. 104, p. 55).

In cross-examining Mr. Palmer's ex-wife, Cammy Palmer, the prosecutor offered into

evidence the affidavit filed by Mrs. Palmer in her divorce action with Petitioner.  This affidavit

was totally irrelevant to the mitigation phase issues and included unsubstantiated and otherwise

incompetent statements regarding Mr. Palmer's efforts to attempt to kill his ex-wife, blowing up

her car, burning down the marital residence, and threatening to kill his daughter and bury her.

The affidavit used by the prosecutor also made reference to allegations that Mr. Palmer tried to

"run his ex-mother-in-law off the road."  The affidavit also made unsubstantiated references to

alleged sexual advances Mr. Palmer made toward his ex-mother-in-law.  It contained

unsupported allegations that Mr. Palmer beat his ex-wife, beat his children and sexually molested

his children.  These bizarre, outrageous and conclusory assertions in a divorce proceeding

affidavit utterly lacked any evidentiary support or foundation and did not relate in any way to the

mitigation evidence offered by Mr. Palmer.   (Mit. Trial Tr.  pp. 122-126).  Again, the prosecutor

compounded this intentional error by arguing it to the jury in his efforts to convince the jury to

return a recommendation of death.  He repeats the baseless allegations that were contained in that

affidavit, including in his recounting some of the content of the affidavit.

> . . . not only was he going to kill her [Cammy Palmer], hang
> himself, blow up her car, burn her house down, kill her daughter
> and bury her . . . .

(Mit. Trial Tr. p. 153). The prosecutor also reminds the jury of the speculation regarding Mr.

Palmer's motives toward Mr. Goolie and repeats the misconduct that occurred during the trial

phase as established above. He tells the jury that "our [the prosecutor and the jurors] instincts

were pretty good. Our instincts were pretty good about why the defendant was there . . . we had

the right instincts there that he was there to hurt George. That's the background of the case. The

background and circumstances of the case, he was there to even the score." (Mit. Trial Tr. p.

145).

      None of this evidence of other acts was competent or relevant. Yet the prosecutor insists

on beating them like a drum before the jury during closing argument. If the jury would not

sentence him to death for the shootings of Mr. Vargo and Mr. Sponhaltz alone, then the

prosecutor clearly wanted to sentence him to death because of Mr. Palmer's purported evil

character as evidenced by the prosecutor's persistence in introducing irrelevant and prejudicial

material regarding purported other acts committed by Petitioner.

      Concern regarding the prejudice occasioned by this misconduct must be particularly

sensitive in light of the critical nature of sentencing proceedings in death penalty cases.

> In the context of a death penalty sentencing hearing, however, the question of error or
> effect is more complex than in traditional trials. Rather than determining whether a
> constitutional error would have pushed a jury from a "not guilty" verdict to a "guilty"
> verdict, we must attempt to discover whether the constitutional error influenced the jury's
> decision between life and death.

*Bates v. Bell,* 402 F.3d 635, 641 (6th Cir., 2005). The Court concluded that, as the remarks of the

prosecutor tended to incite and mislead the jury, the writ should issue reversing the imposition of the death sentence. *Id* at 641-643.  The same result must occur here where the prosecutors misconduct during sentencing was designed to inflame and mislead the jury.  While the nature of the misconduct in *Bates* was factually different than the present case, as demonstrated above, the effect was no less prejudicial.

Again, the cumulative effect of this misconduct when added to multiple incidents reviewed above compels a finding that the misconduct violated Petitioner's right to a fundamentally fair trial. *Berger v. U.S.,* 295 U.S.  at 89;  *Darden v. Wainwright*, 477 U.S. at 181. Based on all of these factors. Petitioner posits that jurists of reason would find it debatable that this claim states a valid claim of the denial of a constitutional right.

