Hopper v. Evans, 456 U.S. 605, 612 (1982). A certificate of appealability should therefore, as in

Lambright, be issued concerning Petitioner's Fourth Claim for Relief.

### 4.    Sixth Claim for Relief

**THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY THAT THEY WERE REQUIRED TO MAKE A SPECIFIC FINDING THAT PETITIONER INTENDED TO KILL THE RESPECTIVE VICTIMS WAS CONTRARY TO OR AN UNREASONABLE APPLICATION OF A CONCLUSION OF LAW ANNOUNCED IN THE UNITED STATES SUPREME COURT CASES OF *UNITED STATES V. GAUDIN* AND *NEDER V. UNITED STATES* AND DEPRIVED PLAINTIFF OF HIS RIGHT TO DUE PROCESS OF LAW AND HIS RIGHT TO BE PROTECTED FROM CRUEL AND UNUSUAL PUNISHMENT UNDER THE UNITED STATES CONSTITUTION.**

The District Court resolved this Claim on its merits. (Doc. 103, Report and

Recommendation, pp. 61-64).

In order to commit aggravated murder under Ohio law, the defendant must specifically

intend to kill the victim. "No person shall be convicted of aggravated murder ***unless he is***

***specifically found to have intended to cause the death of another.***" ORC 2903.01. ORC

2901.22 defines the capable mental state, "purposely."

> (A) A person acts purposely when it is his ***specific intention to cause a certain result*** or, when the gist of the offense is prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, if it is his specific intention to engage in conduct of that nature.

The only relevant portion of this definition is the first portion, that is, "a person acts

purposely when it is his specific intention to cause a certain result." The trial judge erred by

giving the second portion of that charge to the jury, thus allowing the jury to conclude that

Petitioner was guilty of aggravated murder even if he didn't specifically intend to cause the death

of Mr. Sponhaltz and Mr. Vargo. Consequently, the jury was free to convict him of aggravated

murder if it believed that he specifically intended to engage in certain conduct, such as swinging

his gun at Mr. Sponhaltz, even though he did not intend to kill.

This violates ORC 2903.01 which provides in relevant part,

> In no case shall a jury in an aggravated murder case be instructed in
> such a manner that it may believe that a person who commits or
> attempts to commit any offense listed in Division (B) of this
> section is to be conclusively inferred, because he engaged in a
> common design with others to commit the offense by force or
> violence or because the offense and the manner of its commission
> would likely to  produce death, to have intended to cause the death
> of any person who is killed during the commission or attempt to
> commit, or flight from the commission or attempt to commit, the
> offense.

With respect to each of the aggravated murder charges, the trial court gave the improper

instruction which permitted the jury to find petitioner guilty of aggravated murder if he simply

intended to engage in conduct leading to the death of the victims, even though he may not have

intended to kill either of the victims.  (Tr. pp. 1207, 1212, 1215, 1220).  The operative instruction

allowed the jury to infer that Mr. Palmer was guilty of aggravated murder simply upon finding

that he intentionally swung the gun at Mr. Sponhaltz or cocked the pistol and fired it in the

direction of the decedents, even though he did not intend to kill them.  Indeed, the jury was free

to assume that if Petitioner purposely engaged in prohibited conduct such as having and waving a

gun, or using a gun during what they believe was a robbery, then Petitioner was guilty of

aggravated murder.  The Court's instructions, therefore, allowed the jury to convict Petitioner

even without finding that he specifically intended to kill the victims.  This result is further

encouraged by the Court's instruction that "the purpose with which a person brings about a result

is determined from the manner in which it is done, the weapon used, and all other facts and

circumstances and evidence." (Tr. p. 1207).  If the jury in an aggravated murder case such as this

is instructed that it can infer from the manner of the commission of the offense that the defendant could have intended to cause the death of another person, the Court must also instruct the jury "that [such an] inference is nonconclusive . . . and that the prosecution must prove the specific intent of the person to have caused the death [of the victim] by proof beyond a reasonable doubt." ORC 2903.01(D).

By telling the jury that it can conclude specific intent "when the gist of the offense is a prohibition against the conduct of a certain nature *regardless of what the offender intends to accomplish thereby*, if it is his specific intention to *engage in conduct of that nature*," the court permitted the jury to conclusively infer specific intent to kill based on the defendant's general conduct, rather than basing that conclusion on any evidence relating to a specific purpose of intent to kill the victims.

Where a jury is given an instruction which can be reasonably interpreted by it to create a presumption, such as the one created in this case, the instruction is unconstitutional and renders the verdicts fundamentally unfair. In Sandstrom v. Montana, 442 U.S. 510 (1979), the Supreme Court struck down as unconstitutional an instruction to a jury that the law presumes a person intends the ordinary consequences of his voluntary acts. The Court held that the mere possibility that the jury believed that it was required to apply the presumption regarding intent rendered the instruction unconstitutional. Id., 442 U.S. 514-515. Like the offending instruction in Sandstrom, the trial court's instruction here allowed the possibility that the jury would conclusively presume intent to kill the victims from Mr. Palmer's unspecified intent to engage in other conduct. The instruction is therefore arguably unconstitutional. As a consequence Palmer has made a substantial showing of the denial of his rights under Sandstrom. Petitioner, therefore, is entitled

30

to issuance of a certificate of appealability as to the Sixth Claim for Relief.

### 5.    Eighth Claim for Relief

**THE TRIAL COURT ERRONEOUSLY PERMITTED THE ADMISSION OF EVIDENCE OF AN ARGUMENT RELATING TO IRRELEVANT AND HIGHLY PREJUDICIAL "OTHER ACTS" WHICH PETITIONER ALLEGEDLY COMMITTED AGAINST PERSONS NOT NAMED IN THE INDICTMENT, THEREBY DEPRIVING PETITIONER OF HIS RIGHT TO DUE PROCESS OF LAW AND TO BE FREE OF CRUEL AND UNUSUAL PUNISHMENT AS GUARANTEED BY THE UNITED STATES CONSTITUTION.**

The District Court disposed of this claim on the merits.  (Doc. 103, Report and Recommendation, pp. 65-66).

The United States Supreme Court long ago explained that principles of fairness underlie the widely accepted rule that character evidence suggested by other bad acts" cannot be permitted to provide a basis for conviction.

