appealability as to Claim 15.10.

**(v)    Claims 15.11, 15.12 and 15.13**
**Failure to object to testimony by Deputy Hawthorn concerning his contact with petitioner on May 7-8th 1989.**

**Failure to object to testimony by Larry Kiss concerning his observations of a brown car on May 8, 1989.**

**Failure to object to testimony by service station employees Critzer and Kolb concerning their observations of Petitioner on the day of the shooting.**

**(Advanced Together)**

The District Court disposed of these claims on procedural grounds. (Doc. 103, pp. 101-102).

All three of these claims deal with petitioner's right to the effective assistance of trial counsel in failing to object to other act evidence. Petitioner has demonstrated above, Claim 3 that the prosecutor's barrage of irrelevant evidence of alleged other criminal activity "so infected that the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. at 181. Counsel's deficient performance in failing to oppose such evidence so prejudiced the Petitioner that it deprived him of a trial whose results at both the guilt and mitigation phases were rendered unreliable. *Strickland,* 466 U.S. at 687. Given the serious nature of the unrelated evidence of other criminal activity, there can be no question that there is a reasonable probability, that but for counsel's errors regarding the admission of this evidence, "the result of the proceeding would have been different." *Id.* 466 at 694. Under such circumstances jurists of reason would find it debatable as to whether this claim states a valid claim of the denial of a constitutional right.

In the present habeas proceedings, the Court previously found that Respondent failed to

57

oppose Petitioner's motion for Summary Judgment that this claim was not defaulted. (R&R, Doc. 50, pp. 13-14). In adopting the Report and Recommendation regarding Petitioner's motion for summary judgment the District Court made a finding that this claim was not procedurally defaulted. (Doc. 61). In conflict with the prior ruling, the Report and Recommendation erroneously concludes that this claim is procedurally defaulted. (R&R, Doc. 103, pp. 102). Thus, jurists of reason would find it debatable whether the district court could ignore the law of the case doctrine and impose a procedural default the Warden never asserted.

**(vi)     Claims 15.14 and 15.22**

**Failure to be adequately prepared for the sentencing/mitigation phase.**

**Failure to properly investigate and present mitigating evidence.**

**(Advanced together)**

The District Court disposed of these claims as being procedurally defaulted. (R&R Doc. 103, p. 91).

The theory of mitigation in Palmer's case was that his long history of drug abuse and his drug and alcohol use prior to the time of shootings its effect on his pre-existing psychological problems explained his behavior called for a sentence of less than death. In habeas proceedings, Trial counsel conceded that his representation was inadequate:

> A.     My answer is that ***I did not feel fully competent at that time and I don't feel that I was fully competent sitting here today because we didn't have the experience in such cases.*** We had cases that were capital but not death and we were also holding our regular full time positions and trying other cases. So ***I still don't feel that we had a really good adequate defense in the case***. (Emphasis added).

(Nichelson Tr. Vol. I, pp. 86-87).

Petitioner's state trial counsel, James Nichelson and Mark Costine, produced to Petitioner's counsel all documents they could find with respect to their representation of Donald Palmer during his initial trial and mitigation hearings.  Mr. Nichelson identified Petitioner's Exhibit 1 as his "working file" case and Petitioner's Exhibit 2 as the trial notebook which he maintained in defending Mr. Palmer.  (Nichelson Tr. Vol. 1, pp. 11, 13).

Mr. Nichelson testified that it was his practice in 1989, at the time of the trial, to keep all of his notes regarding witness interviews in his working file similar to Petitioner's Exhibit 1, Mr. Nichelson confirmed his normal practice that witness notes would normally be kept in a single file and that he could not recall any other files that he kept on Mr. Palmer's case which would have contained notes of witness interviews.  (Id., pp. 16-17).  Mr. Nichelson's review of the working file in Mr. Palmer's case revealed notes of interviews with only two witnesses, their client, Donald Palmer, and his ex-wife, Cammy Palmer.  (Id., pp. 15-16).  Mr. Nichelson also testified that he remembered speaking with witnesses Ruby Grimes, Petitioner's great-aunt, and Petitioner's mother, Norma Needham.  (Nichelson Tr. Vol. 2, pp. 10-12).  Mr. Nichelson does not recall if he spoke with any of the other witnesses on the witness list he had in his trial notebook.  (Nichelson Tr. Vol. 2, pp. 11-14).  Mr. Nichelson was unable to recall which of the witnesses on the witness list the defense team had spoken with either before the trial or before the mitigation hearing.  (Id. at 9-10).

