UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DONALD L. PALMER,                                         [electronically filed]
                    Petitioner,

-V-                                                       Case No.  C-1-00-882
                                                          Judge Rose
                                                          Magistrate Judge Merz


MARGARET A. BAGLEY, Warden,
                    Respondent.

---

**PETITIONER'S OBJECTIONS TO REPORT AND RECOMMENDATION
OF MAGISTRATE JUDGE (DOC. 128)**

---

Pursuant to Fed.R.Civ.P. 72, Petitioner lodges specific objections to that portion of the

proposed findings and recommendations of the Magistrate Judge filed October 2, 2006, (Doc.

128) that recommend denying a certificate of appealability for the reasons set forth in the

accompanying memorandum and in Petitioner's Motion for Issuance of a Certificate of

Appealability.


                                          s/ Keith A. Yeazel
                                          _____
                                          KEITH A. YEAZEL (0041274)
                                          65 SOUTH FIFTH STREET
                                          COLUMBUS, OHIO 43215
                                          (614) 228-7005
                                          yeazel@netwalk.com
                                          TRIAL ATTORNEY FOR
                                          PETITIONER

s/ Michael O'Hara
_____
MICHAEL O'HARA (0014966)
O'HARA, RUBERG, TAYLOR,
SLOAN & SERGENT
25 Crestview Hills Mall Road, St.201
Crestview, Kentucky 41017
(859) 331-2000
(859) 578-3365 (facsimile)
mohara@ortlaw.com
CO-COUNSEL FOR PETITIONER

# TABLE OF CONTENTS

Page

**MEMORANDUM IN SUPPORT**

A.    **Procedural Posture and Summary**    1

B.    **STANDARD FOR ISSUANCE OF CERTIFICATE OF
      APPEALABILITY.**    1

C.    **ARGUMENT SUPPORTING OBJECTIONS TO
      MAGISTRATE JUDGE'S REPORT AND
      RECOMMENDATION REGARDING DENIAL OF
      CERTIFICATE OF APPEALABILITY AS TO
      CLAIMS 2, 3.2, 3.3, 3.4, 3.9 3.10, 3.14, 3.17, 8,
      9, 12, 15 AND 17.**    2

      1.    **Second Claim for Relief.**    2

      2.    **Third Claim for Relief.**    4

      3.    **Eighth Claim for Relief.**    17

      4.    **Ninth Claim for Relief.**    23

      5.    **Tenth Claim for Relief.**    26

      6.    **Twelfth Claim for Relief.**    28

      7.    **Fifteenth Claim for Relief.**    33

      8.    **Seventeenth Claim for Relief.**    71

D.    **CONCLUSION**    73

**CERTIFICATE OF SERVICE**    75

<u>**MEMORANDUM IN SUPPORT**</u>

**A.    PROCEDURAL POSTURE**.

On December 16, 2005, the Magistrate Judge recommended that the Petition for Writ of Habeas Corpus be denied.  (Report and Recommendation, Doc. 103).  Petitioner filed his timely objection to that Report (Doc. 110) and the District Court adopted the Report and Recommendation over Petitioner's Objections.  (Doc. 117).  Petitioner filed a timely Notice of Appeal (Doc. 119, 121) and filed his Motion for Issuance of a Certificate of Appealability.  (Doc. 126).  On October 2, 2006, the Magistrate Judge filed his Report and Recommendations on Certificate of Appealability  (Doc. 128) recommending that the Certificate of Appealability be granted as to Petitioner's Grounds for Relief 3.5, 3.19, 3.20, 4 and 6.  The Magistrate Judge recommended denying the Certificate of Appealability as to Claims 2, 3.2, 3.3, 3.4, 3.9 and 3.10, 8, 9, 10, 12, 15 and 17.  Petitioner files this Memorandum outlining in detail his Objections to these claims for which the Magistrate Judge has recommended denial of a Certificate of Appealability.

**B.    STANDARD FOR ISSUANCE OF CERTIFICATE OF APPEALABILITY**.

If a federal habeas claim is denied on the merits, the question of whether to issue a certificate of appealability is governed by 28 U.S.C. § 2253 (c) (2). Under 28 U.S.C. § 2253 (c)(2), a certificate of appealability may issue if applicant has made "a substantial showing of the denial of a constitutional right." If a federal habeas claim is denied on procedural grounds, without reaching the underlying merits of the claim, then the question is different. In *Slack v. McDaniel,* 529 U.S. 473, 478 (2000), the Supreme Court held that when a district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional

1

claims, a certificate of appealability may issue if the prisoner shows: (1) that jurists of reason would find it debatable whether the petition states a valid claim of the denial of constitutional right and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

**C.    ARGUMENT SUPPORTING OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION REGARDING DENIAL OF CERTIFICATE OF APPEALABILITY AS TO CLAIMS 2, 3.2, 3.3, 3.4, 3.9 3.10, 3.14, 3.17, 8, 9, 12, 15 AND 17.**

> **1.    Second Claim for Relief: Petitioner's Conviction for Aggravated Murders and the Resulting Death Sentences Are Contrary to and an Unreasonable Application of the Conclusion of Law Announced by the United States Supreme Court in *in Re: Winship*, 397 U.S. 358, 364 (1970) and Were Obtained in Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution Because Evidence Introduced by the State Failed to Establish That Petitioner Acted with Prior Calculation and Design.**

