properly prepare for mitigation as expressly alleged in paragraph 133.

Remember, it is the Magistrate Judge, not the Petitioner, who has assigned separate "sub-claim" numbers to the paragraphs of the Petition. A reading of the Petition makes it clear that Petitioner has not abandoned these claims. Reading 15.14 together with 15.22, it is apparent that Petitioner has demonstrated that he is entitled under *Slack* to a certificate of appealability as to these claims.

The theory of mitigation in Palmer's case was that his long history of drug abuse and his drug and alcohol use prior to the time of shootings and its effect on his pre-existing psychological problems explained his behavior and called for a sentence of less than death.

In habeas proceedings, trial counsel conceded that his representation was inadequate:

A. My answer is that ***I did not feel fully competent at that time and I don't feel that I was fully competent sitting here today because we didn't have the experience in such cases.*** We had cases that were capital but not death and we were also holding our regular full time positions and trying other cases. So ***I still don't feel that we had a really good adequate defense in the case***. (Emphasis added). (Nichelson Tr. Vol. I, pp. 86-87).

Petitioner's state trial counsel, James Nichelson and Mark Costine, produced to Petitioner's counsel all documents they could find with respect to their representation of Donald Palmer during his initial trial and mitigation hearings. Mr. Nichelson identified Petitioner's Exhibit 1 as his "working file" case and Petitioner's Exhibit 2 as the trial notebook which he maintained in defending Mr. Palmer. (Nichelson Tr. Vol. 1, pp. 11, 13).

Mr. Nichelson testified that it was his practice in 1989, at the time of the trial, to keep all

of his notes regarding witness interviews in his working file similar to Petitioner's Exhibit 1 Mr. Nichelson confirmed it was his normal practice that witness notes would be kept in a single file and that he could not recall any other files that he kept on Mr. Palmer's case which would have contained notes of witness interviews. (Id., pp. 16-17). Mr. Nichelson's review of the working file in Mr. Palmer's case revealed notes of interviews with only two witnesses, their client, Donald Palmer, and his ex-wife, Cammy Palmer. (Id., pp. 15-16). Mr. Nichelson also testified that he remembered speaking with witnesses Ruby Grimes, Petitioner's great-aunt, and Petitioner's mother, Norma Needham. (Nichelson Tr. Vol. 2, pp. 10-12). Mr. Nichelson does not recall if he spoke with any of the other witnesses on the witness list he had in his trial notebook. (Nichelson Tr. Vol. 2, pp. 11-14). Mr. Nichelson was unable to recall which of the witnesses on the witness list the defense team had spoken with either before the trial or before the mitigation hearing. (Id. at 9-10).

Although Mr. Nichelson and Mr. Costine thought there might have been other interviews, there is nothing in their files, produced in response to Petitioner's subpoena, which would confirm that they spoke with any other lay witnesses in preparation for mitigation. The absence of any adequate preparation for the mitigation hearing is apparent from a review of the mitigation transcript. Admittedly, Mr. Nichelson called seven witnesses other than Petitioner, six of those were family members (Grimes, Younkins, Needham, Cammy Palmer and Harris) or very close friends (Agnes Jones and James Jones). Most of their testimony was redundant and focused on Donald Palmer being a good child growing up and did virtually nothing to advance the defense team's theory of mitigation, i.e., Palmer's long history of drug abuse and his drug and alcohol abuse, its psychological causes and the affect on Mr. Palmer at the time of the killings. (See Joint

52

Appendix, Vol. IV, pp. 17-136).

Additionally, the defense team called Keith Groves who was minister at Petitioner's church and testified regarding Mr. Palmer's apparent remorse and his opinion that he was "basically a person who had run into some difficulties with drugs and alcohol." (Id. at 135). Unfortunately, none of the witnesses called by Petitioner could directly corroborate Petitioner's history of drug abuse or its affect on Petitioner at the time of the shootings at issue. Nor do any of these witnesses address Palmer's psychological illnesses (which the records showed he suffered prior to the shootings) that would have contributed to his history of alcohol and chemical abuse. The failure to obtain such records has been found to be prejudicial. See, *Rompilla v. Beard*, 125 S.Ct. 2456 (2005).

Counsel's failure to meet minimum standards of conducting an investigation into available evidence operates to deny Petitioner his constitutional right to effective assistance of counsel and undermines the fundamental fairness of the jury's imposition of the death penalty. Counsel's lack of preparation is evident in the Mitigation testimony of Petitioner's mother, Norma Needham. Her testimony fails to cover critical matters which she had previously described in a May 25, 1989, letter to Mr. Nichelson and Mr. Costine. In that letter she describes the following matters which were not addressed in testimony:

- The 1985 incident where Donald Palmer "lost control at my house . . . His nerves were bad due to separation of wife and 3 children - said he was losing his mind."

- Doctors at Riverside suggested that he get help for his ***deep depression*** and attempted suicide.

- In 1988 and 1989 "Don was very, very depressed at home and would set around

53

not talking much. ***Out of depression and chemical use*** slept a lot. He was out of a job and had no car."