In disposing of this claim on procedural grounds, the Court relied on the fact that even though these claims were raised in the trial phase they were not raised in state court as errors occurring in the <u>penalty</u> phase.  Petitioner submits that, in context, the Court's imposition of procedural default was not warranted.   Below, Petitioner presented to the state courts very specific examples of prosecutorial misconduct to support his federal constitutional claim that he was denied a fair trial and thus denied Due Process of law.

These specific factual examples of prosecutorial misconduct set out in Claims 3.19 and 3.20 simply present additional factual support for the claim of prosecutorial misconduct as permitted by the Supreme Court in *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).  In reviewing these federal constitutional challenges to prosecutorial misconduct, the state reviewing courts were charged with determining whether the statements supporting prosecutorial misconduct were isolated or among a series of improper statements.  *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir.

21

2000). The additional facts pleaded in support of Petitioner's prosecutorial misconduct claims, such as arguments regarding improper use of "other bad acts" evidence during the penalty phase do not "fundamentally alter" or place in a "significantly different posture" the legal claim already considered by the state courts and accepted for federal review. As a consequence, Ohio courts were presented with a fair opportunity to decide and remedy the asserted constitutional violation as required by this Court in *Riggins v. McMackin*, 935 F.2d 790 (6th Cir. 1991). Thus, jurists of reason would find it debatable whether the district court was correct in its procedural ruling. The Court should issue a certificate of appealability as to the Claims 3.19 and 3.20

      **3.    Fourth Claim for Relief**

      **THE TRIAL COURT FAILED TO GIVE A LESSER INCLUDED OFFENSE INSTRUCTION.**

The District Court resolved this claim on its merits. (Doc. 103, Report and Recommendation, pp.58-60).

Prior to the charge to the jury at the guilt phase, counsel for Defendant requested an instruction on the lesser included offense of involuntary manslaughter. The request was denied and the objection to its exclusion was overruled. (Tr. p. 1203). This ruling, affirmed the state's Appellate and Supreme Courts, deprived Plaintiff of his rights to due process.

It is axiomatic that a sentence of death may not be constitutionally imposed after a jury verdict of guilt of a capital offense when the jury was not permitted to consider a verdict of guilty of a lesser included non-capital offense where the evidence would support such a verdict. Beck v. Alabama, 447 U.S. 625 (1980). The Supreme Court explained the constitutional importance of this principle.

> [P]roviding the jury with the `third option' of convicting on a
> lesser included offense ensures that the jury will accord the
> defendant the full benefit of the reasonable-doubt standard . . . .
> but a defendant is entitled to a lesser offense instruction–in this
> context or any other–precisely because he should not be exposed to
> the substantial risk that the jury's practice will diverge from theory.
> Where one of the elements of the offense charge remains in doubt,
> but the Defendant is plainly guilty of some offense, the jury is
> likely to resolve its doubts in favor of conviction. (Citations and
> internal quotes omitted).

Id., 447 U.S. at 634. The Supreme Court in <u>Beck</u> then proceeds to explain the fundamental

nature of this constitutional protection.

> That [procedural] safeguard would seem to be especially important
> in a case such as this. For when the evidence unquestionably
> establishes that the defendant is guilty of a serious, violent
> offense–but leaves some doubt with respect to an element that
> would justify conviction of a capital offense–the failure to give the
> jury the `third option' of convicting on a lesser included offense
> would seem inevitably to enhance the risk of an unwarranted
> conviction. ***Such a risk cannot be tolerated in a case in which
> the defendant's life is at stake*** . . . .
>
> To ensure that the death penalty is indeed imposed on the basis of
> `reason rather than caprice or emotion' we have invalidated
> procedural rules that tended to diminish the liability of the
> sentencing determination. The same reasoning must apply to rules
> that diminish the reliability of the guilt determination. ***Thus, if the
> unavailability of a lesser included offense instruction enhances
> the risk of an unwarranted conviction, [the state] is
> constitutionally prohibited from withdrawing that option from
> the jury in a capital case.*** (Emphasis added).