> "Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. . . . The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime.[FN8] The inquiry is not rejected because character is irrelevant; [FN9] on the contrary, it is said to weigh too much with the jury and to so over persuade them as to prejudge one with a bad general record and *deny him a fair opportunity to defend against a particular charge.* The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance *tends to prevent confusion of issues, unfair surprise and undue prejudice.*" (Emphasis added)

*Michelson v. U.S.* 335 U.S. 469, 475-476 (1948).  More recently, the Court reaffirmed this constitutional concern for such prejudicial evidence.  "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."  *Payne v. Tennessee* 501 U.S.

31

808, 825 (1991).  These principles were ignored by the state courts who reviewed Mr. Palmer's

conviction and sentence.

      The Ohio Supreme Court has long recognized a strict limitation on the admission of such

"other act" testimony and evidence.  Where the evidence of "other acts" does not

> form part of the immediate background of the alleged act which
> **forms the foundation of the crime charged in the indictment.**  In
> such cases, **it would be impossible to prove that the accused
> committed the crime charged without also introducing evidence
> of the other acts.**  To be admissible pursuant to this sub-category
> of `scheme, plan or system' evidence, the `other acts' testimony
> **must concern events which are inextricably related to the alleged
> criminal act.**  (Emphasis added).

*State v. Curry*, (1975), 43 Ohio St.2d 66, 69.  The only other permissible use of "other acts"

evidence is when it is necessary to prove the identity of the perpetrator.  Neither of these

exceptions apply to the instant case.

      Identity was not an issue since Petitioner admitted the shootings.  Nor can any of the

"other acts" evidence prove "events which are inextricably related to the alleged criminal act."

The other criminal acts evidence offered by the state and relied upon by the prosecutor in closing

to prove intent cannot logically be connected with the serendipitous auto accident with the 2

victims who were unknown to Petitioner and who were completely uninvolved in these "other

acts."  Petitioner's stopping at a gas station and ***purchasing*** gas and pop, his stopping for a few

minutes at a local motel and his driving past George Goolie's house can have no logical

connection to the auto accident and the victims of the shooting.  Yet, as established above, the

prosecutor used this evidence to divine an unsupportable conclusion that petitioner specifically

intended to kill Mr. Sponhaltz and Mr. Vargo, two individuals previously unknown to Petitioner

who had no involvement in these "other acts."   As the prosecutor argued the jury, "[n]o one can

get inside another person's mind.  We infer a person's intentions *from all the facts and circumstances surrounded by his acts."* (Trial Tr. p. 1192).  After so directing the jury, the prosecutor returns to his fabrication regarding criminal acts that never occurred, including his unsupported characterization that Petitioner was probably intending to rob and kill the "guys at the gas station" and Goolie. (Trial Tr. p. 1197-1198).  Of course, this occurs after the prosecutor spent much of his initial closing argument describing several other fictional accounts of Petitioner's intent to kill other people and after he offers the completely basis assertion that "he would have killed any number of people who came along." (Trial Tr. p. 1154; see also Trial Tr. p. 1148, 1149, 1157).

Use of such highly prejudicial "other acts" evidence deprived Mr. Palmer of a fundamentally fair trial.  In *Manning v. Jarnigan*, 501 F.2d 408 (6th Cir. 1974), the Sixth Circuit reversed the denial of a petition for writ of habeas corpus and remanded the case for an evidentiary hearing concerning the prosecutor's conduct in making references to the criminal defendant's alleged prior involvement in criminal acts concerning bootlegging and other incidents relating to the possession of barbiturates.  The Court found that such misconduct could in fact render the criminal defendant's trial unfair in a constitutional sense and ordered an evidentiary hearing regarding what the Court of Appeals referred to as "facts . . .  disturbing enough to remand these issues also for an evidentiary hearing and findings of fact on appellant's claims of federal due process violation."  *Id.* at 412.

Similarly in *McKinney v. Rees*, 993 F.2d 1378 (9th Cir. 1993), the court affirmed the granting of a habeas corpus petition where the prosecution exploited "other acts" evidence which was probative only to establish the murder defendant's character, thus depriving him of a

fundamentally fair trial requiring granting of a writ of habeas corpus. In so holding, the Ninth

Circuit stated,

> The use of `other acts' evidence as character evidence is not only
> impermissible under the theory of evidence codified in the
> California rules of evidence . . ., but is contrary to firmly establish
> principles of Anglo-American jurisprudence.

*Id*. at 1380. In so holding, the court relied on the long established constitutional principle

enunciated in *Brinegar v. United States*, 338 U.S. 160 (1949):

> 'Guilt in a criminal case must be proved beyond a reasonable doubt
> and by evidence confined to that which long experience in the
> common-law tradition, to some extent embodied in the
> constitution, has crystalized into rules of evidence consistent with
> that standard. These rules are historically grounded rights of our
> system, developed to safeguard men from dubious and unjust
> convictions, with resulting forfeitures of life, liberty and property.'

*McKinney v. Rees,* at 1381, quoting *Brinegar*, 338 U.S. at 174. The Ninth Circuit then proceeded

to emphasize the historical importance of the rule against the admission of "other acts" evidence.

> The rule against using character evidence to show behavior in
> conformance therewith, or propensity, is one such historically
> grounded rule of evidence. It has persisted since at least 1684 to
> the present, and is now established not only in the California and
> Federal Rules of Evidence, but in evidence rules of 37 other states
> and in the common-law precedents of the remaining 12 states and
> the District of Columbia.

*McKinney,* at 1381. Applying those principles, the Ninth Circuit held that evidence that the

defendant possessed certain types of knives and that the defendant was proud of his knife

collection was in fact character evidence offered only to show propensity and thus violated the

defendants right to due process. *Id.* at 1385. The Court of Appeals explain the fundamental

constitutional importance of this principle as recognized by the Supreme Court. "The character

rule is based on such a 'fundamental conception of justice' and the 'community's sense of fair

34

play and decency' as concerned the Supreme Court in *Dowling* [*v. U.S.*493 U.S. 342 (1990]*."* *McKinney,* 993 F.2d at 1384.