Although Mr. Nichelson and Mr. Costine thought there might have been other interviews, there is nothing in their files, produced in response to Petitioner's subpoena, which would confirm that they spoke with any other lay witnesses in preparation for mitigation.  The absence of any adequate preparation for the mitigation hearing is apparent from a review of the mitigation

transcript.  Admittedly, Mr. Nichelson called seven witnesses other than the Petitioner, six of those were family members (Grimes, Younkins, Needham, Cammy Palmer and Harris) or very close friends (Agnes Jones and James Jones).  Most of their testimony was redundant and focused on Donald Palmer being a good child growing up and did virtually nothing to advance the defense team's theory of mitigation, i.e., Palmer's long history of drug abuse and his drug and alcohol abuse, its psychological causes and the affect on Mr. Palmer at the time of the killings. (See Joint Appendix, Vol. IV, pp. 17-136).  Additionally, the defense team called Keith Groves who was minister at Petitioner's church and testified regarding Mr. Palmer's apparent remorse and his opinion that he was "basically a person who had run into some difficulties with drugs and alcohol."  (Id. at 135).  Unfortunately, none of the witnesses called by Petitioner could directly corroborate Petitioner's history of drug abuse or its affect on Petitioner at the time of the shootings at issue.  Nor do any of these witnesses address Palmer's psychological illnesses (which the records showed he suffered prior to the shootings) that would have contributed to his history of alcohol and chemical abuse. The failure to obtain such records has been found to be prejudicial. See, Rompilla v. Beard, 125 S.Ct. 2456 (2005).

Counsel's failure to meet minimum standards of conducting an investigation into available evidence, operates to deny Petitioner his constitutional right to effective assistance of counsel and undermines the fundamental fairness of the jury's imposition of the death penalty.

Counsel's lack of preparation is evident in the Mitigation testimony of Petitioner's mother, Norma Needham.  Her testimony fails to cover critical matters which she had previously described in a May 25, 1989, letter to Mr. Nichelson and Mr. Costine.  In that letter she describes the following matters which were not addressed in testimony:

- The 1985 incident where Donald Palmer "lost control at my house . . . His nerves were bad due to separation of wife and 3 children - said he was losing his mind."

- Doctors at Riverside suggested that he get help for his **deep depression** and attempted suicide.

- In 1988 and 1989 "Don was very, very depressed at home and would set around not talking much. **Out of depression and chemical use** slept a lot. He was out of a job and had no car."

- "May 3rd **Don lost a child**! He was crying and went into the bathroom. He was sitting on the tub with his head hung down. And then he had to reach down and take the baby to the hospital. Its head, eyes, small arms and legs were formed. I had to get a container of water for him."

- Don's Grandmother died the 6th of May and was buried the 9th of May - was **depressed over that as his grandmother practically raised him.** . . . . he felt that his Grandmother was only one who loved him besides his mother. He has never been the same since.

- "Don is under so much pressure mentally in my estimation that I was having a hard time getting him to understand things at different times when we would talk. He just sat in a daze very often."

(Emphasis added). (See Nichelson Trial Notebook, Petitioner's Ex. 2, Bates pp. 237-238, and

compare Mitigation testimony of Norma Needham, Joint App. Vol. IV, Mitigation Tr. 49-61).

At the Mitigation hearing, trial counsel had Ms. Needham state in a conclusory fashion that

Donald Palmer was depressed and unhappy after his divorce and that he had been hospitalized.

Although he had the mother's letter regarding Petitioner's history, none of this specific

information was presented by counsel in Ms. Needham's testimony. In short, Defense counsel

offered no specific corroborating evidence to support the primary theory of mitigation.

At the outset of his opening statement at the Mitigation phase, Mr. Nichelson confessed

to the jury: "last night when I should have been making my notes for this opening statement, I

was watching the television as to the earthquake in California, so my notes are not extensive and

my comments are not extensive." (Joint App. Vol IV, Mitigation Tr. p. 12). Mr. Nichelson's candid admissions are supported by the record before this Court which reflects a failure of constitutionally adequate preparation and resulting prejudice to Petitioner.

In fact, counsel's decision to present Petitioner's ex-wife, Cammy Palmer, actually caused irreparable harm to his client's mitigation efforts. When the decision was made to call Cammy Palmer, trial counsel was or should have been aware that, during those divorce proceedings, Cammy Palmer had filed an affidavit with the Belmont County Court of Common Pleas, stating under oath that Petitioner had: repeatedly physically abused her; threatened to kill her; physically abused and beaten her children; repeatedly sexually molested and sexually abused her children; threatened to kill and bury her daughter; threatened to blow up Cammy's car and burn down her house. All of this information came in without counsel's objection. (Nichelson Tr. Vol. I, pp. 46-48; Joint App. Vol. IV, Mitigation Tr. pp. 122-123).

Indeed, it was initially raised by defense counsel during his direct examination of Cammy Palmer. It is difficult to conceive of any information that could have more effectively doomed Petitioner's efforts to receive a sentence less than death. Where counsel creates a more damaging image of his client than the prosecution, constitutional ineffectiveness is present and prejudice should be presumed. See *Rickman v. Bell,* 131 F.3d 1150, 1156-1157 (6th Cir. 1997). All of these factors show that jurists of reason would find it debatable whether Palmer received effective assistance of counsel.