The factual record before the Court indicates that Petitioner exited a vehicle driven by Mr. Hill to assist Mr. Hill who, Mr. Palmer believed, was being accosted by the victim.  In the course of assisting Mr. Hill, Mr. Palmer's firearm discharged into his victim's head as he swung at the victim with a loaded gun.  Almost immediately, Mr. Palmer backed up and was surprised by the second victim whom he shot in the state of confusion.  There was no dispute in the record that Mr. Palmer did not know the victims, nor was there any dispute that the encounter on the roadside was purely random.  There was no evidence offered in the trial to rebut Petitioner's evidence that the shootings occurred in a spontaneous eruption of events which were clouded by Mr. Palmer's panic and confusion.  At least two decisions from Ohio courts have found that facts similar to these provided an insufficient basis for finding prior calculation and design. In *State v. Jenkins*, (1976), 48 Ohio App.2d 99, 100, the court of appeals found insufficient evidence of

prior calculation and design although defendant took the time during an argument with a motorist to walk to the defendant's car, pull out a pump shotgun, walk to the front of the car and fire a shot into the victim's trunk after which defendant, being 25 feet away from the victim, shot the victim once, spun around and shot the victim again.  See also, *State v. Davis*, (1982), 8 Ohio App.3d 205 (where the evidence showing that the shooting occurred during a tussle after an argument which developed among the defendant, the owner of a bar and the doorman was insufficient evidence of prior calculation and design).

The Ohio Supreme Court set out the three factors to be considered in determining whether prior calculation and design exist:

> (1) Did the accused and the victim know each other, and if so, was the relationship strained?
> (2) Did the accused give thought or preparation to choosing the murder weapon or murder site?
> (3) Was the act drawn out or an almost instantaneous eruption of events?

*State v. Taylor*, (1977), 78 Ohio St.3d 15, 19.  In Mr. Palmer's case, the first two questions must be answered in the negative and, as to the third question, the record reveals that in fact, the shootings in this case constituted a "instantaneous eruption of events."  There is no doubt, based on that case law and the record, as Justice Pfeiffer noted in his opinion in Mr. Palmer's case that evidence of prior calculation and design was clearly lacking.

> In this case, the prosecution failed to prove beyond a reasonable doubt that the killings of [the victims] were the product of prior calculation and design.  The murders were not the result of "studied care in planning or analyzing the means of the crime." Rather, they were the result of a spur of the moment decision by Palmer to kill two total strangers.

*State v. Palmer*, (1977), 80 Ohio St.3d 543, 578.  It follows that the state has failed in its

constitutional burden to prove "every fact necessary to constitute the crime with which

[Petitioner] has been charged" beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307,

315 (1979). At the very least, it is clear from Justice Pfeiffer's opinion that the matter is open to

reasonable debate.

In recommending against issuing a certificate of appealability with respect to this claim,

the Magistrate Judge fails to analyze any of that case law or record. More important, the

Magistrate Judge simply concludes that Petitioner, in his Motion for a Certificate of

Appealability, failed to offer any additional evidence or support for his second claim. (Report

and Recommendation, Doc. 128, p. 4). Of course, that is not Petitioner's burden when seeking a

certificate of appealability. The Magistrate Judge fails to conduct the analysis required by *Slack*.

In fact, both the record before the Court and Justice Pfeiffer's Opinion regarding prior calculation

and design make it clear that "jurists of reason would find it debatable whether the [second claim

for relief] states a valid claim of denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. at

484. Since there clearly is room for debate regarding whether Petitioner has stated a valid

constitutional claim, the certificate should issue as to Petitioner's second claim for relief. See

also *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). Petitioner has demonstrated above and in

his original motion that he has met that burden. Thus, a certificate of appealability should issue

as to the Second Ground for Relief.

   2.    **Third Claim for Relief: Prosecutorial Misconduct with Respect to the
         Introduction of Other Acts Evidence Introduced During the Trial
         Phase Constitutes Prejudicial Misconduct and the Decisions of the
         Trial Court, Court of Appeals and Ohio Supreme Court to the
         Contrary Constitute an Unreasonable Application of the Conclusions
         of Law Announced in *Berger v. United States*, and Prejudiced
         Petitioner in Both the Trial and Penalty Phases of His Trial.**

     (a)     **Claims 3.2, 3.3, 3.4, 3.9 and 3.10–Other Acts Evidence Introduced During the Trial Phase.**

Petitioner has raised the following prosecutorial misconduct claims which he contends renders his conviction and sentence unconstitutional:

> Claims 3.2, 3.3, 3.4 3.9, 3.10 – Other Acts Evidence introduced during the trial phase. (Argued together)
>
> 3.2    The Prosecutor argued that the jury could conclude that because Petitioner had a dispute with George Goolie about Goolie's treatment of Palmer's ex-wife , and because various persons deemed Petitioner's activities prior to the shootings to be suspicious, that it was Petitioner's intent to rob and kill anyone in his path.
>
> 3.3    The prosecutor opined that the persons at the gas station where Petitioner stopped prior to the shootings were lucky that they had not been killed by Petitioner.
>
> 3.4    The prosecutor told the jury that it was permissible to infer from Petitioner's dislike of Goolie, and his suspicious activities prior to the shootings, that he intended to cause the death of persons with whom he came in contact prior to the shootings.
>
> 3.9    The prosecutor introduced irrelevant and inflammatory evidence of other acts committed by petitioner.
>
> 3.10    The prosecutor argued that the jury could consider other acts evidence for improper purposes.

The Magistrate Judge has assigned separate claim numbers to each of Petitioner's individual allegations regarding prosecutorial misconduct. "However, in order to determine whether relief is warranted, prosecutorial misconduct must be assessed `in the context of the entire trial' . . .". *Miranda v. Bennett*, 322 F.3d 171, 180 (2nd Cir. 2003), quoting *Donnelly v. DeChris Toforo,* 416 U.S. 637, 639 (1974). The Magistrate Judge fails to properly analyze Petitioner's prosecutorial misconduct claim in this manner.