-    "May 3rd `***Don lost a child!*** He was crying and went into the bathroom. He was sitting on the tub with his head hung down. And then he had to reach down and take the baby to the hospital. Its head, eyes, small arms and legs were formed. I had to get a container of water for him."

-    Don's Grandmother died the 6th of May and was buried the 9th of May - was ***depressed over that as his grandmother practically raised him..*** . . . . he felt that his Grandmother was only one who loved him besides his mother. He has never been the same since.

-    "Don is under so much pressure mentally in my estimation that I was having a hard time getting him to understand things at different times when we would talk. He just sat in a daze very often."  (Emphasis added).


(See Nichelson Trial Notebook, Petitioner's Ex. 2, Bates pp. 237-238, and compare Mitigation testimony of Norma Needham, Joint App. Vol. IV, Mitigation Tr. 49-61).  At the Mitigation hearing, trial counsel had Ms. Needham state in a conclusory fashion that Donald Palmer was depressed and unhappy after his divorce and that he had been hospitalized.

Although he had the mother's letter regarding Petitioner's history, none of this specific information was presented by counsel in Ms. Needham's testimony. In short, Defense counsel offered no specific corroborating evidence to support the primary theory of mitigation.

At the outset of his opening statement at the Mitigation phase, Mr. Nichelson confessed

54

to the jury: "last night when I should have been making my notes for this opening statement, I was watching the television as to the earthquake in California, so my notes are not extensive and my comments are not extensive." (Joint App. Vol IV, Mitigation Tr. p. 12). Mr. Nichelson's candid admissions are supported by the record before this Court which reflects a failure of constitutionally adequate preparation and resulting prejudice to Petitioner.

In fact, counsel's decision to present Petitioner's ex-wife, Cammy Palmer, actually caused irreparable harm to his client's mitigation efforts. When the decision was made to call Cammy Palmer, trial counsel was or should have been aware that, during those divorce proceedings, Cammy Palmer had filed an affidavit with the Belmont County Court of Common Pleas, stating under oath that Petitioner had: repeatedly physically abused her; threatened to kill her; physically abused and beaten her children; repeatedly sexually molested and sexually abused her children; threatened to kill and bury her daughter; threatened to blow up Cammy's car and burn down her house. All of this information came in without counsel's objection. (Nichelson Tr. Vol. I, pp. 46-48; Joint App. Vol. IV, Mitigation Tr. pp. 122-123).

Indeed, it was initially raised by defense counsel during his direct examination of Cammy Palmer. It is difficult to conceive of any information that could have more effectively doomed Petitioner's efforts to receive a sentence less than death. Where counsel creates a more damaging image of his client than the prosecution, constitutional ineffectiveness is present and prejudice should be presumed. See *Rickman v. Bell,* 131 F.3d 1150, 1156-1157 (6th Cir. 1997). All of these factors show that under the *Slack* analysis jurists of reason would find it debatable whether Palmer received effective assistance of counsel.

    (a)    **Procedural Default as to 15.22 is Subject to Fair Debate Under *Slack*.**

As to 15.22 alone, the Magistrate Judge finds that the claim has been procedurally defaulted.  As he does no analysis under *Slack,* he makes no specific finding that the issue of procedural default is not subject to fair debate by reasonable jurists.  As Petitioner demonstrated in his Motion, the procedural default as to this claim is indeed subject to such fair debate.

The basis for the District Court's procedural default determination was that Palmer allegedly violated a state procedural rule that post conviction claims be supported by evidence outside the record. One problem with this analysis is that Ohio's Post Conviction statute (R.C. §2953.21(A) (1)) clearly indicates that the purported evidentiary requirement is directory not mandatory because it uses the terms "may file a supporting affidavit and other documentary evidence in support of the claim for relief." Another problem with the analysis is that the last state court to deal with this claim found not that the claim was defaulted, but that the claim was not sufficiently documented. The Ohio Court of Appeals decided on the merits that Petitioner had no right to such an expert since he had presented insufficient evidence to establish the need for such an expert. (Joint Appendix pp. 2480, 2483-2484). Thus, the state court of appeals looked at the merits of the claim and decided Palmer did not meet his burden of production or, ultimately, his burden of persuasion. As a consequence jurists of reason would find it debatable whether these claims are defaulted.   Consequently, the Court should issue a Certificate of Appealability as to claims 15.14 and 15.22 on both the merits issue and the procedural default issue.

> **(vii)    Claim 15.15 - Failure to Object to Numerous Instances of Prosecutorial Misconduct During the Penalty Phase**.

The Magistrate Judge recommends against granting an appeal as to this claim by simply noting that he made no recommendation for a certificate as to the underlying merits and essentially incorporates his discussion regarding Petitioner's Third Ground for Relief and its sub-claims. (Doc. 128, p. 20). Petitioner demonstrates above under the Third Ground for Relief that the pervasive and highly prejudicial nature of the prosecutorial misconduct, designed as it was to inflame the passions of the jury, does raise serious constitutional issues regarding which reasonable jurists can engage in fair debate. Rather than repeat those arguments here, Petitioner respectfully refers the Court to the discussions of the sub-claims under the Third Ground for Relief.