Id., 447 U.S. at 637-638. In Ohio, under ORC 2945.74 and Crim. R. 31(C), the jury is permitted

to consider three categories of lesser included offenses on which, when supported by evidence

presented at trial, it must be charged: (1) attempts to commit the crime charged, if such an

attempt is an offense at law; (2) inferior degrees of the indicted offense; or (3) lesser included

offenses. <u>State v. Deem</u>, (1988), 40 Ohio St.3d 205, syllabus, para. 1. Under Ohio law an

offense may be considered a lesser included offense where,

> (i) the offense is a crime of a lesser degree than the other; (ii) the offense of the greater decree cannot be committed without the offense of the lesser degree also being committed; and (iii) some element of the greater offense is not required to prove the commission of a lesser offense.

<u>State v. Kidder</u>, (1987), 32 Ohio St.3d 279, syllabus, para. 1.

Involuntary manslaughter, therefore, which can be an aggravated felony of the first

degree, is an offense of a lesser degree than aggravated murder, a capital offense. Indeed, as the

Ohio Supreme Court has held, "involuntary manslaughter is a lesser included offense of murder."

<u>Id</u>. at 282. When the defendant offers a defense to certain elements of the higher offense

charged, he is entitled to an instruction on the lesser included offense. The defendant need only

come forward with "some evidence." <u>State v. Jenkins</u>, (1984), 15 Ohio St.3d 164, 218-219. As

the court in *Jenkins* noted, the primary defense between involuntary manslaughter and aggravated

murder lies in the defendant's intent. For involuntary manslaughter, the killing need only occur

as a proximate result of committing or attempting to commit a felony. <u>Id</u>. citing ORC

2903.04(A). It is important to remember that "the persuasiveness of the evidence regarding the

lesser included offense is irrelevant. <u>State v. Wilkins</u>, (1980), 64 Ohio St.2d, 382, 388. As the

Court in <u>Wilkins</u> explained,

> If under ***any reasonable view*** of the evidence ***it is possible*** for the trier of fact to find the Defendant not guilty of the greater offense and guilty of the lesser offense, ***the instruction on the lesser included offense must be given.*** The evidence must be considered in the light most favorable to the defendant. (Emphasis added).

<u>Id</u>.

24

In Mr. Palmer's case, he was entitled to an instruction on the lesser included offense of involuntary manslaughter.  As the Court in <u>Jenkins</u> noted, the difference between involuntary manslaughter and aggravated murder relates to the degree of intent.  In this case, there was un-refuted evidence that shortly before the shootings, Mr. Palmer had consumed a half bottle of whiskey or more as he and Eddie Hill drove around the Martin's Ferry area (see for example Tr. p. 1088).  Such a consumption of a high volume of alcohol alone should allow for the involuntary manslaughter instruction.  When you couple that fact with the un-refuted testimony of Mr. Palmer that Mr. Sponhaltz was ranting and raving at Mr. Hill in spite of Mr. Hill's apologetic demeanor, and that Sponhaltz, in a state of anger, grabbed Eddie Hill.  It was not until that point that Mr. Palmer, with his gun in his hand, swung at and hit Mr. Sponhaltz, thereby discharging his gun into the side of Mr. Sponhaltz's head.  In fact, initially, Mr. Palmer thought he had hit his companion with a gunshot because Mr. Hill screamed at the time the gun was discharged.  Mr. Palmer testified that he fired again but did not remember pulling the trigger.  He described his state of mind as "mass confusion."  (Tr. pp. 1093-1095).  Mr. Palmer then, backing up, turned into Mr. Vargo who threw his arms up either to keep appellant from running into him or to grab him.  In his state of confusion and with no time to think, his gun fired again.  Appellant denied any intent to kill or rob the victims.  (Tr. pp. 1096-1101).  There was no witness who testified to the shootings.  All evidence offered by the prosecution as to Mr. Palmer's intent was circumstantial.