   The facts in *McKinney* are instructive and analogous to the facts here.  In that case the defendant was charged with the murder of his mother whose throat was slit.  Additionally, there was testimony that the defendant would occasionally wear a knife strapped to his side.  The prosecutor was permitted to inquire about the defendant's "fascination with knives."  The prosecutor reiterated this kind of evidence in its closing argument, as did the prosecutor in the case at bar.  The state argued that the evidence was probative of opportunity and that it disputed the defendant's assertion that he had no knives at the time of his mother's murder.  The Court of Appeals found that the evidence was primarily evidence of another act offered to prove character and giving rise to a propensity inference, and did not tend to prove a fact of consequence. *Id.* at 1382-1384.  The Court concluded that the prosecutor's introduction of most of the evidence of other acts relating to the knives in the knife collection was an emotionally charged effort to "help paint a picture of a young man with a fascination with knives and with a commando lifestyle . . . it served only to prey on the emotions of the jury, to leave them to mistrust McKinney and to believe more easily that he was the type of son who would kill his mother in her sleep without much apparent motive."  *Id*. at 1385.  Consequently, the court found that the other acts evidence rendered in McKinney's trial "fundamentally unfair in violation of the due process clause."  *Id*. And, see *Michelson v. United States*, *supra*, 335 U.S. at 475-76 (1948).

   The same result must obtain here where the prosecutor literally peppered the state's entire case with repeated references to irrelevant and highly prejudicial other acts.  The state's transgressions include the following:

35

(1)     Remarks by the prosecutor in opening statement informing the jury that Mr. Palmer went to the area of the shootings because it was his intent to `burglarize the home of George Goolie and to rob him.'  The prosecutor also explained that Goolie was having a relationship with appellant's ex-wife which angered the appellant.

(2)     The prosecutor introduce evidence of investigator Fred Thompson regarding his assertion that Palmer told him that he drove past Goolie's trailer and his place of employment, pointing out that Goolie's trailer was one-quarter mile from the location where Mr. Vargo's body was found.

(Tr. pp. 801-802).

(3)     Thompson was permitted to testify that Palmer told him that they were in the area to rob Goolie.  Thompson gave this information and was allowed to tell the jury that he was in that area to `stake out the house for that purpose.'

(Tr. p. 867).

(4)     Frank Donbeck, a friend of Mr. Sponhaltz was allowed to testify that Goolie had asked Sponhaltz to watch his trailer because of a past burglary, implying that it was appellant who burglarized Goolie's trailer in the past.  This was based on Goolie's suspicions and not on any evidence.

(Tr. pp. 840, 924).

(5)     George Goolie was allowed to testify despite the fact that he had no personal knowledge of the shootings and knew nothing of relevance relating to the alleged offenses.  Goolie testified that his home had been burglarized in February.

(Tr. p. 968).

(6)     Goolie was also permitted to verify that Sponhaltz and other neighbors watched his trailer for him.

(Tr. p. 969).

(7)     Goolie was allowed to testify about his relationship with Palmer's ex-wife, Cammy Palmer.

36

(Tr. p. 970).

       (8)     Although he had never met Palmer, Goolie was allowed to testify on one occasion when he was at Cammy's home, he answered the telephone and spoke to someone who identified himself as Palmer and spoke on the telephone with his ex-wife. Goolie was allowed to testify that the conversation was unfriendly and concerned non-support of Palmer's children.

(Tr. pp. 971, 972, 975).

       (9)     Goolie was permitted to testify that after the alleged offenses Donald Palmer called him and said something about `performing sexual acts with me and something to the extent he wanted to kill me afterwards.'

(Tr. p. 972).[1]

       (10)    The prosecutor asked Mr. Palmer during cross-examination if he disliked Goolie which appellant denied.  The prosecutor then accused Palmer of hating Mr. Goolie and going to his place to `rob and kill him.'

(Tr. p. 1127).

       (11)    The prosecutor made a continued issued about Mr. Palmer having a gun as he drove past Goolie's home.  The prosecutor thus was allowed to infer Mr. Palmer's intent to kill and rob Mr. Goolie.

(Tr. p. 1127).

       (12)    The prosecutor emphasized these various issues regarding Mr. Goolie throughout his closing argument.  He made references such as `he didn't much care for George Goolie.  He didn't care for the way George Goolie treated his ex-wife. . . .`  The prosecutor went on to argue that `on May 7, 1989, the defendant formed an attempt to do something unlawful or criminal to George Goolie.'

---

[1]Defense counsel requested that all this testimony be stricken.  The request was overruled.  (Tr. p. 974).  Much later in the trial after the state rested, the trial court finally ordered the testimony concerning the telephone threat only to be stricken.  All of Goolie's other testimony remained before the jury.  (Tr. p. 1054).

37

The prosecutor then referred to Mr. Palmer's effort to locate Mr. Goolie at his place of employment and concluded that `defendant was going to do more than just burglarize George's house. . . .` The evidence shows that his intention was to do something harmful to George.

(Tr. p. 1148).

(13)    Further along in closing argument, the prosecutor referred to Mr. Palmer as `circling around the Goolie trailer like birds of prey going in for the kill.'

(Tr. p. 1198).

(14)    The prosecutor then told the jury that `you good people are permitted to infer what was going on in his mind . . . what was their original purpose regarding Goolie and a loaded gun circling Goolie's.'

(Tr. p. 1200)

(15)    The prosecutor was allowed to inquire of the gas station attendants that the petitioner and Mr. Hill came into their service station on two separate occasions acting suspiciously.  One of the attendants was permitted to give the opinion that Mr. Palmer was acting like he was "casing the place."

(Tr. pp. 945-48, 953-57).

(16)    This was used to create the improper inference that petitioner was going to rob the gas station and possibly do harm to the attendants.

(17)    The prosecutor exploited this in closing argument by arguing to the jury that the gas station attendants were lucky that they were not robbed and killed.

(Tr. p. 1198).

(18)    The prosecutor was also allowed to call Sergeant Hawthorne during the guilt phase to testify that around the time of the shootings, he saw a car in the parking lot of a local motel where there had been thefts in the area.  The Sergeant was allowed to create the innuendo that Palmer had engaged in theft in that area.

38

(Tr. pp. 932-935).