The basis for the District Court's procedural default determination was that Palmer allegedly violated a state procedural rule that post conviction claims be supported by evidence outside the record. One problem with this analysis is that Ohio's Post Conviction statute (R.C. §

2953.21(A) (1)) clearly indicates that the purported evidentiary requirement is directory not mandatory because it uses the terms "may file a supporting affidavit and other documentary evidence in support of the claim for relief."   Another problem with the analysis is that the last state court to deal with this claim found, not that the claim was defaulted,  but that the claim was not sufficiently documented.  The Ohio Court of Appeals decided on the merits that Petitioner had no right to such an expert since he had presented insufficient evidence to establish the need for such an expert. (Joint Appendix pp. 2480, 2483-2484).  Thus, the state court of appeals looked at the merits of the claim and decided Palmer did not meet his burden of production or, ultimately, his burden of  persuasion. As a consequence jurists of reason would find it debatable whether these claims are defaulted. .The Court should issue a certificate of appealability as to claims 15.14 and 15.22.

### (vii)    Claim 15.15

**Failure to object to numerous instances of prosecutorial misconduct during the penalty phase**.

The District Court disposed of this claim on the merits. (Doc. 103, pp. 102-103).

Petitioner refers the Court to the arguments set forth Claim 3 as to what trial counsel should have objected to and why it was prejudicial to Palmer to fail to oppose such evidence. Petitioner submits that with respect to this claim he has made a substantial showing of the denial of a constitutional right. Thus, the Court should issue a certificate of appealability as to Claim 15.15.

### (viii)    Claim 15.16
**Failure to object to erroneous jury instructions.**

The District Court disposed of this claim on procedural grounds. (Doc. 103, p. 103).

63

Petitioner respectfully refers the Court to the arguments set forth in the Twelfth Claim supra. Petitioner submits that those arguments establish a substantial showing of the denial of his constitutional rights under Mills.

In the present habeas proceedings, the Court previously found that Respondent failed to oppose Petitioner's motion for Summary Judgment that this claim was not defaulted. (R&R, Doc. 50, pp. 13-14). In adopting the Report and Recommendation regarding Petitioner's motion for summary judgment the District Court made a finding that this claim was not procedurally defaulted. (Doc. 61). In conflict with the prior ruling, the Report and Recommendation erroneously concludes that this claim is procedurally defaulted. (R&R, Doc. 103, pp. 102). Thus, jurists of reason would find it debatable whether the district court should ignore the law of the case doctrine and impose a procedural default the Warden never asserted.

### (ix)    Claims 15.17 and 15.18
**Failure to object to cross-examination by the State of defense witnesses concerning other acts evidence.**

**Failure to object to the introduction of an affidavit filed by petitioner's wife in divorce proceedings.**
**(Advanced together).**

The District Court disposed of these claims on the merits. (Doc. 103, p. 105-106)

As outlined in Claim 3 supra, the prosecution elicited a virtual smorgasboard of other act evidence. Petitioner relies on the arguments set forth in Claim 3 that the other act evidence was improper and its cumulative effect denied Palmer a fair trial. Petitioner suggests that trial counsel's failure to oppose such lines of questioning fell below the Strickland performance standard. Petitioner was prejudiced by the admission of the other act evidence in that, there is a reasonable probability that the result would have been different in the penalty phase had the other

act evidence not been placed before the jury. Under such circumstances, Palmer has made a

substantial showing of the denial of his constitutional right to effective assistance of trial counsel.

Therefore, Petitioner requests that the Court issue a certificate of appealability as to Claims 15.17

and 15.18.

> **(x)    Claims 15.19-15.20**
> **Failure to obtain a mitigation specialist to assist with mitigation phase.**
> **Failure to request the services of a toxicologist or pharmacologist during guilt phase to explain the effect of alcohol and cocaine withdrawal on Petitioner's ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of law.**
> **(Advanced Together).**

The District Court disposed of these claims on procedural grounds. (Doc. 103, p. 107).

Defense counsel made no formal effort to obtain any death penalty mitigation specialist.

The only witness called by counsel to address in any substantive way Petitioner's history of drug

and alcohol abuse and its significance with respect to the shootings was Newton Jackson, Ph.D.

(Nichelson Tr. Vol. 1, p. 59).

At the time Defendant's counsel retained Dr. Jackson as their mitigation expert,  they had

formulated a theory of the case for both the guilt phase and mitigation that would focus on the

issue of Mr. Palmer's history of drug abuse and the effect of drug and alcohol abuse had on Mr.

Palmer's culpability at the time of the shootings.  (Nichelson Tr. Vol. I, pp 27-28, Vol. II, pp. 13-

14).  Defense counsel made this decision to hire Dr. Jackson although they were unaware that he

had any particular expertise in the psychological effects of drug and alcohol abuse.  They were

familiar only with what was contained in his C.V.  (Nichelson Tr. Vol. 1, p. 34).  In fact, Dr.

Jackson's C.V. confirms that he lacks any expertise with drug or alcohol addiction.  (See

Nichelson Trial Notebook, Petitioner's Ex. 2, Bates pp. 385-392).