In Sub-claims 3.2, 3.3, 3.9 and 3.10, Petitioner Palmer demonstrates in his Motion that the prosecutor's introduction and use of numerous instances of "other bad acts" evidence, for which Petitioner was never charged and which was substantively unrelated to the shootings at issue rendered Petitioner's trial fundamentally unfair and violated his rights to due process.

In Subclaim 3.4, the Petitioner shows that the prosecutor then used those unrelated and uncharged "other bad acts" to persuade the jury to find that Palmer intended to kill two victims who, the record demonstrates, are strangers to Petitioner. In recommending against the Certificate of Appealability with respect to any of these sub-claims, the Magistrate Judge repeats his acceptance of the Ohio Court of Appeals' explanation that the evidence was not in fact "other bad acts" character evidence, but was evidence of "whereabouts, intentions or state of mind during the time preceding the murder." The Magistrate Judge concludes that Petitioner had to demonstrate that the Court of Appeals' decision was an unreasonable application of clearly established federal law. (Report and Recommendation, Doc. 128, p. 5). Without conducting any analysis of the evidence reviewed in Petitioner's Motion, the Magistrate Judge concludes that it "does not appear that reasonable jurist could find that [the Court of Appeals' decision was an unreasonable application of Supreme Court precedent.]" (Report and Recommendation, Doc. 128, p. 6).

To the contrary, Petitioner establishes in his Memorandum in support of his Motion that, given the extraordinary record of instances in which the prosecutor introduced highly prejudicial and irrelevant "other acts" evidence, it is unreasonable to accept the characterization of the Ohio Court of Appeals that the evidence was used only to show Petitioner's "whereabouts, intentions, or state of mind." The shooting of the two victims in this case is undisputably random. The

6

shootings followed a serendipitous auto accident occasioned, not by Petitioner, but by Mr. Hill who was operating the vehicle. The shootings followed an altercation between Mr. Hill and the first victim.

The Ohio Court of Appeals never explains how unsupported speculative testimony that Petitioner intended to do harm to George Goolie, or Mr. Kiss, or two gas station attendants, or rob a motel could have any logical connection to the unfortunate automobile accident that ultimately culminated in the shootings at issue. It is important that the instances of prosecutorial misconduct were not sporadic or isolated. They peppered the entire trial and were used at both the guilt and mitigation phases to impassion the jury against Petitioner.

The Constitution vests grave powers in a prosecutor seeking the death penalty. The constitutional corollary is that the prosecutor also assumes the obligation to refrain from improper methods calculated to produce a wrongful conviction or penalty. In *Berger v. United States*, 295 U.S. 78 (1935), the United States Supreme Court held that. It is as much his [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. Petitioner submits that the prosecution's use of "other acts" evidence was so egregious that it rendered the entire trial unfair.

The prosecutor repeatedly referred to an alleged dispute between George Goolie and Petitioner relating to Petitioner's ex-wife. During opening statement, the prosecutor made references to speculation that Mr. Palmer was in the area of the shootings for the purpose of burglarizing the home of George Goolie, an offense for which he was never charged and for which no competent proof was offered. (Tr. p. 751).

Additionally, during the trial, the prosecutor was allowed to ask Deputy Thompson to

7

testify that Petitioner and Eddie Hill drove past Goolie's trailer and his place of employment, and that Goolie's trailer was located one-quarter mile from where the decedent's body was found. (There was never a dispute about the location or fact of the shootings by Petitioner). Deputy Thompson was also permitted to testify that Palmer had told him that he was in the area to rob Mr. Goolie. (Trial Tr. p. 847, 867). In the same vein, the prosecutor elicited testimony from a friend of one of the decedents that the two decedents were asked by Goolie to watch his trailer because of past burglaries, implying that Petitioner was the one who had burglarized Goolie's trailer. (Trial Tr. pp. 840, 924). The prosecutor also elicited from Mr. Goolie his unfounded assertion that Petitioner had called Petitioner's ex-wife at Mr. Goolie's house regarding non-support of two of his children. (Trial Tr. pp. 970, 972, 975).

To further inflame the passions of the jury, the prosecutor asked and was permitted to have Mr. Goolie testify that on the day subsequent to the alleged offenses, Mr. Palmer called Goolie and said something to him about "performing sexual acts with me and something to the extent he wanted to kill me afterwards." (Trial Tr. p. 972).[1] Consistent with this highly prejudicial and irrelevant line of questioning, the prosecutor accused Petitioner during cross examination of hating Mr. Goolie and wanting to go to his place to rob him and kill him. (Trial Tr. p. 1127). Again, these completely speculative accusations came into evidence although Mr.

---

[1] The fact that the trial court later sustained an objection to this evidence was not sufficient to dispel the prejudice enuring to Petitioner. (Trial Tr. p. 1054). This "correction" was, to say the least, belated as it came the week after the testimony came in (Trial Tr. p. 1054). In any event, the harm had already occurred. "'The naive assumption that prejudicial effects can be overcome by instructions to the jury ... all practicing lawyers know to be unmitigated fiction.' "*Burgett v. Texas,* 389 U.S. 109, 115, f.n.7 (1967), quoting, *Krulewitch v. United States*, 336 U.S. 440, 446 (1949) (Jackson, J., concurring). This admonition is particularly true here where the jury is allowed such a lengthy period of time to consider the prejudicial evidence and where so much similar prejudicial testimony and argument is permitted for jury consideration.