**(viii)    Claim 15.16:  Failure to Object to Erroneous Jury Instructions.**

Petitioner contends that trial counsel were constitutionally ineffective in their failure to object to erroneous instructions regarding an unanimity requirement for any life verdict and the charge that the jury had to first resolve whether a sentence of death should be imposed.  In his argument on the merits of the underlying claim regarding the unanimity instruction, Petitioner has demonstrated an entitlement to appeal applying the appropriate *Slack* standards.  Petitioner respectfully refers the Court to that discussion of his Twelfth Ground for Relief above which demonstrates a legitimate dispute regarding violation of Petitioner's constitutional rights under *Mills*.

The Magistrate Judge recommends denial of appeal of this claim finding that neither its procedural default finding nor the merits are subject to fair debate.  (Doc. 128, p. 20).     As discussed above, the Court previously found that Respondent failed to oppose Petitioner's

57

motion for Summary Judgment that this claim was not defaulted. (Report and Recommendation, Doc. 50, pp. 13-14). Such a failure by the Respondent itself constitutes a waiver of that defense.

> [Defendant] has waived these affirmative defenses by not asserting them in its
>
> own motion for summary judgment and, more importantly, by not asserting them
>
> in its opposition to the [plaintiff's] motion for summary judgment.

*United Mine Workers of America 1974 Pension Trust v. Rawl Sales and Processing Co.,* 793 F.Supp. 339, 344 (D.D.C. 1992), aff'd 984, F.2d 469 (D.C. Cir. 1993), *cert. denied,* 509 U.S. 924 (1993). This waiver occurs even where the defense is raised in the answer. *Id.* 793 F.Supp. at 344. In affirming that holding the D.C. Circuit explained, "[a]s a general rule the failure to raise an affirmative defense in opposition to a motion for summary judgment constitutes an abandonment of that defense." *United Mine Workers of America 1974 Pension Trust,* 984 F.2d at 478. Thus, the defense has been waived, and, contrary to the Magistrate Judge's suggestion, cannot be revived.

In adopting the Supplemental Report and Recommendation regarding Petitioner's motion for summary judgment the District Court made a finding that this claim was not procedurally defaulted. (Doc. 61). In conflict with the prior ruling, the Report and Recommendation erroneously concludes that this claim is procedurally defaulted. Even if the Respondent had not waived this procedural defense (which under the applicable case law it clearly has) the conflicting decisions of this Court regarding the procedural default issue is alone sufficient to meet *Slack.* A Certificate of Appealability should thus issue on both the procedural issues and merits of this claim.

58

**(ix)    Claims 15.17 and 15.18 - Failure to Object to Cross-examination by the State of Defense Witnesses Concerning Other Acts Evidence. Failure to Object to the Introduction of an Affidavit Filed by Petitioner's Wife in Divorce Proceedings. (Advanced Together).**

As outlined in Claim 3 supra, the prosecution elicited a virtual smorgasbord of other acts evidence. Petitioner respectfully refers the Court to the the arguments and record set forth in Claim 3 that the other acts evidence was `improper, undisputably prejudicial and that its cumulative effect denied Palmer a fair trial.

The Magistrate Judge concludes that objections by the counsel would have been without merit because the door to that line of questioning had been by Petitioner's witnesses. The Magistrate Judge suggests that no Supreme Court authority supports Petitioner's position and thus the issue is not subject to fair debate under *Slack.* (Doc. 128, pp. 20-21). He is in error.

The Magistrate Judge overlooks the fact that it was trial counsel who theoretically opened the door to such a disastrous line of questioning. During divorce proceedings that predated Mr. Palmer's trial, Cammy Palmer had filed an affidavit with the Belmont County Court of Common Pleas, stating under oath that Petitioner had: repeatedly physically abused her; threatened to kill her; physically abused and beaten her children; repeatedly sexually molested and sexually abused her children; threatened to kill and bury her daughter; threatened to blow up Cammy's car and burn down her house. All of this information came in without counsel's objection. (Nichelson Tr. Vol. I, pp. 46-48; Joint App. Vol. IV, Mitigation Tr. pp. 122-123).

Indeed, it was initially raised by defense counsel during his direct examination of Cammy

59

Palmer.  It is difficult to conceive of any information that could have more effectively doomed Petitioner's efforts to receive a sentence less than death. Where counsel creates a more damaging image of his client than the prosecution, constitutional ineffectiveness is present and prejudice should be presumed. See *Rickman v. Bell,* 131 F.3d 1150, 1156-1157 (6th Cir. 1997).

Petitioner has offered substantial authority that trial counsel's failure to oppose such lines of questioning fell below the *Strickland* performance standard. Petitioner was prejudiced by the admission of the other act evidence in that, there is a reasonable probability that the result would have been different in the penalty phase had the other act evidence not been placed before the jury. Under such circumstances, Palmer has made a substantial showing of the denial of his constitutional right to effective assistance of trial counsel.  All of these factors show that under the *Slack* analysis jurists of reason would find it debatable whether Palmer received effective assistance of counsel. Thus, a Certificate of Appealability should issue with respect to Claims 15.17 and 15.18.