Palmer met his burden under Ohio law to offer "some evidence" that he lacked the intent to kill the victims.  Again, under Ohio law, the persuasiveness of the evidence offered by the Defendant is irrelevant to his entitlement to a charge on a lesser included offense.  Mr. Palmer,

25

having come forward with "some evidence" that he lacked purposeful intent to kill his victims, he was constitutionally entitled to an instruction on the lesser included offense of involuntary manslaughter, consistent with Ohio law.  Beck v. Alabama, 447 U.S. at 634-637.

In Hogan v. Gibson, 197 F.3d 1297 (10th Cir. 1999), cert. denied, 120 S.Ct. 2658, the court of appeals reversed a denial of a petition for writ of habeas corpus to a criminal defendant who was denied a lesser included offense of first degree manslaughter under Oklahoma law.  In holding that the petitioner's due process rights were violated by the refusal to instruct on the lesser included offense, the Court held that the fact that the state record indicated sufficient evidence to support the premeditation finding did not obviate the need to instruct the jury on the lesser included offense.

> Similarly, state appellant court's original conclusion on direct appeal that a manslaughter instruction was not necessary because there was `sufficient evidence' to support a finding of premeditation in the trial record is squarely contrary to the holding of *Beck*.  (Citation omitted).  *Beck* requires a court to consider whether there is sufficient evidence to warrant instructing the jury on a lesser included offense, not whether there is sufficient evidence to warrant conviction on the greater offense.  A *Beck* claim is not the functional equivalent of a challenge to the sufficiency of the evidence for conviction; rather, *Beck* focuses on the constitutionality of the procedures employed in the conviction of a defendant in a capital trial and is specifically concerned with the enhanced risk of an unwarranted capital conviction where the defendant's life is at stake and a reasonable jury could have convicted on a lesser included offense.

*Id*. at 1305.

Likewise, in Valdez v. Ward, 219 F.3d 1222 (10th Cir. 2000), the Court held that a defendant's admission of intent to kill the victim did not foreclose a jury's consideration of first-degree manslaughter as a lesser included offense.  Id. at 1242-1243 and see Wiggerfall v. Jones,

918 F.2d 1544 (11th Cir. 1990) (where the court reversed the denial of a habeas corpus petition finding that petitioner's due process rights were violated by the trial court's failure to charge the jury on a lesser included non-capital offense).  And see also, <u>Vujosevic v. Rafferty</u>, 844 F.2d 1023, 1027 (3rd Cir. 1988) (where the court reversed the denial of a habeas corpus petition holding that the petitioner's due process rights to a  fundamentally fair trial were violated in an aggravated manslaughter conviction case by the trial court's failure to instruct on aggravated assault as a lesser included offense).

In <u>Lambright v. Stewart</u>, 220 F.3d 1022 (9th Cir. 2000), the court granted a certificate of appealability to a habeas corpus petitioner on the issue of the state court's denial of a lesser included instruction.   In that case, in spite of a significant amount of evidence against the defendant regarding the issue of purposeful killing, the Court found a basis for providing an instruction on the lesser included offense.

> To be sure, there is substantial evidence in this case indicating that the killing was premeditated.  But there is also ***some evidence*** showing that neither petitioner intended to kill the victim.  Given the presence of conflicting evidence, . . . we concluded that the issue of whether the trial court violated *Beck* in failing to instruct on a lesser included offense is debatable among jurists of reason. We therefore grant a COA.  (Emphasis added).

<u>Id</u>. at 1028.

Petitioner, having offered some evidence that he did not intend to kill Mr. Sponhaltz and Mr. Vargo, was entitled to the lesser included offense instruction.  The trial court's failure to instruct on involuntary manslaughter under Ohio law deprived Plaintiff of his due process rights and his protection against cruel and unusual punishment as enunciated in <u>Beck</u>.  Palmer has made a substantial showing that he was denied his constitutional rights as outlined in <u>Beck</u> and in