> (19)    The prosecutor was permitted to call Larry Kiss who was
> allowed to testify that he was being followed on May 8th by a
> brown car which turned around in the driveway next to his and
> yelled something at him.  The testimony was admitted to infer that
> petitioner intended to rob or do harm to Mr. Kiss.

(Tr. pp. 940-942).

Petitioner has demonstrated above in Claim 3 that the prosecutor engaged in a persistent

effort to pepper the guilt phase and penalty phase proceedings with evidence that Mr. Palmer

engaged in many instances of other criminal activity for which he was not charged and which

were unrelated to the criminal charges for which he was indicted.  Petitioner has made a

substantial showing that the morass of "other act" evidence violated his Due Process rights as

outlined in Michelson and Brinegar.  The Court should grant petitioner a certificate of

appealability as to Eighth Claim for Relief.

### 6.    Ninth Claim for Relief

**THE TRIAL COURT'S FAILURE TO GIVE A LIMITING INSTRUCTION ON
THE "OTHER ACTS" EVIDENCE DEPRIVED PETITIONER DUE PROCESS
OF LAW AND VIOLATED PETITIONER'S RIGHT TO BE FREE OF CRUEL
AND UNUSUAL PUNISHMENT.**

The District Court resolved this Ninth Claim on the merits. (Doc. 103, Report and

Recommendation, pp. 67-69).

Petitioner has detailed in his Eighth Claim for Relief the substantial volume of "other

acts" evidence which was used by the prosecution to obtain aggravated murder convictions

against Mr. Palmer by attempting to show his purported character or propensity to act in violation

of his due process rights.  The prejudicial nature of the improper admission of this evidence and

its prejudicial affect on the verdicts rendered in this case was substantially enhanced by the trial

39

court's failure to provide any limiting instruction with regard to the use of that evidence.
Generally, if the trial judge concludes the balancing of the probative versus the prejudicial affect
of other acts testimony weighs in favor of its admission, the Court "should ordinarily instruct the
jury carefully as to the limited purpose for which the evidence is admitted." *United States v.
Sangrey*, 586 F.2d 1312, 1314 (9th Cir. 1978).[2]  See also *United States v. Yopp*, 577 F.2d 362, 365
(1978) (failure to give an admonition is clear error which requires vacation of the judgment).

Both the state and federal rules of evidence regarding the admission of other acts are
substantively identical.  (Compare Rule 404, Federal Rules of Evidence with Rule 404, Ohio
Rules of Evidence).  Ohio prohibits the use of "other acts" evidence to show character or
propensity.  When such evidence has a legitimate purpose, the jury must be instructed to limit its
consideration of such proof.  *State v. Flonnory*, (1972), 31 Ohio St.2d 124, syllabus, para. 2).  As
the Sixth Circuit has held,

> When the trial court's final decision is made, the balancing have
> been done, and the jurors are permitted to hear of the Defendant's
> prior misconduct, it is important that the jurors then be ***clearly,
> simply, and correctly instructed concerning the narrow and
> limited purpose for which the evidence may be considered.*** . . .
> (Emphasis added).

*U.S. v. Johnson*, 27 F.3d 1186, 1193 (6th Cir. 1994), cert. denied 513 U.S. 1115.  As the
Court of Appeals explained, "because prior acts evidence carries with it such a high risk of
confusion and misuse . . . there is a heightened need for the careful application of principles set
out in Rule 403.  *Id.* at 1193.  The Court affirmed the conviction in that case, only because the

_____

[2]The court in this case found no error, noting that it appeared from the "record as a whole" that the trial judge adequately weighed the probative value in prejudicial effective proffered evidence before its admission. . . . *Id.* at 1315.  Of course, in the case at bar there is scant evidence that the trial court properly weighed the unusually large volume of "other acts" testimony and evidence against its prejudicial effect.

trial court, unlike the trial court in Mr. Palmer's case, gave specific limiting instructions.

Petitioner has previously demonstrated that the state's pervasive use of "other acts" evidence throughout the guilt and penalty phase of the proceedings in state court were not admissible for any purpose. Even assuming the voluminous "other acts" evidence had some limited purpose for which it could be admitted, the trial court would then have a *sua sponte* obligation to provide a limiting instruction, even in the absence of any objection by Petitioner's counsel. The Court's failure to offer such a limiting instruction as the evidence was admitted and in final instructions to the jury was plain error and denied Petitioner his substantive right to due process. *U.S. v. Suaza-Martinez*, 217 F.3d 754, 759-60 (9th Cir. 2000) (where the Court held that the trial court had a *sua sponte* obligation to provide a limiting instruction regarding the proper use of a co-defendant's out of court statement).

Petitioner has demonstrated in his Eighth Claim for Relief, above, the historical and fundamental importance of protecting a criminal defendant against the use of "other acts" evidence to prove a criminal defendant's character or propensity. As Petitioner has demonstrated, these principles and fundamental fairness are deeply rooted in the Anglo-American jurisprudence. In reversing a denial of a petition for writ of habeas corpus, and remanding the matter for an evidentiary hearing, the Ninth Circuit held,

> In *Dickson [v. Sullivan*, 849 F.2d 403 (9th Cir. 1998)] we found it `impossible' to conclude that exposure of one or more jurors to highly prejudicial information regarding the defendant's prior criminal acts was harmless beyond a reasonable doubt. (Citation omitted). The serious concerns that motivated us to grant habeas relief in that case are likewise present here and lead us to the same result even under the . . . harmless error standard.

*Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993).

41

It is readily apparent from the record in this case that Petitioner was denied a fundamentally fair trial as a result of the prosecutor's pervasive introduction of "other acts" testimony and evidence which was not circumscribed by an appropriate instruction from the trial court. The decisions of the state Court of Appeals and Ohio Supreme Court to the contrary were clear unreasonable applications of longstanding precedent established by the United States Supreme Court and implemented by lower federal courts. Accordingly, Petitioner has made a substantial showing of a denial of his constitutional rights. As such, the Court should issue a certificate of appealability as to Petitioner's Ninth Claim for Relief.