Given Jackson's lack of expertise, it is important to emphasize that the defense team did not give Dr. Jackson any specific directions to speak with anyone to develop and confirm Petitioner's substantial history of psychological disorders and related drug and alcohol abuse. (Nichelson Tr. Vol. 1, pp. 31-32). As it happens, neither defense counsel nor Dr. Jackson spoke with any health care provider or representatives of hospitals that had previously treated Petitioner for drug or alcohol abuse, suicide attempts and depression. (Id. at 30-32). This is so in spite of defense counsel's concession that it was their duty as counsel to assure that Dr. Jackson had properly developed evidence to support their mitigation theory. (Id. at p. 59).

The record before this Court demonstrates that counsel failed in this duty. Having failed to instruct Dr. Jackson or otherwise direct him to speak with people with relevant knowledge regarding Petitioner's psychological history, Dr. Jackson spoke with no one other than defense counsel and Donald Palmer. (See Dr. Jackson's time records, Petitioner's Ex. 1, Bates pp. 58-59; Nichelson Tr. Vol. 1, pp. 35-36).[1] Having spoken with no relevant medical care providers, Dr. Jackson's testimony consisted of almost entirely of simply repeating what he was told by Mr. Palmer. While Dr. Jackson did testing to arrive at a diagnosis of borderline personality disorder and mentions Petitioner's turning to abuse of alcohol and drugs, he fails to make any substance abuse diagnosis. (Joint Appendix Vol. IV, pp. 85-86). In fact, the opinion elicited by defense counsel ultimately harms Petitioner's chance of mitigation. After asking Dr. Jackson to recount his findings, Mr. Nichelson then asked Dr. Jackson to agree that Petitioner does not meet the

---

[1] Mr. Nichelson confirmed that this represented the entire billing they received from Dr. Jackson for work he performed on the case. (Nichelson Tr., Vol. 1, p. 35).

legal criteria for criminal insanity.  Additionally, he asked the following two questions which, on

their face, totally undercut the mitigation interest of his client:

> Q:    And we are not saying that Donald Palmer is criminally
> insane.
>
> A:    No.  I do not believe he meets the legal criteria for that
> definition.
>
> Q:    By the same token, *we are not saying that this is
> something that absolutely mitigates against penalties in
> this type of case either, are we?*
>
> A:    I'm not sure I understood that question.
>
> Q:    Okay.  Let me rephrase that.  *This is not something that
> falls squarely within the mitigating categories of the law
> in capital cases as well, is it?*
>
> A:    *No.  This diagnosis is not of itself a mitigating factor. . .*

(Id., pp. 86-87).

When asked about those questions and the responses elicited, Mr. Nichelson could not

recall asking the questions or why he would have asked them.  He did agree that the questions as

framed may have confused the jury into thinking that he wasn't offering Dr. Jackson's diagnosis

as a mitigating factor in his death penalty case.  (Nichelson Tr., Vol. 1, pp. 50-51).  As

mentioned, Jackson is asked to make no diagnosis of substance abuse, in spite of the fact that that

diagnosis had been made nearly two years prior to the shootings at issue in this case.  (See Joint

Appendix Vol. IV, Mitigation Tr., pp. 85-86).  Nor does Jackson address in any way Petitioner's

history of serious depression or the interplay of his psychological disorders and substance abuse

on his actions which lead to the shootings of Mr. Vargo and Mr. Sponhaltz.  (Id. at pp. 86-89).

Although Dr. Jackson mentions that he has reviewed Petitioner's prior medical records

relating to his psychological disorders, defense counsel does not ask him to provide any detailed description of those records nor do they offer those records into evidence. (See Joint Appendix, Vol. IV, Mitigation Tr., p. 135). In response to the Judge's request about whether they have any exhibits to introduce, Mr. Nichelson replies, "we do not."

Had the defense counsel offered the medical records from the Ohio Valley Medical Center, the jury would have learned that medical professionals, not hired by the defense to render an opinion in a mitigation hearing, had, two years before the killings, diagnosed Petitioner with borderline personality disorder and substance abuse–multiple drugs. Although these records were in Mr. Nichelson's file at the time of the mitigation hearing, they were never offered into evidence. (See Petitioner's Ex. 2, Trial Notebook, Bates pp. 405-442). Additionally, if defense counsel had met their duty to obtain the proper expert testimony from one who has expertise with the interplay of psychological disorders and substance abuse, the jury would have received much more relevant information in mitigation. In this regard, Petitioner attaches the affidavit of Robert Smith, Ph.D., one who has considerable experience in forensic psychology with an expertise in substance abuse. Dr. Smith reviewed medical records that were available at the time of the mitigation hearing. He also reviewed the mitigation hearing transcript. He concludes that counsel failed to give proper direction to Dr. Jackson. He further offers the following relevant opinions:

> 12.    Based upon my review of Mr. Palmer's history as set out in his medical records and described above confirming his history of drug addiction, and given Mr. Palmer's testimony regarding drug and alcohol use, especially drug and alcohol use around the time of the killings at issue in this case, it is my opinion, within a reasonable degree of scientific probability, that Mr. Palmer's mental status was affected by the use of drugs and alcohol around and immediately preceding the time of the killings. His substance abuse interacted with his mental

68

health disorders of depression and borderline personality disorder.