Palmer had never been charged with any offenses relating to any of the unsupported assertions.

During the trial, the prosecutor insisted on pursuing other equally prejudicial and irrelevant avenues of evidence. For example, Sergeant Hawthorne was asked to testify that on May 7 and the early morning of May 8, he saw a car, implied to be Petitioner's car, in a parking lot of a local motel and noted that there had been a lot of theft in that area. This testimony was designed to and did create the baseless inference the Petitioner engaged in theft in that area. (Trial Tr. pp. 932, 935).

Adding to the prejudice to Petitioner, the prosecutor called as a witness for the State a Mr. Kiss who, in response to the prosecutor's questions, was allowed to testify that on May 8 he was being followed by a brown car to his home which turned around in the driveway next to him, and that the persons in the car yelled something at him. His testimony was admitted by the prosecutor to infer that Petitioner intended to rob and harm Mr. Kiss. (Trial Tr. pp. 940-942).

Similarly, the prosecutor called two gas station attendants and elicited from them that, on the dates of the shootings, on two separate occasions, the Petitioner and Mr. Hill came into the service station and were acting "suspiciously." Indeed, the prosecutor had one of the attendants offer what can only be described as pure speculation, that Petitioner and Mr. Hill were acting like they were "casing the place." (Trial Tr. pp.945-948, 953-957). In fact, Petitioner and Hill had done nothing more than purchase pop and gasoline. (Trial Tr. pp. 1089-1090).

The prosecutor's improper motive and intent became clear during closing argument when he capitalized on the totally inappropriate "other bad acts" evidence. In his initial closing remarks the prosecutor tells the jury to consider the following utterly speculative "other bad acts" from which they were invited to infer prior calculation and design to kill Mr. Sponhaltz and Mr.

9

Vargo:

-     "[D]efendant didn't much care for George Goolie. He didn't care for the way George had treated his ex-wife . . .

-     The defendant formed the intent to do something unlawful or criminal to George Goolie. He told Detective McMenemy . . . that he was going to rob George. . . .

-     A very reasonable inference you can draw from this fact is that defendant was going to do more than just burglarize George's house. The evidence shows that his intention was to do something harmful to George. . . .

-     It doesn't take a great leap of logic to figure from that fact and from the fact that he passed up an opportunity to burglarize the home . . . and went looking for George with a loaded .22. It doesn't take any tremendous leap of logic **to figure out what his real intentions were** . . ." (Emphasis added).

(Trial Trial Tr. p. 1148-1149).

The prosecutor then directs the jury to assume, without any basis, that the Petitioner was also intending to kill Larry Kiss. "[Defendant and Hill] followed Larry Kiss all the way . . . to his home . . . I think Mr. Kiss can be thankful that he made it to his driveway before there was any kind of traffic accident." (Trial Trial Tr. p. 1149). The Prosecutor continues to taint the jury with fabricated facts unrelated to the charges against Petitioner by arguing, "the guys at the gas station, they were very lucky they weren't **robbed and killed."** (Emphasis added). (Trial Tr. p. 1198). The prosecutor then improperly argues to the jury: "we know pretty much what he did, and from that you good people **are permitted to infer what was going on in his mind** at the time he did it. All of this we have been over and over what was their original purpose regarding Goolie and the loaded gun circling Goolie's . . . like birds of prey going in for the kill." (Trial Tr. pp. 1148, 1198, 1200).

It is important to note that the prejudicial effect of the prosecutor's acts and conduct

during the trial and closing argument was exacerbated by the failure of the Court to properly instruct the jury that they could not base an inference on another inference.[2]  Exploiting his misconduct, the prosecutor told the jury,

> No matter what anyone tells you, you alone have the power to put those facts together and draw the necessary and reasonable inferences. No one can tell you that you can or cannot draw a certain inference if you feel beyond a reasonable doubt, if you know in your heart that this is the necessary and probable inference to draw from all of the evidence. It is clear that all the reasonable inferences that any rational person can draw point to no other conclusion and that Petitioner is guilty as charged of all counts and all specifications.

(Trial Tr. pp. 1159-60). In short, the prosecutor invited the jury to infer from this "other bad acts," (evidence which included purely speculative opinions about intent to kill and rob other people, and the characterization of Mr. Palmer's motives relating to people other than the victims) that Mr. Palmer was a man who was simply bent on robbing and killing anyone in sight. In unambiguous terms the Prosecutor tells the jury, ". . . he would have killed any number of people who came along. . . ." (Trial Tr. 1154).  The prosecutor used this evidence to get the jury to convict and sentence Petitioner to death because of his purportedly bad character.

The state courts' interpretation of this evidence as simply showing intent, scheme, or plan to commit the offenses is objectively unreasonable. Mr. Palmer's being driven by Goolie's empty house cannot provide a logical connection to a scheme of killing and robbery, much less the subsequent shooting of two strangers. To note the obvious, if Palmer were interested in robbing and killing that day he surely would have exploited the opportunity when he passed by Goolie's empty trailer. He passed up other opportunities when he and Hill pulled up next to Mr. Kiss mistaking him for a friend; when they stopped momentarily at the Knight's Inn; when they

---

[2]  See Argument as to Seventh Claim for Relief infra.

11

stopped to purchase a fifth of Southern Comfort at the state liquor store; and when they stopped at the gas station to buy pop and gas.

The fact is, nothing happened at any of those locations, no burglaries, no robberies, no assaults, no threats, no objective misconduct of any kind. And yet that evidence of "other bad acts" was permitted to be used by the prosecution to prove prior calculation and design for the shootings of two individuals who the prosecution concedes were strangers,[3] and whose shootings would not have occurred but for an unforeseeable tragic accident occasioned by Hill's negligence in operating the vehicle. There is no authority for the admission of such tangential and irrelevant evidence to be used in such a prejudicial fashion.