> **(x)** **Claims 15.19-15.20:  Failure to obtain a mitigation specialist to assist with mitigation phase. Failure to request the services of a toxicologist or pharmacologist during guilt phase to explain the effect of alcohol and cocaine withdrawal on Petitioner's ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of law.  (Advanced Together).**

Even though the Court found that Respondent had raised no procedural default defense with respect to these claims (Docs. 50, 56 and 61), the Court reversed that decision when it made its merits ruling.  In his recommendation, the Magistrate Judge repeats the procedural default conclusion and incorporates the same procedural default analysis for denying appeal as he discussed with respect to claims 15.3 and 15.20.  (Doc. 128, p. 22).  Petitioner has addressed that

60

procedural default analysis and demonstrated under *Slack* that the procedural default issue itself is subject to debate among reasonable jurists.

In the present habeas proceedings, the Magistrate Judge expressly found that that no procedural default defense was raised as to this claim. (Report and Recommendation, Doc. 50, p. 10; and see Supplemental Report and Recommendation 56). Both of theses Reports and Recommendations were affirmed by the District Judge. (Decision and Entry, Doc. 61). The Magistrate Judge correctly stated in his Report that "Petitioner's Motion [for Summary Judgment] plainly challenges Respondent to set forth clearly where procedural default is claimed and to show why summary judgment is not justified." (Doc. 50, p.10) In fact, the Respondent did not file any objection to the Magistrate Judge's conclusion that ***no procedural default defense had been raised with respect to Claim 15.3 ,*** or any of the other claims listed in that Report. (See Respondent's Objections to March 4, 2002 Report, Doc. 52, p. 2, where Respondent does not list Claim 15.3 as among the objections she asserts to the Magistrate Judge's Report). Consistent with Rule 72 the defense is thereby waived. The Magistrate Judge, therefore, is in error when he states the claim was raised in the Return of Writ as to 15.3.

It is important to note that, in his Supplemental Report and Recommendation, the Magistrate Judge concluded,

> When Respondent opposed Petitioner's Partial Summary Judgment Motion, she did not even mention the ineffective assistance of trial counsel claims (See Doc. No. 133) not even to the point of incorporating by reference the assertions made in her Return of Writ. . . . It is not enough when faced with a motion in Federal Court to remain silent and then expect the Court to hypothesize a present opposition from the content of an earlier pleading. It frequently happens that parties plea claims or defenses in the hope that something will develop to support them, but summary

> judgment practice is the "fish or cut" bait time: if you persist in
> your claim or defense, you must show that you are entitled to
> litigate it further.

(Supplemental Report and Recommendation, Doc. 56, pp. 2-3).  No objection was filed to this

Report which was ultimately affirmed by the Court.  Such a failure by the Respondent itself

constitutes a waiver of that defense.

> [Defendant] has waived these affirmative defenses by not asserting them in its
> own motion for summary judgment and, more importantly, by not asserting them
> in its opposition to the [plaintiff's] motion for summary judgment.

*United Mine Workers of America 1974 Pension Trust v. Rawl Sales and Processing Co.,* 793

F.Supp. 339, 344 (D.D.C. 1992), aff'd 984, F.2d 469 (D.C. Cir. 1993), *cert. denied,* 509 U.S. 924

(1993).  This waiver occurs even where the defense is raised in the answer.  *Id.*  793 F.Supp. at

344.   In affirming that holding the D.C. Circuit explained, "[a]s a general rule the failure to raise

an affirmative defense in opposition to a motion for summary judgment constitutes an

abandonment of that defense." *United Mine Workers of America 1974 Pension Trust,* 984 F.2d at

478.  Thus, the defense has been waived, and, contrary to the Magistrate Judge's suggestion,

cannot be revived.  Thus, under *Slack* a Certificate of Appealability should issue to review the

Court's contradictory rulings on this procedural issue.

As Petitioner previously noted, another problem with the Magistrate Judge's analysis

regarding procedural default is that Ohio's Post Conviction statute (R.C. § 2953.21(A)(1)) clearly

indicates that the purported evidentiary requirement is directory not mandatory because it uses

the terms "may file a supporting affidavit and other documentary evidence in support of the claim

for relief." Another problem with the analysis is that the last state court to deal with this claim

found, not that the claim was defaulted, but that the claim was not sufficiently documented. The

62

state trial court found that this issue hand already been raised on direct appeal. (Joint Appendix p. 2300). This issue was presented to the Court of Appeals as part of Assignments of Error II, IV, and V. (Joint Appendix p. 2324). The Court of Appeals decided on the merits that Petitioner had no right to such an expert since he had presented insufficient evidence to establish the need for such an expert. (Joint Appendix pp. 2480, 2483-2484). Thus, the state court of appeals looked at the merits of the claim and decided Palmer did not meet his burden of production or, ultimately, his burden of persuasion. Hence there is no default. As a result, jurists of reason would find it debatable whether the district court's procedural ruling was correct. Therefore, Petitioner respectfully requests that the Court issue a Certificate of Appealability as to Claims 15.19 and 15.20.