7.    **Tenth Claim for Relief**

**TRIAL COURT'S FAILURE TO ORDER THE ELECTION OF COUNTS PRIOR TO THE SENTENCING PHASE OF PETITIONER'S TRIAL WAS CONTRARY OR AN UNREASONABLE APPLICATION OF THE CONCLUSION OF LAW THAT CAPITAL SENTENCING PROCEDURE MUST BE ONE THAT GUIDES AND FOCUSES THE JURY'S OBJECTIVE CONSIDERATION OF THE INDIVIDUAL OFFENSE AND THE INDIVIDUAL OFFENDER BEFORE IT CAN IMPOSE A SENTENCE OF DEATH AS ANNOUNCED IN *JUREK V. TEXAS,* AND THUS DEPRIVED PETITIONER OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.**

The District Court resolved thus claim on its merits. (Doc. 103, Report and Recommendation, p. 720.

Prior to the sentencing phase hearing, defense counsel requested the court to require the prosecutor to elect the counts of the indictment upon which the State chose to proceed for each victim. The trial court refused the request. Consequently, the jury was permitted to consider four counts of aggravated murder even though there were only two victims. (Mit. Tr. pp. 5-6). The jury's consideration at the sentencing phase of multiple aggravated murder charges for each

victim unfairly infected the weighing process at mitigation and greatly prejudiced the Petitioner.

Under Ohio law, "where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment . . . may contain counts for all such offenses but the defendant may be convicted of only one." ORC 2941.25. In a non-capital case, the issue of multiple sentences for an allied offense is easily remedied by a reviewing court which can simply vacate one of the sentences. However, in a capital case such a remedy is not feasible. Unlike a non-capital case, a jury is involved directly in the sentencing phase. Consequently, when a jury is permitted to consider allied offenses during a sentencing proceeding, the weighing process is adversely affected rendering the sentences constitutionally unreliable.

In *State v. Johnson*, (1986), 24 Ohio St.3d 87, 93, the Ohio Supreme Court held that,

> Pursuant to *Furman v. Georgia*, (1972), United States Supreme Court has directed that jury discretion and capital sentencing be sufficiently guided so as to avoid the arbitrary and selective imposition of the death penalty.

*Id.* at 93. Consistent with this principle, the Court has held that the sentencing procedure in a case where the death penalty is being considered must be one that "guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." *Jurek v. Texas*, 428 U.S. 262, 263 (1976).

In cases where duplicative or non-statutory aggravating circumstances have been included for the jury's consideration in a capital sentencing proceeding, the courts have found that the constitutional principles enunciated in *Furman* and *Johnson* have not been met.

That requirement is not met in a system where the jury considers

43

the same act or indivisible course of conduct to be more than one
special circumstance . . ., the inclusion of a non-statutory
aggravating factor creates a situation where a jury can deviate from
the guidance provided by statute.  The result may be an `arbitrary
and capricious infliction of the death penalty' contrary to the
dictates of *Godfrey*, *supra*. (Citations omitted).

*Johnson,* at 94.

Because the death penalty is "qualitatively different from a sentence of imprisonment,

however, long . . . there is a corresponding difference in the need for reliability in the

determination that death is the appropriate punishment in a specific case.  *Johnson,* at 94, quoting

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

The submission to the jury of two principle offenses in the penalty phase which involve

only a single indivisible course of conduct as to each victim, impermissibly tips the scales toward

death, thus denying Mr. Palmer fundamental fairness.

Pursuant to ORC 2929.04(B), a jury is instructed that it is permitted to consider the nature

and circumstances of the offense in the weighing process.  The nature of the offense is only to be

considered for purposes of determining the extent of mitigation.  *State v. Stumpf*, (1987), 32 Ohio

St.3d, 95.  The Sixth Circuit has explained the risk associated with the failure to require an

election.

A duplicitous indictment charges a single offense in several counts.
Its dangers are that the defendant may be given multiple sentences
for what Congress considered a single offense, in that prolix
recitation may falsely suggest to a jury that the defendant has
committed not one, but several crimes.

*United States v. Duncan*, 850 F.2d 1104, 1108, f.n. 4 (6th Cir. 1988), abrogated on other grounds,

*U.S. v. Sanderson,* 966 F.2d 184, 187 (6th Cir. 1992).  See also *United States v. Marquardt*, 786

F.2d 771, 778 (7th Cir. 1986) (multiple indictments create the impression of more criminal

44

activity than in fact occurred).

In this case, the direct effect of the multiple charges misled the jury into considering more aggravating factors than it should have been permitted to consider during the weighing process. The inclusion of multiple charges for a single death would lead the jury to inflate the aggravating circumstances. An impression is created in the minds of the jurors that the deaths were especially heinous because of the number of charges stemming from the deaths. The risk to the Petitioner in this case was exacerbated by the Court's instruction that "you will consider all of the evidence, arguments, the testimony of defendant, and all other information which is relevant to the ***nature and circumstances of the aggravating circumstances . . . .***" (Mit. Tr. pp. 157-158). The jury was also instructed that it was to "consider any mitigating factors, including but not limited to the ***nature and circumstances of the offense***. . . ." (Emphasis added). (Mit. Tr. p. 161).

Given the record, there can be little doubt that the failure to require an election, at least prior to the sentencing phase, created a real and viable risk that the jury would incorrectly assume that the "defendant has committed not one but several crimes." *Duncan, supra*, 850 F.2d at 1108, f.n. 4. This is the precise harm that requiring an election is intended to avoid. The net effect of this is that the court has failed to properly "direct that jury discretion and capital sentencing be sufficiently guided so as to avoid arbitrary and selective imposition of the death penalty." *State v. Johnson, supra*, 24 Ohio St.3d at 93; and see *Jurek v. Texas, supra*, 428 U.S. at 273-274. The trial court's failure to prevent this risk by ordering an election of counts, coupled with its instructions to the jury to weigh all the aggravating circumstances against mitigating circumstances, significantly compromised Mr. Palmer's right to a fair sentencing proceeding and

render the death sentence unreliable in violation of his constitutional rights as enunciated in *Woodson, supra; Jurek, supra*; and *Duncan, supra.*  Petitioner has made a substantial showing that decisions of the Ohio Court of Appeals and Ohio Supreme Court are an unreasonable application of and contrary to established Supreme Court precedent announced in <u>Furman v. Georgia</u>, <u>Godfrey v. Georgia</u>, 466 U.S. 420 (1980) and <u>Jurek v. Texas</u> that a state must have a principled way for a jury to exercise its discretion in death penalty cases so as to avoid arbitrary or capricious sentencing.   Accordingly, the Court should issue a certificate of appealability as to the Tenth Claim for Relief.