Each of these disorders alone was sufficient to significantly impair Mr. Palmer's perceptions and behavior at the time of the offense. In combination, these disorders had a multiplicative effect. Each disorder exacerbated the effects of the other. Mr. Palmer's depressive symptoms and Borderline Personality traits were magnified by the effects of the alcohol, causing him to be even more impulsive, irritable, emotionally labile and illogical. His ability to interpret interpersonal interactions was impaired, leading to misperceptions regarding the intentions of others. The combined effect of these disorders was impairment in Mr. Palmer's cognition, labile and unstable mood and an inability to appreciate the nature and consequences of his actions.

(Affidavit of Robert L. Smith, Ph.D.).

Additionally, counsel was ineffective in presenting any helpful explanatory information that would assist the jury at both phases of the case. Ultimately, this was due to the failure of defense counsel to meet their obligations. As Dr. Smith states,

13.    In spite of the fact that this information regarding this affect of alcohol and drugs on Mr. Palmer's ability to appreciate the nature and consequences of his actions at the time of the killings was available to the defense counsel at the time of guilt and penalty phases of his trial, neither defense counsel nor the one expert retained by defense counsel, Newton L. P. Jackson, Jr., Ph.D., presented any helpful explanatory information that would assist the jury in understanding this affect.

14.    For example, defense counsel and their expert should have informed the jury at the mitigation hearing of Plaintiff's detailed history of drug abuse and its interplay with his substantial consumption of nearly an entire fifth of Southern Comfort whiskey at the time of the killings. The records also disclose that Mr. Palmer consumed LSD at approximately 7:00 p.m. on the evening before the shootings and had been taking cocaine on a near daily basis. On the date of the shootings, sometime after 2:00 p.m., Mr. Palmer purchased and consumed most of a fifth of Southern Comfort. Mr. Palmer's co-defendant, Eddie Hill, testified in a suppression hearing that Mr. Palmer drank the entire fifth of Southern Comfort by himself. Given Mr. Palmer's height and weight at the time of the killings, approximately six feet and 165 pounds, the effect the alcohol would have had on Mr. Palmer at the time of the shootings would include impaired motor control, impulsivity, poor judgment, difficulty with decision-making, mood swings, distorted perceptions and impaired memory. This information would have been

69

significant at the mitigation phase since it demonstrates a significantly diminished capacity to appreciate the consequences of his acts on the day of the shootings.

15.    It appears form the records I have reviewed that Dr. Jackson did nothing to develop mitigation evidence other than to speak with the Defendant, Donald Palmer. Based upon my experience in consulting and testifying in cases such as this, the attorney for the Defendant typically insures that the mitigation experts have spoken with friends, family members, teachers, treatment professionals, witnesses, etc. who would have relevant knowledge regarding the Defendant's psychological status, including his history of drug and alcohol abuse. Additionally, the attorney would typically provide the expert with all relevant medical, psychological and school records and present these to the jury to support the expert's opinion. In addition, the expert may discover additional records that he/she may request the attorney to acquire. In this case, no medical, school, etc. records were presented to the jury at mitigation. As mentioned, these records would have been important to properly inform the jury of Mr. Palmer's mental health condition at the times of the shootings, as well as to properly inform the jury of Mr. Palmer's developmental history as it relates to his actions at the time of the shootings. Neither the defense counsel nor Dr. Jackson presented to the jury any independent medical records which would have confirmed, for example, that Mr. Palmer suffered from drug addiction, exacerbated by alcohol abuse, and was also suffering from depression at the time of the shootings at issue.

(Affidavit of Robert L. Smith, Ph.D.,).

Counsel's failure to meet minimum standards of conducting "some investigation into available evidence, operates to deny Petitioner his constitutional right to effective assistance of counsel and underminds the fundamental fairness of the jury's imposition of the death penalty. *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999) (trial counsel's failure to investigate and present records showing that the defendant was not the trigger man in a prior murder conviction, even though "slim evidence of mitigation" should have been presented to the jury).[2]

In this case, counsel failed to even seek an expert knowledgeable in the field of alcohol

---

[2]Although the Court found that trial counsel's ineffectiveness had been waived, that ineffectiveness played a part in the Court's decision to find Appellate counsel ineffective, in part for failing to investigate and present corroborating mitigation evidence. *Id.* at 427.

and drug abuse.  They failed otherwise to fully investigate these issues and properly present them to the jury for consideration at mitigation although all of the information above was available to them at the time of mitigation.  Given the fact that the affect of the drug abuse and alcohol abuse on Petitioner's culpability was the focus of the defense and mitigation at a relatively early stage of the proceedings, such a failure rises to the level of constitutionally ineffective assistance of counsel, undercutting the reliability of both the guilt phase and mitigation phase verdicts. *Skaggs v. Parker,* 235 F.3d 261, 271-272 (6th Cir. 2000).

Petitioner has thus established both prongs of the *Strickland* test.  That is, counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment and this deficient performance prejudiced Defendant by depriving him of trial whose result is reliable.  *Strickland v. Washington*, 466 U.S. at 687.  Given the deficiencies of counsel described above and in light of the affidavit of Dr. Smith, Petitioner has established a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."  (Id., 466 U.S. at 694).  The state court's failure to find Petitioner's trial counsel rendered ineffective assistance of counsel during the guilt phase clearly constitutes an unreasonable application of the conclusions of law announced by the Supreme Court in *Strickland*.