Given the overwhelming evidence of prosecutorial misconduct, it is, at the very least, debatable among reasonable jurists as to whether the state's misconduct in this case violated Plaintiff's constitutional right to a fundamentally fair trial as enunciated in *Berger v. United States*, *supra*.

> **(ii)    Claim 3.4: The Prosecutor Improperly Argued that Petitioner was Guilty of Three Aggravating Circumstances.**

During the penalty phase, the prosecutor improperly argued that all the aggravating factors at trial would weigh against the mitigators in the penalty phase.  Specifically, the prosecutor directed the jury that,

> The judge will tell you if you find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors and you shall recommend a sentence of death; not may or can, but shall.

---

[3] Trial Tr. 1196.

(Mit. Tr., pp. 157-158). This clearly violated Ohio law which requires the jury to weigh all

mitigating factors against the aggravating circumstances of each particular offense. "[O]nly

aggravating circumstances relating to a given count may be considered in assessing the penalty

for that count." *State v. Cooey*, (1989), 46 Ohio St.3d 20, syllabus, para. 3.

        In recommending against a Certificate of Appealability as to this issue, the Magistrate

Judge stated that this was a matter of state law which was rejected by the Ohio Supreme Court

and that the Federal Court in a habeas proceeding has no authority to reverse such a finding,

"especially when it is raised by asserting prosecutory misconduct." (Report and

Recommendation, Doc. 128, p. 7). However, the conduct of the prosecutor in this regard did

violate clearly established federal law. Where the aggravating circumstances from all counts are

combined and weighed against the mitigating circumstances, the Defendant is denied, "that

`consideration of *** circumstances of the particular offense *** that is a constitutionally

indispensable part of the process of inflicting the penalty of death.'" *State v. Cooey*, (1989), 46

Ohio St.3d 20, syllabus, para. 3, quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).

Indeed, the Supreme Court makes it very clear that individualized consideration for each

particular offense is constitutionally required.

>        While the prevailing practice of individualizing sentencing
> determinations generally reflects simply enlightened policy rather
> than a constitutional imperative, we believe that in capital cases,
> the fundamental respect for humanity underlying the Eighth
> Amendment . . . requires consideration of the character and record
> of the individual offender and the circumstances ***of the particular
> offense*** as a constitutionally indispensable part of the process of
> inflicting the penalty of death.

*Woodson*, 428 U.S. at 304. (Emphasis added).

        In *Mills v. Maryland*, 486 U.S. 384 (1988), the Supreme Court makes it very clear that

13

conducting a penalty phase trial in such a way as to mislead or even confuse a jury as to the law it

must follow in deciding whether a sentence of death is to be imposed constitutionally taints that

phase and requires reversal of the death sentence. *Id.* at 384.  In light of *Woodson* and *Mills,* at

the very least, reasonable jurists could debate the issue of whether the prosecutor's misconduct in

misleading the jury by instructing them to combine all of the aggravating circumstances against

all of the mitigating factors rendered the sentence of death constitutionally infirm.  Accordingly,

a Certificate of Appealability regarding Claim 3.14 should issue.

> **(iii)    Claim 3.17: The Prosecution Argued that Since the Jury had Rejected Voluntary Intoxication in the Trial Phase, Voluntary Intoxication Was Not a Mitigator in the Penalty Phase.**

At mitigation, the prosecutor argued:

> You have rejected this defense [alcohol intoxication] once already in your first proceedings when the alcohol or intoxication defense charge was given to you.  And, of course, he knew enough about what he was doing so that he could plan a way before he took that first drink of Southern Comfort, he had planned to do what he was going to do.[4]

(Mit. Tr., p. 144).  The prosecutor, thus, directs the jury to reject the alcohol intoxication as a

mitigating factor since it has already rejected it as a defense during the guilty phase.  This was

improper.

In *State v. Lawrence*, (1989), 44 Ohio St.3d 24, the Ohio Supreme Court reversed the

death sentence imposed on the defendant were the prosecution had repeatedly misstated the

import of a jury's rejection of a defense at the guilt phase by implying that the same result

---

[4]The plan the prosecutor was referring to here, by inference, was to kill George Goolie, not the victims in this case.

14

necessarily would obtain at the penalty phase. That court found that, in spite of appropriate instructions from the trial court, the prosecutor's misstatement of the law in this regard was in error. The court found that the statement could reasonably have mislead the jury into believing that the juror's determination of the existence of a mental disorder as a defense of the guilt phase had to be considered the same during the sentencing phase. The court therefore reversed the convictions.

Consequently, even through the jury instructions regarding the burden of proof during the mitigation phase of Palmer's trial were accurate statements of the law, a court should nevertheless vacate the death sentence in light of the prosecutor's repeated misstatements to the jury suggesting that it was defendant's burden to prove that the mitigating circumstances outweighed the aggravating factors. *Id*. Due process demands no less. This misstatement and others were not remedied by jury instructions. The jury would have every reason to rely on the prosecutor's statement of what the law was. In *Mills v. Maryland,* 486 U.S. 384 (1988), the Supreme Court makes it very clear that conducting a penalty phase trial in such a way as to mislead or even confuse a jury as to the law it must follow in deciding whether a sentence of death is to be imposed constitutionally taints that phase and requires reversal of a death sentence. *Id.* 384. Although the Court was addressing an instruction regarding unanimity, the same concerns which caused reversal there apply with equal force here. The prosecutor's repeated misstatements regarding the law that must be followed in the sentencing phase of Petitioner's case occasioned the same constitutional harm that required reversal in *Mills.* Accordingly, Palmer has made a substantial showing that his constitutional rights, as discussed in *Mills*, were denied. Thus, a certificate of appealability should issue as to Claim 3.17.