The Magistrate Judge does not directly address the issue of whether the merits of these claims are subject to appeal under the *Slack* analysis because he recommends denial of the certificate on procedural default grounds. Petitioner has demonstrated that the procedural default issue itself is subject to appealability under *Slack*. Accordingly, he will address appealability of the merits of the claims below.

Defense counsel made no formal effort to obtain any death penalty mitigation specialist. The only witness called by counsel to address in any substantive way Petitioner's history of drug and alcohol abuse and its significance with respect to the shootings was Newton Jackson, Ph.D. (Nichelson Tr. Vol. 1, p. 59).

At the time Defendant's counsel retained Dr. Jackson as their mitigation expert, they had formulated a theory of the case for both the guilt phase and mitigation that would focus on the issue of Mr. Palmer's history of drug abuse and the effect of drug and alcohol abuse had on Mr.

Palmer's culpability at the time of the shootings. (Nichelson Tr. Vol. I, pp 27-28, Vol. II, pp. 13-14). Defense counsel made this decision to hire Dr. Jackson although they were unaware that he had any particular expertise in the psychological effects of drug and alcohol abuse. They were familiar only with what was contained in his C.V. (Nichelson Tr. Vol. 1, p. 34). In fact, Dr. Jackson's C.V. confirms that he lacks any expertise with drug or alcohol addiction. (See Nichelson Trial Notebook, Petitioner's Ex. 2, Bates pp. 385-392).

Given Jackson's lack of expertise, it is important to emphasize that the defense team did not give Dr. Jackson any specific directions to speak with anyone to develop and confirm Petitioner's substantial history of psychological disorders and related drug and alcohol abuse. (Nichelson Tr. Vol. 1, pp. 31-32). As it happens, neither defense counsel nor Dr. Jackson spoke with any health care provider or representatives of hospitals that had previously treated Petitioner for drug or alcohol abuse, suicide attempts and depression. (Id. at 30-32). This is so in spite of defense counsel's concession that it was their duty as counsel to assure that Dr. Jackson had properly developed evidence to support their mitigation theory. (Id. at p. 59).  The record before this Court demonstrates that counsel failed in this duty. Having failed to instruct Dr. Jackson or otherwise direct him to speak with people with relevant knowledge regarding Petitioner's psychological history, Dr. Jackson spoke with no one other than defense counsel and Donald Palmer. (See Dr. Jackson's time records, Petitioner's Ex. 1, Bates pp. 58-59; Nichelson Tr. Vol. 1, pp. 35-36).[1]  Having spoken with no relevant medical care providers, Dr. Jackson's testimony consisted of almost entirely of simply repeating what he was told by Mr. Palmer. While Dr.

---

[1]Mr. Nichelson confirmed that this represented the entire billing they received from Dr. Jackson for work he performed on the case. (Nichelson Tr., Vol. 1, p. 35).

Jackson did testing to arrive at a diagnosis of borderline personality disorder and mentions Petitioner's turning to abuse of alcohol and drugs, he fails to make any substance abuse diagnosis. (Joint Appendix Vol. IV, pp. 85-86). In fact, the opinion elicited by defense counsel ultimately harms Petitioner's chance of mitigation. After asking Dr. Jackson to recount his findings, Mr. Nichelson then asked Dr. Jackson to agree that Petitioner does not meet the legal criteria for criminal insanity. Additionally, he asked the following two questions which, on their face, totally undercut the mitigation interest of his client:

> Q:    And we are not saying that Donald Palmer is criminally insane.
>
> A:    No. I do not believe he meets the legal criteria for that definition.
>
> Q:    By the same token, ***we are not saying that this is something that absolutely mitigates against penalties in this type of case either, are we?***
>
> A:    I'm not sure I understood that question.
>
> Q:    Okay. Let me rephrase that. ***This is not something that falls squarely within the mitigating categories of the law in capital cases as well, is it?***
>
> A:    ***No. This diagnosis is not of itself a mitigating factor. . .***

(Id., pp. 86-87).  (Emphasis added).

When asked about those questions and the responses elicited, Mr. Nichelson could not recall asking the questions or why he would have asked them. He did agree that the questions as framed may have confused the jury into thinking that he wasn't offering Dr. Jackson's diagnosis as a mitigating factor in his death penalty case. (Nichelson Tr., Vol. 1, pp. 50-51).  As mentioned, Dr. Jackson is not asked to make a diagnosis of substance abuse, in spite of the fact that that diagnosis had been made nearly two years prior to the shootings at issue in this case. (See Joint

Appendix Vol. IV, Mitigation Tr., pp. 85-86). Nor does Jackson address in any way Petitioner's history of serious depression or the interplay of his psychological disorders and substance abuse on his actions which lead to the shootings of Mr. Vargo and Mr. Sponhaltz. (Id. at pp. 86-89).

Although Dr. Jackson mentions that he has reviewed Petitioner's prior medical records relating to his psychological disorders, defense counsel does not ask him to provide any detailed description of those records nor do they offer those records into evidence. (See Joint Appendix, Vol. IV, Mitigation Tr., p. 135). In response to the Judge's request about whether they have any exhibits to introduce, Mr. Nichelson replies, "we do not."