### 8.    Twelfth Claim for Relief

**THE TRIAL COURT'S INSTRUCTION TO THE JURY DURING THE SENTENCING PHASE OF MR. PALMER'S TRIAL REQUIRING THE JURY TO BE UNANIMOUS IN THEIR DECISION AS TO WHETHER MR. PALMER WAS TO RECEIVE A LIFE SENTENCE WAS CONTRARY TO OR UNREASONABLE APPLICATION OF THE CONCLUSION OF THE LAW ANNOUNCED BY THE UNITED STATES SUPREME COURT IN *MILLS V. MARYLAND*, AND VIOLATED PETITIONER'S RIGHTS TO DUE PROCESS OF LAW AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT AS PROTECTED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The District Court disposed of this claim on the merits. (Doc. 103, Report and Recommendation, p. 79).

At the sentencing phase of Mr. Palmer's trial, the Court instructed the jury as follows:

> You shall recommend the death sentence, if you ***unanimously*** find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.  If you do not so find as to any one or all of the four counts of the indictment, you shall ***unanimously*** recommend either life sentence with parole eligibility after serving 20 years of imprisonment or life sentence with parole eligibility after serving 30 years of imprisonment. (Emphasis added).

46

(Mit. Tr. p. 162).

This instruction requiring an unanimous verdict regarding sentences less than death

violates Mr. Palmer's rights as secured by the Eighth and Fourteenth Amendments to the United

States Constitution.

In *Mills v. Maryland*, 486 U.S. 367 (1988), the Supreme Court reversed the imposition of

a death sentence and remanded for resentencing in light of the probability that jurors, by virtue of

the Court's instructions, thought that they were precluded from considering any mitigating

evidence unless they first unanimously agreed on the existence of a particular mitigating

circumstance. The Court explained its concern,

> . . . if petitioner is correct, a jury that does not unanimously agree
> on the existence of any mitigating circumstance may not give
> mitigating evidence any effect whatsoever, and must impose the
> sentence of death.

*Id*. at 375. In light of the *Mills* Court's emphasis that "in reviewing death sentences, the Court

has demanded even greater certainty that the jury's conclusions rested on proper ground," a

reversal of the death sentence is equally appropriate in this case. The *Mills* Court went on to

caution,

> But common sense . . . [s]uggest[s] that juries to not leave blanks
> and so do not report themselves as deadlocked over mitigating
> circumstances after reasonable deliberations . . ., unless they are
> expressly instructed to do so. The decision to exercise the power
> of the state to execute a defendant is unlike any other decision,
> citizens and public officials are called upon to make. Evolving
> standards of societal decency have imposed a correspondingly high
> requirement of reliability on the determination that death is the
> appropriate penalty in a particular case. The possibility that
> petitioner's jury conducted its tasks improperly certainly is great
> enough to require re-sentencing.

*Id.* at 383-84.

47

The Court's instruction in this case makes it clear that the jury has to unanimously agree on the aggravating circumstances or unanimously agree that the mitigating factors outweigh the aggravating circumstances. This is clearly contrary to the admonition of *Mills*. As the Sixth Circuit has properly characterized the Supreme Court's decision, *Mills* stated that it would be the "height of arbitrariness" to require unanimous agreement on mitigating circumstances. *Gall v. Parker*, 231 F.3d 265, 328 (6th Cir. 2000). Yet, that is precisely what the trial court has done in this case. The instruction clearly improperly leads the jury to believe that it is required to impose the death penalty where one juror was able to prevent the other eleven from giving effect to mitigating evidence. *Gall* at 329.

Unlike the instructions in *Scott v. Mitchell*, 209 F.3d 854 (2000), upon which the Respondent relies in her Return of Writ, the instructions here allowed for the distinct possibility that the jury could incorrectly believe that they had to be unanimous in their decision in regarding the mitigating circumstances. Under *Mills* and *Gall, supra*, such instructions deny Petitioner a fundamentally fair sentencing hearing. Petitioner has made a substantial showing of the denial of his constitutional rights. The Court should issue a certificate of appealability as to the Twelfth Claim for Relief..

9.     **Fifteenth Claim for Relief**

   **INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL**.

(i)     **Claim 15.3**

   **Trial Counsel failed to request the services of a toxicologist or pharmacologist during guilt phase to explain the effect of alcohol and cocaine withdrawal on Petitioner's ability to form the specific intent to kill.**

The District Court disposed of this claim on procedural grounds. (Doc. 103, Report and

48

Recommendation, p. 91).

Palmer's trial counsel failed to obtain any competent expert who had a familiarity with the effect that Petitioner's history of drug and alcohol abuse had on his actions at the time of the shootings. The Sixth Circuit recognizes "that the failure of defense counsel to engage a competent psychiatrist would be relevant in determining whether a defendant received ineffective assistance of counsel." Mason v. Mitchell, 320 F.3d at 616. Trial counsel was aware early on in the case that Petitioner had a significant history of drug and/or alcohol abuse, together with serious psychological disorders. (See for example, Norma Needham's May 25, 1989 letter to counsel, Petitioner Exhibit 2, Trial Notebook, pp. 237-238, and see OVMC Records for July 1987 hospitalization, Trial Notebook, pp. 405-442). Nevertheless, counsel did nothing to obtain a competent expert to address the effect that Mr. Palmer's drug abuse and alcohol consumption leading up to the shootings had on his ability to form the requisite intent.

Since trial counsels' failure to obtain a competent expert on this issue was not the product of a strategic decision, it fails to meet the minimum standards set by the Supreme Court for providing effective counsel under Strickland. As the testimony of Dr. Smith at the evidentiary hearing confirmed, had someone with Dr. Smith's credentials been called to testify at the guilt phase, the jury would have received scientifically based evidence that Petitioner's ability to form intent at the time of the shootings was significantly impaired. This undermines the outcome of the jury verdict as to both guilt and sentence, and renders those verdicts unreliable within the meaning of Strickland. See Mason v. Mitchell, 320 F.3d at 616 where the Sixth Circuit expressly found that "the failure of defense counsel to engage a competent psychiatrist would be relevant in determining whether a defendant received ineffective assistance of counsel." See also, Caro v.