It is apparent that Petitioner's state trial counsel really did nothing to investigate his psychological history and background, especially as it was affected by his family circumstances. The only mitigation expert retained by defense counsel relied entirely on information he obtained from Mr. Palmer.  As this Court is aware,

The sole source of mitigating factors cannot properly be that

71

> information which Defendant may volunteer, counsel must make
> some effort at independent investigation in order to make a
> reasoned, informed decision as to their utility.

*Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000). That is precisely what happened in this case

with respect to the primary focus of mitigation, i.e., Plaintiff's psychological disorders effected

by drug and alcohol abuse mitigating the killings at issue. Dr. Jackson relied entirely on its

conversations with Plaintiff. The medical records he referred to were not offered in evidence,

nor were any of Mr. Palmer's treating medical providers that were interviewed offered as

witnesses. Counsel's failure to properly investigate and present mitigating evidence which was

readily available to them at the time of trial and mitigation falls below the objective standard of

reasonableness required under the Sixth and Fourteenth Amendments. *Carter,* 218 F.3d at 596.

As the Supreme Court has held, "it is undisputed that [Petitioner] had a right–indeed, a

constitutionally protected right–to provide the jury with the mitigating evidence that his trial

counsel either failed to discover or failed to offer." *Williams v. Taylor*, 529 U.S. 362, 393

(2000). In *Williams*, the Supreme Court found that counsel did not begin to prepare for the

mitigation phase of the proceedings until a week before trial and failed to conduct an

investigation that would have uncovered extensive records that went directly to the mitigation

issues in that case. *Id.*, 529 U.S. at 395. Similarly, in this case, trial counsel failed to present any

of Petitioner's actual treatment records, nor did they offer testimony of medical care providers

who had treated Petitioner for his previously diagnosed borderline personality disorder and

multiple drug substance abuse. No evidence was offered to explain the interplay between

Petitioner's psychological disorders, his substance abuse, and his drinking of an entire bottle of

whiskey immediately preceding the killings. This, no doubt, is a part of counsel's failure to

72

adequately prepared by retaining the appropriate expert and by properly giving that expert direction. Like counsel's failures in *Williams* and *Carter*, the failure of Mr. Palmer's counsel to develop and present appropriate expert testimony and existing records regarding Mr. Palmer's pre-existing psychological disorders prejudiced Petitioner within the meaning of *Strickland*. As the Court held in *Williams*, the state court's contrary conclusions are objectively unreasonable. *Williams*, 529 U.S. at 397. Petitioenr submits that these factors show that jurists of reason would find it debatable whether Palmer was denied his right to the effective assistance of trial counsel.

Even though the Court found that, even though no procedural default defense was raised by the Warden with respect to these claim in the return of writ, that these claims were barred by the doctrine of res judicata. One problem with this analysis is that Ohio's Post Conviction statute (R.C. § 2953.21(A) (1)) clearly indicates that the purported evidentiary requirement is directory not mandatory because it uses the terms "<u>may</u> file a supporting affidavit and other documentary evidence in support of the claim for relief." Another problem with the analysis is that the last state court to deal with this claim found, not that the claim was defaulted, but that the claim was not sufficiently documented. The state trial court found that this issue hand already been raised on direct appeal. (Joint Appendix p. 2300). This issue was presented to the Belmont County Court of Appeals as part of Assignments of Error II, IV, and V. (Joint Appendix p. 2324). The Belmont County Court of Appeals decided on the merits that Petitioner had no right to such an expert since he had presented insufficient evidence to establish the need for such an expert. (Joint Appendix pp. 2480, 2483-2484). Thus, the state court of appeals looked at the merits of the claim and decided Palmer did not meet his burden of production or, ultimately, his burden of persuasion. Hence there is no default. As a result, jurists of reason would find it debatable

whether the district court's procedural ruling was correct. Therefore, Petitioner respectfully

requests that the Court issue a certificate of appealability as to Claims 15.19 and 15.20.

10.    **Seventeenth Claim for Relief**

       **INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

**Claims 17.7, 17.9, 17.12 and 17.13**

**Appellate Counsel rendered deficient performance when they failed to present an assignment of error premised on the grounds that: The judgment and sentences against appellant are void or voidable because he was denied the assistance of an expert in the presentation of his defense that he was unable to form the requisite specific intent to commit the crimes with which he was charged due to his drug abuse, intoxication and mental disorder or to present such in mitigation, thus denying Appellant his rights to due process of law, to a fair hearing and to be free from cruel and unusual punishment as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