15

Interestingly, the Magistrate Judge appears to concede that the prosecutor may have "arguably misstated the law about reconsidering the intoxication during mitigation. . . ." (Report and Recommendation, Doc. 128, p. 8). The Magistrate Judge then suggested that the argument could have been interpreted by the jury as suggesting that there wasn't much evidence in intoxication. Of course, there is no way of determining that from the record before this Court. The critical point is that the prosecutor mislead the jury in improperly stating to them that they had already disposed of intoxication as a mitigator by denying the intoxication defense during the guilt phase. This was clearly improper for the prosecutor to do. As demonstrated above, the law was clearly established as long ago as 1988 that, in conducting the penalty phase of the trial in such a way as to mislead or even confuse a jury regarding the law it must follow in deciding whether to impose a sentence of death, constitutionally taints the mitigation phase and requires a reversal of the death sentence. "The possibility that Petitioner's jury conducted its task improperly certainly is great enough to require resentencing." *Mills v. Maryland*, 486 U.S. at 384.[5] Again, the record in this case regarding the prosecutor's misconduct in misleading the jury in its deliberations regarding imposition of the death penalty, at the very least, creates a debatable issue for reasonable jurists. The Certificate of Appealability should issue with respect to this claim.

3.      **Eighth Claim for Relief: The Trial Court Erroneously Permitted the Admission of Evidence and Argument Relating to Irrelevant and Highly Prejudicial "Other Acts" Which Petitioner Allegedly Committed Against Persons Not Named in the Indictment, Thereby Depriving Petitioner of His Right to**

---

[5]Although the Court in *Mills* was focusing on instructions given by the trial court, the end result should be no different. Where the prosecutor misleads the jury in its deliberations regarding a sentence of death or otherwise confuses them in those deliberations, reversal of a death sentence is constitutionally mandated by *Mills*.

**Due Process of Law and to be Free of Cruel and Unusual
Punishment as Guaranteed by the United States Constitution.**

Without conducting any specific analysis under *Slack v. McDaniel*, *supra*, the Magistrate

Judge recommends against granting a Certificate of Appealability with respect to this claim.

That is, the Magistrate Judge makes no finding that reasonable jurists could find the

constitutional claims debatable.  *Slack v. McDaniel*, 529 U.S. at 44; *Miller-El v. Cockrell*, 537

U.S. at 336.  The Magistrate Judge concludes incorrectly that "Petitioner has cited no authority to

show that this ruling was somehow an unreasonable application of clearly established federal

law."  That is not the standard to be applied to the issue of appealability.  In his Memorandum in

support of his Motion, Petitioner does establish that there is fair room for debate among

reasonable jurists regarding this claim.  In fact, Petitioner begins his federal law analysis with the

Supreme Court's decision in *Michelson v. U.S.*, 335 U.S. 469 (1948), where the Supreme Court

unequivocally holds that "courts that follow the common law tradition almost unanimously have

come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character

to establish a probability of his guilt. . . ." *Id*. at 475.  The Court explains that the "overriding

policy of excluding such evidence, despite its admitted probative value, is the practical

experience that its disallowance ***tends to prevent confusion of issues, unfair surprise and***

***undue prejudice.***" *Id*., 335 U.S. at 476.  (Emphasis added).  More recently, the Supreme Court

reaffirmed the vitality of this principle by holding that "[i]n the event that evidence is introduced

that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause

of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S.

808, 825 (1991).  These principles were not included in the Magistrate Judge's analysis.

Without discussing the clearly established law of the Supreme Court prohibiting use of

17

character type "other acts" evidence, the Magistrate Judge simply accepts the Court of Appeals'

implausible explanation that the repeated use of other acts evidence by the state in Mr. Palmer's

prosecution somehow went to Mr. Palmer's "'whereabouts, intentions, or state of mind' during

the time preceding the murders." (Report and Recommendation, Doc. 128, pp. 10-11). In fact,

whether any of the other acts evidence offered by the prosecution went to any of those issues is

highly debatable.

As the Court will see, none of the other acts evidence of which Mr. Palmer complains can

have any logical connection to his shooting of two strangers after an auto accident occasioned by

the driver of Mr. Palmer's vehicle. The highly prejudicial other acts evidence offered by the

state, considered in light of the circumstances of the shooting, are both irrelevant and appear to

be designed to simply inflame the jury. That evidence includes the following 19 separate

categories of other acts evidence that have no logical connection to the auto accident which

culminated in the shootings of the victims in this case. Keep in mind, other acts evidence is only

potentially relevant if it forms part of the immediate background of the alleged act "which ***forms***

***the foundation of the crime charged in the indictment.***" *State v. Curry*, (1975), 43 Ohio St.2d

66, 69. (Emphasis added). It is clear that the evidence listed below cannot logically be

connected with the crime for which Mr. Palmer was charged.

> (1) Remarks by the prosecutor in opening statement informing the
> jury that Mr. Palmer went to the area of the shootings because it
> was his intent to `burglarize the home of George Goolie and to rob
> him.' The prosecutor also explained that Goolie was having a
> relationship with appellant's ex-wife which angered the appellant.
>
> (2) The prosecutor introduce evidence of investigator Fred
> Thompson regarding his assertion that Palmer told him that he
> drove past Goolie's trailer and his place of employment, pointing
> out that Goolie's trailer was one-quarter mile from the location

where Mr. Vargo's body was found.