Had the defense counsel offered the medical records from the Ohio Valley Medical Center, the jury would have learned that medical professionals, not hired by the defense to render an opinion in a mitigation hearing, had, two years before the killings, diagnosed Petitioner with borderline personality disorder and substance abuse–multiple drugs. Although these records were in Mr. Nichelson's file at the time of the mitigation hearing, they were never offered into evidence. (See Petitioner's Ex. 2, Trial Notebook, Bates pp. 405-442). Additionally, if defense counsel had met their duty to obtain the proper expert testimony from one who has expertise with the interplay of psychological disorders and substance abuse, the jury would have received much more relevant information in mitigation. In this regard, Petitioner attaches the affidavit of Robert Smith, Ph.D., who has considerable experience in forensic psychology with an expertise in substance abuse. Dr. Smith reviewed medical records that were available at the time of the mitigation hearing. He also reviewed the mitigation hearing transcript. He concludes that counsel failed to give proper direction to Dr. Jackson. He further offers the following relevant opinions:

12. Based upon my review of Mr. Palmer's history as set out in his

66

medical records and described above confirming his history of drug addiction, and given Mr. Palmer's testimony regarding drug and alcohol use, especially drug and alcohol use around the time of the killings at issue in this case, it is my opinion, within a reasonable degree of scientific probability, that Mr. Palmer's mental status was affected by the use of drugs and alcohol around and immediately preceding the time of the killings. His substance abuse interacted with his mental health disorders of depression and borderline personality disorder.

Each of these disorders alone was sufficient to significantly impair Mr. Palmer's perceptions and behavior at the time of the offense. In combination, these disorders had a multiplicative effect. Each disorder exacerbated the effects of the other. Mr. Palmer's depressive symptoms and Borderline Personality traits were magnified by the effects of the alcohol, causing him to be even more impulsive, irritable, emotionally labile and illogical. His ability to interpret interpersonal interactions was impaired, leading to misperceptions regarding the intentions of others. The combined effect of these disorders was impairment in Mr. Palmer's cognition, labile and unstable mood and an inability to appreciate the nature and consequences of his actions.

(Affidavit of Robert L. Smith, Ph.D.).

Additionally, counsel was ineffective in presenting any helpful explanatory information that would assist the jury at both phases of the case. Ultimately, this was due to the failure of defense counsel to meet their obligations. As Dr. Smith states,

13. In spite of the fact that this information regarding this affect of alcohol and drugs on Mr. Palmer's ability to appreciate the nature and consequences of his actions at the time of the killings was available to the defense counsel at the time of guilt and penalty phases of his trial, neither defense counsel nor the one expert retained by defense counsel, Newton L. P. Jackson, Jr., Ph.D., presented any helpful explanatory information that would assist the jury in understanding this affect.

14. For example, defense counsel and their expert should have informed the jury at the mitigation hearing of Plaintiff's detailed history of drug abuse and its interplay with his substantial

67

consumption of nearly an entire fifth of Southern Comfort whiskey at the time of the killings. The records also disclose that Mr. Palmer consumed LSD at approximately 7:00 p.m. on the evening before the shootings and had been taking cocaine on a near daily basis. On the date of the shootings, sometime after 2:00 p.m., Mr. Palmer purchased and consumed most of a fifth of Southern Comfort. Mr. Palmer's co-defendant, Eddie Hill, testified in a suppression hearing that Mr. Palmer drank the entire fifth of Southern Comfort by himself. Given Mr. Palmer's height and weight at the time of the killings, approximately six feet and 165 pounds, the effect the alcohol would have had on Mr. Palmer at the time of the shootings would include impaired motor control, impulsivity, poor judgment, difficulty with decision-making, mood swings, distorted perceptions and impaired memory. This information would have been significant at the mitigation phase since it demonstrates a significantly diminished capacity to appreciate the consequences of his acts on the day of the shootings.

15. It appears form the records I have reviewed that Dr. Jackson did nothing to develop mitigation evidence other than to speak with the Defendant, Donald Palmer. Based upon my experience in consulting and testifying in cases such as this, the attorney for the Defendant typically insures that the mitigation experts have spoken with friends, family members, teachers, treatment professionals, witnesses, etc. who would have relevant knowledge regarding the Defendant's psychological status, including his history of drug and alcohol abuse.  Additionally, the attorney would typically provide the expert with all relevant medical, psychological and school records and present these to the jury to support the expert's opinion. In addition, the expert may discover additional records that he/she may request the attorney to acquire. In this case, no medical, school, etc. records were presented to the jury at mitigation. As mentioned, these records would have been important to properly inform the jury of Mr. Palmer's mental health condition at the times of the shootings, as well as to properly inform the jury of Mr. Palmer's developmental history as it relates to his actions at the time of the shootings.  Neither the defense counsel nor Dr. Jackson presented to the jury any independent medical records which would have confirmed, for example, that Mr. Palmer suffered from drug addiction, exacerbated by alcohol abuse, and was also suffering from depression at the time of the shootings at issue.