49

Calderon, 165 F.3d 1223, 1226-28 (9th Cir. 1999), *cert. denied*, 527 U.S. 1049 (1999) (failure to retain a competent expert can raise to the level of constitutionally inadequate counsel.)  Thus, this is a valid claim of the denial of a constitutional right to effective assistance of counsel as announced in Strickland v. Washington, 446 U.S. 668 (1984).

In the present habeas proceedings, the Court previously found that no procedural default defense was raised as to this claim. (R&R, Doc. 50, p. 10; Supplemental R&R, Doc. 56).  In adopting the Report and Recommendation regarding Petitioner's motion for summary judgment the District Court never made a finding that this claim was procedurally defaulted.  Moreover, Respondent never raised any procedural default defense to this claim in the Post Hearing Memorandum. (Doc. 74). The subsequent Report and Recommendation erroneously concludes that this claim is procedurally defaulted.   (R&R, Doc. 103, p. 91).  The basis for the determination in the R&R was that Palmer allegedly violated a state procedural rule that post conviction claims be supported by evidence outside the record. One problem with this analysis is that Ohio's Post Conviction statute (R.C. § 2953.21(A) (1)) clearly indicates that the purported evidentiary requirement is directory not mandatory because it uses the terms "may file a supporting affidavit and other documentary evidence in support of the claim for relief."   Another problem with the analysis is that the last state court to deal with this claim found that the claim was not sufficiently documented rather than defaulted. This issue was presented to the Belmont County Court of Appeals as part of Assignments of Error II, IV, and V. (Joint Appendix p. 2324). The Belmont County Court of Appeals decided on the merits that Petitioner had no right to such an expert since he had presented insufficient evidence to establish the need for such an expert. (Joint Appendix pp. 2480, 2483-2484).  Thus, the state court of appeals looked at the merits of

50

the claim and decided Palmer did not meet his burden of production or, ultimately, his burden of persuasion. Thus, jurists of reason would find it debatable whether the district court could ignore the law of the case doctrine and impose a procedural default the Warden never asserted.

**(ii)     Claim 15.6**

**Failure to properly object to incomplete and erroneous instruction jury instruction on inferences.**

The District Court disposed of this claim on procedural grounds. (Doc. 103, Report and Recommendation, p. 91).

State courts may not permit a jury to base an inference of fact upon another inference. Fundamental fairness dictates that the Court must provide a limiting instruction where an element of an offense, such as intent to kill, is based upon circumstantial evidence and inferences drawn upon that evidence. "We will not uphold a conviction, however, that was obtained by nothing more than `piling inference upon inference . . . '" *U.S. v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000), quoting *United States v. Fox*, 902 F.2d 1508, 1513 (10th Cir. 1990). Permitting a jury to stack inferences in this way renders a resulting verdict unreliable. "Where an inference is based solely and entirely upon another inference, its foundation is so insecure that reliance upon the second inference would stretch credulity beyond its permissible bounds and result in an inferred fact which in reality is speculative . . ." *State v. Ebright*, (1983), 11 Ohio App.3d 97, 98.

In the case at bar, the trial court provided the jury only with a general instruction regarding the definition of inference. (Joint App., Vol. IV, Tr. p. 1231). In this case, the record discloses no objection by counsel to the Court's failure to instruct the jury that it is prohibited from stacking one inference upon another inference to prove an element of an offense. Defense

51

counsel was aware of the importance of such a limiting instruction and conceded that there would

be no strategic justification for not either submitting an instruction to be included or objecting to

the omission of such an instruction.  (Nichelson Trial Tr., Vol 1, pp. 58-59).  Such an instruction

was particularly important where the prosecution introduced substantial evidence of other acts of

criminal misconduct unrelated to the indictments.  *Id.* at 59.  The instruction in this case

permitted the jury to go beyond an inference from direct circumstantial evidence.  The trial judge

instructed the jury,

> In order to warrant a conviction in a criminal case upon
> circumstantial evidence *or by any evidence,* it is necessary that the
> evidence be so clear and convincing as to exclude every reasonable
> doubt . . .

(Emphasis added).  (Joint App. Vol. IV, Trial Tr., p. 1232).

The Court then proceeds to instruct the jury on determining credibility by informing them

that they should "take into consideration *any other facts or circumstances* which may have a

bearing upon the credibility of the witnesses."  (Emphasis added).  (Id.).  By using the phrase

"circumstantial evidence or *by any evidence*", and by further informing the jury that they can

take into consideration in weighing credibility "any other facts or circumstances" invited the jury

to consider a variety of evidence that was clearly unrelated to the elements of intent and purpose,

such as the unsubstantiated allegations that he sexually abused his children and ex-wife, that he

was intending to harm Mr. Goolie, and that the gas station attendants were lucky they were not

robbed or killed.  There is little question that the prosecutor, through irrelevant elicited testimony

and through argument, invited the jury to stack these inferences.  (See Petitioner's Traverse Doc.

25, pp. 25-33 for a description of the large body of irrelevant and prejudicial material the

prosecutor used to stack inferences of intent and guilt. (Joint App. Vol. IV, Trial Tr., pp. 751,

52

847, 867, 840, 924, 932, 935, 940-942, 945-948, 953-957, 970, 972, 975, 972, 1127, 1198, 1148,

1198, 1200, 1159-60,  and Mitigation Tr., pp. 122-126, 153).

"An inference is reasonable only if the conclusion flows from the logical and probablistic

reasoning."  *U.S. v. Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998).  The prosecutor exploited the

absence of a limiting instruction regarding the stack of inferences by arguing to the jury,

> No matter what anyone tells you, you alone have the power to put
> those facts together and draw the necessary and reasonable
> inferences. ***No one can tell you that you can or cannot draw a
> certain inference*** if you feel beyond a reasonable doubt, ***if you
> know in your heart*** that that is the necessary and probable
> inference to draw from ***all of the evidence*** . . .

(Joint App. Vol. IV, Trial Tr. pp. 1159-1160).