**Appellate Counsel rendered deficient performance when they failed to present an assignment of error premised on the grounds that: The judgment and sentences against appellant are void or voidable because Petitioner was denied his rights to have the jury in his case consider whether or not to impose life imprisonment without the possibility of parole and other sentencing alternatives less than death, thus denying Appellant his rights to due process of law, to a fair hearing and to be free from cruel and unusual punishment as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 5, 10 and 16 of Article I of the Ohio Constitution. Lockett v. Ohio, 438 U.S. 586, 605, (1978); Skipper v. South Carolina, 476 U.S. 1, 4 (1986).**

**Appellate Counsel rendered deficient performance when they failed to present an assignment of error premised on the grounds that: Trial counsel was constitutionally ineffective for failing to put on all mitigating evidence at the mitigation phase of Mr. Palmer's capital trial, in violation of his rights to an informed, individualized determination of the appropriate penalty, thus denying Appellant his rights to due process of law, to a fair hearing and to be free from cruel and unusual punishment as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 9, 10 and 16 Article I of the Ohio Constitution. Eddings v. Oklahoma, 455 U.S. 104 (1982); McKoy v. North**

74

**Carolina**, 494 U.S. 433 (1990); **Strickland v. Washington**, 466 U.S. 668 (1984).

**Appellate Counsel rendered deficient performance when they failed to present an assignment of error premised on the grounds that: The judgment and sentences against petitioner are void or voidable because trial counsel was constitutionally ineffective, under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 5, 9, 10 and 16 of the Ohio Constitution, for failing to request, and because the trial court did not appoint, a social worker to assist in preparing for the mitigation phase of trial at the penalty phase of Mr. Palmer's capital trial, in violation of his rights to an informed, individualized determination of the appropriate penalty and to his constitutional rights to due process and against cruel and unusual punishment.  Eddings v. Oklahoma, 455 U.S. 104 (1982); McKoy v. North Carolina, 494 U.S. 433 (1990); Strickland v. Washington, 466 U.S. 668 (1984).**

**(Advanced Together)**

The District Court disposed of these claims on procedural grounds holding that Ohio App.R. 26(b) proceedings were not the proper procedural vehicle for advancing such claims . (Doc. 103, pp. 116-117).

In regard to Claim 17.7, the state must provide an indigent criminal defendant with expert assistance when it is necessary to present an adequate defense. Ake v. Oklahoma, 470 U.S. 68, 77 (1985).  According the affidavit from Dr. Smith, medical records and other information existing at the time of Palmer's trial show that Palmer suffered from drug addiction, exacerbated by alcohol abuse and depression at the time of the shootings. (Smith Aff. ¶ 15). However, this information and supporting records were not presented to the jury. In addition, Dr. Smith opines that the effect of the consumption of a fifth of whiskey just prior to the shootings significantly diminished Palmer's capacity to appreciate the consequences of his actions. (Smith Aff. ¶ 14). Attorney Nichelson testified that the defense team relied entirely on Dr. Jackson to develop their mitigation case. (Nichelson Tr. Vol. 1, p. 59). Dr. Jackson's curriculum vitae indicates that he

75

lacks expertise with respect to drug and alcohol addiction. Thus, Dr. Jackson, alone, could not provide an adequate defense.

By relying on Dr. Jackson, defense counsel abrogated their duties as advocates to fully investigate and present evidence in mitigation of the death penalty. Defense counsels' reliance on Dr. Jackson to perform an independent investigation into mitigating evidence constituted deficient performance. Petitioner was prejudiced by defense counsels' deficient performance because the sentencer never heard and could therefore not give effect to information that Palmer suffered from drug addiction, exacerbated by alcohol abuse and depression at the time of the shootings. The sentencer did not consider that due to consuming a fifth of whiskey Palmer 's capacity to appreciate the consequences of his action was significantly diminished. One can conclude that trial counsel were ineffective in failing to uncover and present such evidence. See, e.g. Williams v. Taylor, 529 U.S. 362, 396-96 (2000). Thus, this issue had merit for purposes of appeal.

As to Claim 17.9, the rule of lenity is applies not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose. Albernaz v. United States, 450 U.S. 333, 342 (1981). In Whalen v. United States, 445 U.S. 684 (1980), the Court held that since the felony murder statute for the District of Columbia did not specifically provide for consecutive sentences the general rule of lenity prevailed and the defendant could not receive consecutive terms. It may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of harsher punishment. Bell v. United States, 349 U.S. 81, 83 (1955).

On July 1, 1996, the Ohio General Assembly added the possible penalty of life without

parole ("LWOP") for those persons convicted of capital offenses. R.C. § 2929.03(D)(2)(a). At

that time, Palmer's case was still in the state court of appeals on direct appeal. Palmer's jury

never was presented with the option of choosing LWOP as the appropriate sentence.  Under the

rule of lenity, since a favorable change in the law occurred during the pendency of Palmer's

direct appeal, Palmer should have received the benefit of that favorable change and been given a

new sentencing proceeding. The issue had merit. For inexplicable reasons, this issue was not

raised on direct appeal but was raised by Appellate counsel Ray in post conviction. Thus, jurists

of reason would find it debatable whether this claim state the denial of a constitutional right.