(Tr. pp. 801-802).

> (3) Thompson was permitted to testify that Palmer told him that they were in the area to rob Goolie. Thompson gave this information and was allowed to tell the jury that he was in that area to "stake out the house for that purpose."

(Tr. p. 867).

> (4) Frank Donbeck, a friend of Mr. Sponhaltz, was allowed to testify that Goolie had asked Sponhaltz to watch his trailer because of a past burglary, implying that it was appellant who burglarized Goolie's trailer in the past. This was based on Goolie's suspicions and not on any evidence.

(Tr. pp. 840, 924).

> (5) George Goolie was allowed to testify despite the fact that he had no personal knowledge of the shootings and knew nothing of relevance relating to the alleged offenses. Goolie testified that his home had been burglarized in February.

(Tr. p. 968).

> (6) Goolie was also permitted to verify that Sponhaltz and other neighbors watched his trailer for him.

(Tr. p. 969).

> (7) Goolie was allowed to testify about his relationship with Palmer's ex-wife, Cammy Palmer.

(Tr. p. 970).

> (8) Although he had never met Palmer, Goolie was allowed to testify that on one occasion when he was at Cammy's home, he answered the telephone and spoke to someone who identified himself as Palmer and spoke on the telephone with his ex-wife. Goolie was allowed to testify that the conversation was unfriendly and concerned non-support of Palmer's children.

(Tr. pp. 971, 972, 975).

19

(9) Goolie was permitted to testify that after the alleged offenses Donald Palmer called him and said something about "performing sexual acts with me and something to the extent he wanted to kill me afterwards."

(Tr. p. 972).[6]

(10) The prosecutor asked Mr. Palmer during cross-examination if he disliked Goolie, which appellant denied. The prosecutor then accused Palmer of hating Mr. Goolie and going to his place to "rob and kill him."

(Tr. p. 1127).

(11) The prosecutor made a continued issue about Mr. Palmer having a gun as he drove past Goolie's home. The prosecutor thus was allowed to infer Mr. Palmer's intent to kill and rob Mr. Goolie.

(Tr. p. 1127).

(12) The prosecutor emphasized these various issues regarding Mr. Goolie throughout his closing argument. He made references such as "he didn't much care for George Goolie. He didn't care for the way George Goolie treated his ex-wife. . . ."The prosecutor went on to argue that "on May 7, 1989, the defendant formed an attempt to do something unlawful or criminal to George Goolie." The prosecutor then referred to Mr. Palmer's effort to locate Mr. Goolie at his place of employment and concluded that "defendant was going to do more than just burglarize George's house. . . ." The evidence shows that his intention was to do something harmful to George.

(Tr. p. 1148).

(13) Further along in closing argument, the prosecutor referred to Mr. Palmer as "circling around the Goolie trailer like birds of prey going in for the kill."

(Tr. p. 1198).

---

[6]Defense counsel requested that all this testimony be stricken. The request was overruled. (Tr. p. 974). Much later in the trial after the state rested, the trial court finally ordered the testimony concerning the telephone threat only to be stricken. All of Goolie's other testimony remained before the jury. (T r. p. 1054).

  (14) The prosecutor then told the jury that "you good people are permitted to infer what was going on in his mind . . . what was their original purpose regarding Goolie and a loaded gun circling Goolie's."

(Tr. p. 1200)

  (15) The prosecutor was allowed to inquire of the gas station attendants that the petitioner and Mr. Hill came into their service station on two separate occasions acting suspiciously. One of the attendants was permitted to give the opinion that Mr. Palmer was acting like he was "casing the place."

(Tr. pp. 945-48, 953-57).

  (16) This was used to create the improper inference that petitioner was going to rob the gas station and possibly do harm to the attendants.

  (17) The prosecutor exploited this in closing argument by arguing to the jury that the gas station attendants were lucky that they were not robbed and killed.

(Tr. p. 1198).

  (18) The prosecutor was also allowed to call Sergeant Hawthorne during the guilt phase to testify that around the time of the shootings, he saw a car in the parking lot of a local motel where there had been thefts in the area. The Sergeant was allowed to create the innuendo that Palmer had engaged in theft in that area.

(Tr. pp. 932-935).

  (19) The prosecutor was permitted to call Larry Kiss who was allowed to testify that he was being followed on May 8th by a brown car which turned around in the driveway next to his and yelled something at him. The testimony was admitted to infer that petitioner intended to rob or do harm to Mr. Kiss.

(Tr. pp. 940-942).

  Given the overwhelming amount of the "other bad acts" evidence used throughout the trial in closing argument by the prosecutor, it is at least debatable among reasonable jurists as to

whether such evidence was "inextricably related to the alleged criminal act." *State v. Curry*, 43 Ohio St.2d at 69.

In his Memorandum in support of his Motion for issuance of a Certificate of Appealability, Mr. Palmer notes that the Sixth Circuit has held that evidence not unlike the evidence used in this case could in fact constitutionally impair a criminal defendant's trial. *Manning v. Jarnigan*, 501 F.2d 408, 412 (6th Cir. 1974). Mr. Palmer also noted a similar holding of the 9th Circuit in *McKinney v. Rees*, 993 F.2d 1378 (9th Cir. 1993). In *McKinney*, the Court granted a habeas corpus petition where the prosecution exploited other acts evidence which tended to establish the murder defendant's character and thus depriving him of a fundamentally fair trial in violation of due process of law. The 9th Circuit explained,

> The use of `other acts' evidence as character evidence is not only impermissible under the theory of evidence codified in California Rules of Evidence . . . ***but is contrary to firmly established principles of Anglo-American jurisprudence***. (Emphasis added).