68

(Affidavit of Robert L. Smith, Ph.D.,).

Counsel's failure to meet minimum standards of conducting some investigation into available evidence, operates to deny Petitioner his constitutional right to effective assistance of counsel and underminds the fundamental fairness of the jury's imposition of the death penalty. *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999) (trial counsel's failure to investigate and present records showing that the defendant was not the trigger man in a prior murder conviction, even though "slim evidence of mitigation" should have been presented to the jury).[2]

In this case, counsel failed to even seek an expert knowledgeable in the field of alcohol and drug abuse. They failed otherwise to fully investigate these issues and properly present them to the jury for consideration at mitigation although all of the information above was available to them at the time of mitigation. Given the fact that the affect of the drug abuse and alcohol abuse on Petitioner's culpability was the focus of the defense and mitigation at a relatively early stage of the proceedings, such a failure rises to the level of constitutionally ineffective assistance of counsel, undercutting the reliability of both the guilt phase and mitigation phase verdicts. *Skaggs v. Parker,* 235 F.3d 261, 271-272 (6th Cir. 2000). Petitioner has thus established both prongs of the *Strickland* test. That is, counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment and this deficient performance prejudiced Petitioner by depriving him of trial whose result is reliable. *Strickland v. Washington*, 466 U.S. at 687. Given the deficiencies of counsel described above and in light of the affidavit of Dr. Smith,

---

[2]Although the Court found that trial counsel's ineffectiveness had been waived, that ineffectiveness played a part in the Court's decision to find appellate counsel ineffective, in part for failing to investigate and present corroborating mitigation evidence. *Id.* at 427.

Petitioner has established a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." (Id., 466 U.S. at 694). The state court's failure to find that Petitioner's trial counsel rendered ineffective assistance of counsel during the guilt phase clearly constitutes an unreasonable application of the conclusions of law announced by the Supreme Court in *Strickland*.

It is apparent that Petitioner's state trial counsel really did nothing to investigate his psychological history and background, especially as it was affected by his family circumstances. The only mitigation expert retained by defense counsel relied entirely on information he obtained from Mr. Palmer. As this Court is aware,

> The sole source of mitigating factors cannot properly be that information which Defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility.

*Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000). That is precisely what happened in this case with respect to the primary focus of mitigation, i.e., Plaintiff's psychological disorders affected by drug and alcohol abuse mitigating the killings at issue. Dr. Jackson relied entirely on his conversations with Plaintiff. The medical records he referred to were not offered in evidence, nor were any of Mr. Palmer's treating medical providers that were interviewed offered as witnesses. Counsel's failure to properly investigate and present mitigating evidence which was readily available to them at the time of trial and mitigation falls below the objective standard of reasonableness required under the Sixth and Fourteenth Amendments. *Carter,* 218 F.3d at 596.

As the Supreme Court has held, "it is undisputed that [Petitioner] had a right–indeed, a constitutionally protected right–to provide the jury with the mitigating evidence that his trial

counsel either failed to discover or failed to offer." *Williams v. Taylor*, 529 U.S. 362, 393 (2000).

In *Williams*, the Supreme Court found that counsel did not begin to prepare for the mitigation

phase of the proceedings until a week before trial and failed to conduct an investigation that

would have uncovered extensive records that went directly to the mitigation issues in that case.

*Id*., 529 U.S. at 395. Similarly, in this case, trial counsel failed to present any of Petitioner's

actual treatment records, nor did they offer testimony of medical care providers who had treated

Petitioner for his previously diagnosed borderline personality disorder and multiple drug

substance abuse. No evidence was offered to explain the interplay between Petitioner's

psychological disorders, his substance abuse, and his drinking of an entire bottle of whiskey

immediately preceding the killings. This, no doubt, is a part of counsel's failure to adequately

prepared by retaining the appropriate expert and by properly giving that expert direction. Like

counsel's failures in *Williams* and *Carter*, the failure of Mr. Palmer's counsel to develop and

present appropriate expert testimony and existing records regarding Mr. Palmer's pre-existing

psychological disorders prejudiced Petitioner within the meaning of *Strickland*. As the Court held

in *Williams*, the state court's contrary conclusions are objectively unreasonable. *Williams*, 529

U.S. at 397. Petitioner has demonstrated above that jurists of reason would find it debatable

whether Palmer was denied his right to the effective assistance of trial counsel as to the merits of

claims 15.19 and 15.20. Petitioner has further shown that the Court's ruling with respect to the

procedural default issues relating to these claims are likewise subject to fair debate by reasonable

jurists. Accordingly, the Court should grant a Certificate of Appealability as to both procedural

and merits issued relating to these claims.