Trial counsel's failure to obtain the limiting instruction regarding stacking of inferences,

as trial counsel conceded, is particularly critical to this case as the prosecutor had offered

substantial evidence regarding unrelated alleged criminal activity of Mr. Palmer prior to the

shootings of Mr. Vargo and Mr. Sponhaltz.  (See generally, Traverse, pp. 25-28 for a recitation of

the prejudicial evidence offered by the prosecutor.)  It was this highly prejudicial evidence that

the prosecutor invited the jury to use in stacking inferences for the purpose of drawing the

conclusion that Mr. Palmer purposely killed the two victims.  This had the effect or relieving the

prosecution of its burden of proving intent which clearly contravenes well established Supreme

Court precedent.  One cannot constitutionally be given the death penalty for an unintended

murder.  *Enmund v. Florida*, 458 U.S. 782, 792-93 (1982).

Trial counsel's failure to propose an instruction prohibiting the jury from stacking

inferences, as they were invited to do by the prosecutor, relieved the state of proving the element

of intent and ultimately permitted the jury to return a verdict of guilty.  Through counsel's

53

deficient performance,  the jury was permitted to stack inferences drawn from unrelated and

highly prejudicial assertions of other criminal acts, the verdict is necessarily rendered unreliable.

In such circumstances jurists of reason would find it debatable as to whether this claim states a

valid claim of the denial of a constitutional right.

  In the present habeas proceedings, the Court previously found that Respondent failed to

oppose Petitioner's motion for Summary Judgment that this claim was not defaulted.  (R&R,

Doc. 50, pp. 13-14).  In adopting the Report and Recommendation regarding Petitioner's motion

for summary judgment the District Court made a finding that this claim was not procedurally

defaulted.  (Doc. 61). In conflict with the prior ruling, the Report and Recommendation

erroneously concludes that this claim is procedurally defaulted.   (R&R, Doc. 103, pp. 97-98).

Thus, jurists of reason would find it debatable whether the district court could ignore the law of

the case doctrine and impose a procedural default the Warden never asserted.

  **(iii)**  **Claims 15.8 and  15.9**

     **Failure to object to Evidence that Palmer did not pay his child support.
     Failure to seek a limiting instruction regarding other acts evidence.
     (Advanced together)**

  The District Court disposed of these claims on the merits. (Doc. 103, Report and

Recommendation, p. 101).

  Trial counsel were  ineffective in failing to oppose the admission of evidence that Palmer

did not pay his child support.  Evidence as to whether or not Palmer paid his child support

obligation was probative of nothing in his capital case. Its admission only served to further the

prosecution's obvious plan of character assassination by trying Palmer for who he was and not

solely for what he did in the culpability phase.  Trial counsel Nichelson conceded in his

deposition that there was no strategic reason for permitting this evidence in. Logic dictates that, in fact, this evidence could only harm the Petitioner's defense at trial and his efforts to prove mitigation. (See Nichelson Tr., Vol. I, pp. 40-56, and see Nichelson Tr. Vol. II, pp. 2, 20-24). Nevertheless, Court held that trial counsel were not ineffective in failing to request a limiting instruction concerning of evidence that Palmer did not pay his child support because there was substantial evidence of his guilt.[Claim 15.9] (R&R, Doc. 103, p. 101).

Such reasoning means as long as there is "substantial evidence of guilt" the prosecution can place before the jury as much character assassination as it can muster since it is harmless. As was the case during the mitigation phase, counsel failed to object to or seek limiting instructions regarding evidence offered by the prosecutor that Petitioner allegedly engaged in other criminal activity unrelated to the charges which were the subject of his trial. Specifically, the prosecutor, without objection, was allowed to elicit testimony regarding Petitioner's alleged criminal intent toward, the gas station attendant, a local motel and regarding unsubstantiated criminal acts allegedly perpetrated against his children and his ex-wife, including sexual and physical abuse. None of this evidence has to do with his whereabouts since it was not contested that he shot the victims. None of this evidence regarding unsubstantiated criminal acts allegedly perpetrated against his children and his ex-wife, including sexual and physical abuse was relevant in any way to his intent or state of mind the day of shootings. There was no objective evidence presented that Palmer had any criminal intent toward the gas station attendant or the local motel. A limiting instruction was warranted.

Petitioner has demonstrated above that the prosecutor's barrage of irrelevant evidence of alleged other criminal activity "so infected that the trial with unfairness as to make the resulting

conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. at 181.  Counsel's deficient

performance in failing to object or to try and limit the prejudical effect of other act evidence so

prejudiced the Petitioner that it deprived him of a trial whose results at both the guilt and

mitigation phases were rendered unreliable. *Strickland,* 466 U.S. at 687.  Given the serious

nature of the unrelated evidence of other criminal activity, there can be no question that there is a

reasonable probability, that but for counsel's errors regarding the admission of this evidence, "the

result of the proceeding would have been different." *Id.* 466 at 694.  As a consequence Palmer

submits that he has made a substantial showing of the denial of a constitutional right. the Court

should issue a certificate of appeal ability as to Claims. 15.8 and 15.9.

> **(iv)    Claim 15.10**
>
> **Failure to object to prosecutorial misconduct concerning: (I) reasons why Petitioner
> was in the geographical area of the offenses; (ii) mis-statements of law in closing
> argument; (iii) interjecting personal opinions; (iv) introduction of other acts
> evidence; and (v) securing juror commitments in voir dire to impose the death
> penalty**.

The District Court disposed of this claim on the merits.  (Doc. 103, Report and

Recommendation, p. 101). The District Court erroneously concluded that petitioner had failed to

advance any argument in support of this claim. In fact, in Petitioner's Post Hearing Merits brief,

(Doc. 78) petitioner combined his arguments for Claims 15.6 through 15.13 into a single

exposition as noted on page 30 of the post hearing brief.  Trial counsel Nichelson testified that

there was no strategic reason for permitting the evidence to be placed before the jury since it

would only harm Palmer's defense at trial and his efforts to establish mitigation. Nichelson Tr. ,

Vol. I, pp. 46-50; Vol. II, pp.2, 20-24). Petitioner had made a substantial showing of the denial of

his right to effective assistance of counsel.  Thus, the Court should grant a certificate of