As to Claim 17.12, a failure by defense counsel to present mitigating evidence when it is

available is an abdication of advocacy rather than a strategic decision. <u>Austin v. Bell</u>, 126 F.3d

843, 849 (CA6 1997).  Petitioner respectfully refers the court to arguments and evidence

presented above in claims 15, and 17. 7 to adjudicate whether these factors state a valid claim of

the denial of a constitutional right.

As to Claim 17.13, the state must provide an indigent criminal defendant with expert

assistance when it is necessary to present an adequate defense. <u>Ake v. Oklahoma</u>, 470 U.S. 68, 77

(1985). By solely relying on Dr. Jackson to develop the mitigation case defense counsel failed to

conduct an extensive investigation into Palmer's personal and family history. See, <u>Wiggins v.</u>

<u>Smith</u>, 539 U.S. 510 (2003); <u>Rompilla v. Beard</u>, 125 S.Ct. 2456 (2005). Defense counsel failed to

verify or corroborate witness testimony about circumstances and events in Palmer's life by

assembling and presenting documentary evidence such as medical, psychological and school

records which could serve as sources of relevant facts. (See, testimony of Dr. Smith). A social

worker/mitigation specialist could have obtained and collated the necessary information

concerning Palmer's life so that it could have been presented to the jury. Petitioner further refers

the court to the arguments made with respect to Claim 15, and17.7 in support of his postition that

he has stated a valid claim of the denial of a constitutional right.

As noted above, the District Court disposed of these claims on procedural grounds

holding that Ohio App.R. 26(b) proceedings were not the proper procedural vehicle for

advancing such claims . (Doc. 103, pp. 116-117).  However, previously, the Court held:

> Here, the last Ohio court to speak on the matter did not enforce any procedural default
> against Petitioner as to his Claim 17 for Relief. Thus, this Court may reach the merits of
> that Claim and Petitioner's motion for Partial Summary Judgment should be granted as to
> Claim 17.

(Doc. 50, Report and Recommendation, pp. 14-15).  This Recommendation was adopted

by the District Court in Doc. 6. Thus, the law of the case was that the ineffective assistance of

appellate counsel claims could be dealt with on their merits.

There is no Ohio procedural rule that requires a defendant to raise claims that rely in part

on evidence outside the record only in post conviction proceeding. In fact, post conviction

proceedings are not the proper procedural vehicle for raising claims of ineffective assistance of

appellate counsel. See, State v. Murnahan, 63 Ohio St.3d 60 (1992).

Moreover, issues developed after sentencing that are reviewable on appeal cannot be

raised in post conviction proceedings. See, State v. Lester, 41 Ohio St.2d 51 (1975). To hold

otherwise would be to ignore the fact that many times Ohio courts of appeal reverse and remand

cases to the trial court for further factual development. This is especially true in cases involving

allegations of ineffective assistance of counsel.

Assuming, arguendo, that there is an Ohio procedural rule requiring defendants to only

raise claims that rely in part on evidence outside the record in post conviction there is absolutely no indication that the Ohio Supreme Court enforced such a rule against Petitioner. Specifically, the Ohio Supreme Court did not find that his claims were raised in the wrong forum or that Palmer used the wrong procedural vehicle. Instead the Ohio Supreme Court found "Palmer has failed to raise 'a genuine issue as to whether [he] was deprived of the effective assistance of counsel on appeal' before the court of appeals, as required under App.R.26(B)(5)." Thus, the Ohio Supreme Court never enforced the procedural sanction raised by the District Court. Therefore Petitioner suggests that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. Consequently, Petitioner requests that the Court issue a certificate of appealability for Claims 17.7, 17.9, 17.12 and 17.13.

**D.    Conclusion**

For the reasons set forth above, Petitioner respectfully requests that the Court issue a certificate of appealability as to his constitutional claims identified in 2, 3.2, 3.3, 3.4, 3.5, 3.9, 3.10, 3.14, 3.17, 3.19, 3.20, 4, 6, 8, 9, 10, 12, 15.3, 15.6, 15.8, 15.9, 15.10, 15.11, 15.12, 15.13, 15.14, 15.15, 15.16, 15.17, 15. 18, 15.19, 15.20, 15.22, 17.7, 17.9, 17,12 and 17.13

Respectfully submitted,

_____

_____   s/ Michael O'Hara

_____
MICHAEL O'HARA, ESQ.(0014966)
O'HARA, RUBERG, TAYLOR,
SLOAN & SERGENT
209 Suite C Thomas More Park
Crestview, Kentucky 41017
(859) 331-2000
(859) 578-3365 (facsimile)
mohara@ortlaw.com

_____                    s/ Keith A. Yeazel
                          KEITH A. YEAZEL (0041274)
                          65 SOUTH FIFTH STREET
                          COLUMBUS, OH 43215
                          (614) 228-7005
                          Trial Counsel for Petitioner


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon:

Matthew C. Hellman
Anna Franceschelli
Assistant Attorney Generals
Capital Crimes Division
30 East Broad Street, 23rd Floor
Columbus, OH 43215

utilizing the CM/ECF system, this 15th day of July, 2006.


_____              _____
_____  s/ Keith A. Yeazel
                                 KEITH A. YEAZEL