*Id.* at 1380. The Court relied on the principle enunciated by the Supreme Court in *Brinegar v. United States*, 338 U.S. 160 (1949).

> `Guilt in a criminal case must be proved beyond a reasonable doubt and by evidence confined to that which long experience in the common-law tradition, to some extent embodied in the Constitution, has crystalized into rules of evidence consistent with that standard. These rules are historically grounded rights of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property.'

*McKinney v. Rees*, at 1381 quoting *Brinegar*, 338 U.S. at 174. Just as the use of other acts evidence in *McKinney* and *Manning* raised serious questions regarding whether the criminal defense trial was "fundamentally unfair in violation of the Due Process Clause", so to the efforts of the prosecutor in Mr. Palmer's case, introducing character evidence throughout the guilt phase

22

arguably rendered his trial fundamentally unfair.  Certainly, reasonable jurists, given the state of

the record in this case, could find that issue debatable.  Thus, the Certificate of Appealability

should be issued regarding Plaintiff's Eighth Claim for Relief.

>**4.    Ninth Claim for Relief: The Trial Court's Failure to Give a Limiting Instruction on the "Other Acts" Evidence Deprived Petitioner of Due Process of Law and Violated Petitioner's Right to be Free of Cruel and Unusual Punishment.**

The Magistrate Judge recommended against issuing a Certificate of Appealability with

respect to this claim by rejecting Petitioner's argument that the overwhelming "other acts"

evidence described above constituted improper character evidence.  The Magistrate Judge rejects

the proposed appeal of this claim by holding that Petitioner's argument "ignores the actual

holding of the Court of Appeals . . ."  (Report and Recommendation, Doc. 128, p. 11).  Again,

the Magistrate Judge fails to do any analysis under *Slack*.  Petitioner demonstrated in the Eighth

Ground for Relief that the issue of whether the voluminous "other acts" evidence was improperly

used to prove bad character, rather than the elements of the crime, thus depriving Plaintiff of a

fundamentally fair trial, is a matter that is subject to debate among reasonable jurists.  The same

demonstration would necessarily apply to this claim for relief.

Petitioner outlined above 19 separate categories of the improper admission of "other bad

acts" evidence and argument by the prosecutor which is not logically connected in any way to the

shootings for which Mr. Palmer was indicted.  The prejudicial nature of the improper admission

of this evidence and its prejudicial effect on the verdicts rendered in this case were substantially

enhanced by the trial court's failure to provide any limiting instruction, although it was

constitutionally obligated to do so.  If, in fact, the trial judge in this case concluded that the

balancing and probative versus prejudicial effect of the challenged areas of evidence weighed in

23

favor of admission, then the trial court "should ordinarily instruct the jury carefully as to the limited purposes for which the evidence is admitted." *United States v. Sangrey*, 586 F.2d 1312, 1314 (9th Cir. 1978). As the 6th Circuit has held, when the trial court's final decision is made, the balancing has been done, and the jurors are permitted to hear of the defendant's prior misconduct, it is important that the jurors then be ***clearly, simply, and correctly instructed regarding the narrow and limited purpose for which the evidence may be considered . . . ."*** (Emphasis added). *U.S. v. Johnson*, 27 F.3d 1186, 1193 (6th Cir. 1994), cert. denied, 513 U.S. 1115. The 6th Circuit explained this ruling noting that "because prior acts evidence carries with it such a high risk of confusion and misuse . . . there is a heightened need for the careful application of the principles set out in Rule 403." *Id.* at 1193.[7]

It is important to remember that the pervasive use of "other acts" evidence consisted largely of speculation about what criminal activity Petitioner may have desired to engage in, but did not actually commit. In short, the "other acts" evidence was riddled with pure speculation that had no logical connection to shootings that occurred after an auto accident caused by Mr. Hill. Nevertheless, even if one assumes that the voluminous other acts evidence had some limited legitimate purpose, the trial court would nevertheless have a *sua sponte* obligation to provide a limiting instruction, even in the absence of an objection by Petitioner's counsel. The trial court's failure to offer such a limiting instruction when the evidence was admitted and in final instructions to the jury was plain error and denied Petitioner his substantive right to Due Process. *U.S. v. Suaga-Martinez*, 217 F.3d 754, 759-60 (9th Cir. 2000) (where the Court held that

---

[7] The Court affirmed the conviction in that case only because the trial court, unlike the trial court in Mr. Palmer's case, gave specific limiting instructions.

24

the trial court had a *sua sponte* obligation to provide a limiting instruction regarding the proper use of a co-defendant's out-of-court statement; see also the 6th Circuit's decision in *U.S. v. Johnson*, *supra*, 27 F.3d at 1193.

The Magistrate Judge offered his conclusion that this evidence would constitute harmless error. This is inconsistent with the weight of federal authority. In reversing a denial of a petition for writ of habeas corpus, and remanding the matter for an evidentiary hearing, the Ninth Circuit held,

> In *Dickson [v. Sullivan*, 849 F.2d 403 (9th Cir. 1998)], we found it `impossible' to conclude that exposure of one or more jurors to highly prejudicial information regarding the defendant's prior criminal acts was harmless beyond a reasonable doubt. [Citation omitted]. The serious concerns that motivated us to grant habeas relief in that case are likewise present here and lead us to the same result even under the harmless error standard.

*Jefferies v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993).

In any event, Petitioner has demonstrated that, given the pervasive nature of the state's use of "other bad acts" evidence throughout Mr. Palmer's trial, serious federal constitutional