**8.      Seventeenth Claim for Relief: INEFFECTIVE ASSISTANCE OF**

### APPELLATE COUNSEL

**(i)    Claim 17.7**

The Report and Recommendation indicates that the requested certificate should denied as to Claim 17. 7. Petitioner objects for the following reasons. First, the R & R provides no authority for the proposition that there is an Ohio procedural rule requiring a defendant to raise claims that rely in part on evidence outside the record in post conviction proceedings. That is because there is none. Second, Ohio R. App.P. 26(B)(2)(e) permits an applicant to file "supplemental affidavits" in support of the application. Third, under Ohio R. App.P. 26(B)(8) the court of appeals is authorized to hold an evidentiary hearing. These factors lead to the conclusion that Ohio R. App.P. 26(B)(2)(e) and (8) provide a mechanism for evidence into the record after conviction outside R.C. 2953.21. Thus, the rationale on which the R & R disposes of the claim is contradicted by express Ohio law. As such jurists of reason would find the ruling debatable.

**(ii)    Claim 17.9**

The R & R indicates that there is no authority for the proposition that the rule of lenity has ever been applied retroactively in Ohio to reduce the sentence in cases pending on direct appeal. Initially, Petitioner would note that whether or not the rule of lenity has been applied retroactively <u>in Ohio</u> is irrelevant. (Emphasis added). The question is whether the federal constitution requires application of the rule of lenity. The rule of lenity has been applied by the United States Supreme Court, the Ohio Supreme Court and is codified in the Ohio Revised Code. Petitioner submits that Due Process requires that he get the benefit of a favorable sentencing option that was not available to him at the time of his original sentence but was available while he was on direct appeal.

72

The R & R indicates that there is no authority for the proposition that appellate counsel rendered ineffective assistance when they fail to argue that the rule of lenity should be applied retroactively in Ohio to reduce the sentence in cases pending on direct appeal.  Nathan Ray was direct appeal counsel. Nathan Ray was state post conviction counsel. Even though this claim does not rely upon evidence de hors the record Nathan Ray raised this claim in post conviction proceedings. At the evidentiary hearing, Ray provided no reason why the claim was not raised on direct appeal. As a consequence, whether or not (defective) strategy was involved is not an issue. Under ABA Guideline 10.8, appellate counsel had a duty to assert claims in the appropriate forum at the appropriate time.  Here, Ray failed to do that his performance was deficient. Had Ray performed properly, this claim would have been brought at the proper time and in the proper forum. As set out below, Petitioner was prejudiced by Ray's failure to properly assert this claim.

The R & R indicates the it is not an unreasonable application of federal law for the Ohio Supreme Court to find that it is not ineffective assistance of appellate counsel to argue that the rule of lenity should be applied retroactively in Ohio to reduce the sentence in cases pending on direct appeal.  It may be fairly said to be a presupposition of our law to resolve doubts in enforcement of a penal code against the imposition of harsher punishment. Bell v. United States (1955), 349 U.S. 81.  The General Assembly has expressly incorporated the rule of lenity into the statutory framework of Ohio's criminal justice system. State v. Best, Mahoning App. No. 04 MA 203, 2005-Ohio-4375 at ¶44-46; State v. Quisenberry (1994), 69 Ohio St.3d 556, 557. Under R.C. 2901.04(A) sections of the Revised Code defining penalties shall be strictly construed against the state and liberally construed in favor of the

73

accused. Since LWOP is arguably more advantageous to a defendant than a death

sentence it is an unreasonable application of federal law for an appellate lawyer to not

seek liberal construction of sentencing statutes in favor of a defendant. Thus, the Court

should issue a certificate of appealability.

**(iii)    Claims 17.12 and Claim 17.13**

Petitioner relies on the arguments set forth with respect to Claim 17.7, presented above,

to establish that a certificate of appealabilty should issue as to Claims 17.12 and 17.13.

**D.    CONCLUSION**

For the reasons set forth above, Petitioner respectfully requests that the overrule the

Report and Recommendation and that the Court issue a certificate of appealability as to his

constitutional claims identified in 2, 3.2, 3.3, 3.4, 3.5, 3.9, 3.10, 3.14, 3.17, 3.19, 3.20, 4, 6, 8, 9,

10, 12, 15.3, 15.6, 15.8, 15.9, 15.10, 15.11, 15.12, 15.13, 15.14, 15.15, 15.16, 15.17, 15. 18,

15.19, 15.20, 15.22, 17.7, 17.9, 17,12 and 17.13

Respectfully submitted,

s/ Keith A. Yeazel

_____

KEITH A. YEAZEL (0041274)
65 SOUTH FIFTH STREET
COLUMBUS, OHIO 43215
(614) 228-7005
yeazel@netwalk.com
TRIAL ATTORNEY FOR
PETITIONER

s/ Michael O'Hara

_____

MICHAEL O'HARA (0014966)
O'HARA, RUBERG, TAYLOR,
SLOAN & SERGENT
25 Crestview Hills Mall Road, St.201
Crestview, Kentucky 41017
(859) 331-2000
(859) 578-3365 (facsimile)
mohara@ortlaw.com
CO-COUNSEL FOR PETITIONER

_____

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon:

Matthew C. Hellman
Anna Franceschelli
Assistant Attorney Generals
Capital Crimes Division
30 East Broad Street, 23rd Floor
Columbus, OH 43215

utilizing the CM/ECF system, this 16th day of October, 2006.

_____

s/ Keith A. Yeazel
KEITH A. YEAZEL

75